UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil No. 19-____-P-_

JOHN DOE,                              )
                                       )
                    Plaintiff          )
                                       )
            v.                         )
                                       )
UNIVERSITY OF MAINE                    )
SYSTEM and DAVID FIACCO,               )
                                       )
                    Defendants         )

## COMPLAINT

Plaintiff John Doe complains against Defendants University of Maine System and

David Fiacco as follows:

### PARTIES AND JURISDICTION

1.      Plaintiff John Doe is a resident of Farmington, Maine.

2.      Defendant University of Maine System ("UMS") operates a system of public

post-secondary educational institutions, including the University of Maine at Farmington

("UMF"), located in Farmington, Maine.

3.      UMS operates public educational institutions that receive federal funds,

making it subject to the requirements of Title IX of the Education Amendments of 1972,

20 U.S.C. § 1681 et seq. ("Title IX").

4.      UMS is a state actor and its actions are taken under color of law.

5.      Defendant David Fiacco ("Fiacco") is the Director of Community Standards,

Rights & Responsibilities for UMS. In all of Fiacco's acts described in this complaint, Fiacco

1

was acting under color of state law and in his capacity as Director of Community Standards, Rights & Responsibilities for UMS. He is sued in his individual and official capacities.

6.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331.

## FACTS COMMON TO ALL COUNTS

7.      Plaintiff has been a student at UMF since the 2013-2014 academic year.

8.      In addition to being a student at UMF, Plaintiff has worked part-time since 2016 as a lifeguard at UMF's Fitness & Recreation Center ("FRC").

9.      In spring 2017, Plaintiff approached Bob Pederson, a UMF employee in the counseling office. Plaintiff reported that another student—a female in the same apartment as Plaintiff (referred to here as K.P.)—was being sexually aggressive toward him and using drugs.

10.     Title IX requires that, if an educational institution knows or reasonably should know about student-on-student harassment that creates a hostile environment, it must take immediate and appropriate steps to investigate or otherwise determine what occurred.

11.     In addition, once such a report of harassment is made, Title IX requires a school to protect the complainant and ensure his or her safety, including taking any interim steps pending the outcome of the investigation.

12.     In spite of these Title IX requirements, Mr. Pederson took no steps to protect Plaintiff or investigate his report. Instead, Mr. Pederson told Plaintiff to either sleep on a friend's couch or try talking directly to K.P. about the issue.

13.     Later during the spring semester 2017, K.P. raped Plaintiff.

2

14.     In or about May 2017, K.P. admitted in writing that she had raped Plaintiff. She made this admission in the following text exchange with Plaintiff:

Plaintiff:      See this is how I know you don't care you won't admit to what you did you just say you didn't mean to

K.P.:           I have admitted it [John]. I have said I did it. I raped you. And I am very very sorry. I feel awful

15.     K.P. graduated from UMF in May 2017.

16.     In October 2017, Plaintiff reported to UMF that K.P. had raped him. He made this report in person to three people: UMF's Director of Student Life (Brian Ufford), a UMF counselor (Gavin Pickering), and U. Maine Augusta's Associate Dean of Students and Title IX Investigator (Laura Rodas).

17.     Despite Plaintiff's report that he had been raped, none of the three UMS employees commenced an investigation or took any steps to provide Plaintiff with options or guidance.

18.     Plaintiff's attorney contacted UMS in late October 2017 to demand action on his report, but UMS took no action in response.

19.     A UMF employee, Amie Parker, called Plaintiff concerning the report. She told him there was nothing UMS could do in response to his report as K.P. already had graduated.

20.     During September 2017, Plaintiff was dating another female student, referred to as M.P. The two of them had been dating since spring 2016.

21.     Their relationship was so close that M.P.'s family invited Plaintiff to spend the 2016 Christmas recess with them at M.P.'s grandparents' home in Vermont.

22.     M.P. spent the spring semester of 2017 in Alaska, maintaining a long-distance relationship with Plaintiff.

23.     M.P.'s mother frequently texted Plaintiff throughout spring and summer 2017, to invite him to come over for dinner, to offer to do his laundry, and to say how happy she was that he was dating her daughter.

24.     During May 2017—and both prior to and after that month—M.P. sent nude photos of herself, along with sexually-themed texts, to Plaintiff.

25.     In August 2017, M.P. texted Plaintiff repeatedly to say that she was looking forward to seeing him at school that fall.

26.     On September 27, 2017, Plaintiff had consensual sexual contact with M.P. following their return to UMF.

27.     In the days following that contact, M.P. sent multiple friendly text messages to both Plaintiff and his friends, asking how Plaintiff was doing.

28.     Unbeknownst to Plaintiff, M.P. had commenced a relationship with a new boyfriend while she was in Alaska; she felt guilty that she had engaged in sex with Plaintiff.

29.     Five days after the sexual contact, M.P. contacted the Farmington police to report, falsely, that Plaintiff had assaulted her.

30.     The district attorney chose not to proceed with any charges against Plaintiff. The Farmington Police determined that M.P.'s guilt about having another boyfriend had caused her to accuse Plaintiff falsely. Both sides agreed to enter into Protection From Abuse ("PFA") orders in civil court on October 11, 2017.

31.     Although UMF had failed to initiate any investigation of Plaintiff's reports that he had been sexually harassed by K.P., UMF did initiate a Title IX investigation of M.P.'s false allegations against Plaintiff.

32.     Throughout the Title IX investigation, M.P. told UMF that she wanted UMF to give her "justice," because she could not get the court to do what she wanted.

33.     M.P.'s attorney, Nicole Bissonnette, encouraged Laura Rodas, UMF's Title IX investigator, to trap Plaintiff by suggesting she request the nude photos M.P. had sent him, even though the PFA orders prevented Plaintiff from showing them to anyone.

34.     In November 2017, another female UMF student (referred to as B.L.) contacted Ms. Rodas about the case. She made various allegations against Plaintiff, but provided no evidence. Ultimately, Ms. Rodas found B.L. not to be credible.

35.     Brian Ufford, UMF's Director of Student Life, asked Plaintiff about B.L. Plaintiff stated that he had only been in the same room with B.L. in two locations: one was at the FRC pool, where he worked as a lifeguard, and the other was at UMF dance club practices. At both locations, many other individuals were present and Plaintiff had not so much as touched B.L.

36.     Plaintiff also told Mr. Ufford that B.L. had been sexually aggressive toward him, including coming on to him at the FRC pool and suggesting that he meet her in the woods for sex. Plaintiff said he had texts that could prove these facts.

37.     Repeating his prior conduct in response to Plaintiff's report concerning K.P., Mr. Ufford again failed to commence a Title IX investigation against B.L. Instead, he told Plaintiff not to worry and said it was not necessary for Plaintiff to provide the texts.

Although Mr. Ufford instituted a No Contact Order between B.L. and Plaintiff, he did nothing further.

38.     Although M.P. alleged that she had concerns about Plaintiff returning to campus for the 2017-2018 academic year, Plaintiff's attorney pointed out to Ms. Rodas that M.P. had sent nude photos and sexual texts to Plaintiff, then told him in August 2017 how much she was looking forward to seeing him on campus that fall.

39.     M.P.'s mother also lied, telling Ms. Rodas that she had had concerns and problems with Plaintiff since Christmas 2016. She claimed that she had rarely texted him. Plaintiff's attorney intervened, sharing with Ms. Rodas the dozens of texts that M.P.'s mother had sent to Plaintiff through July 2017, many of which invited him over for dinner.

40.     M.P.'s roommate testified during the investigation that M.P. had felt guilty and worried about what other people would think if they found out that she had been cheating on her new boyfriend with Plaintiff.

41.     M.P. also lied to Ms. Rodas about her former boyfriend, asserting that (a) he was never abusive toward her, (b) he had never assaulted her, and (c) she had never wanted a protection from abuse order against him. Plaintiff proved all of these statements false by providing Ms. Rodas with texts that M.P. had sent him.

42.     Ms. Rodas estimated that she spent 100 hours on the case before issuing her decision. In the end, she was not fooled by M.P.'s story. On December 15, 2017, based on all the evidence provided—including M.P.'s multiple friendly texts to Plaintiff after the sexual encounter, as well as M.P.'s admission that Plaintiff had asked for and received her ongoing consent during their sexual encounter—Ms. Rodas issued her finding that Plaintiff

6

was "Not Responsible" on M.P.'s allegations of sexual harassment, sexual assault, dating violence, and causing fear of physical harm.

43.    Ms. Rodas did make a "Responsible" finding against Plaintiff for harassment/intimidation and stalking, but did so only based on the sheer volume of calls and texts from Plaintiff to M.P. over a two-month period. Ms. Rodas's decision acknowledged that M.P. had indicated to Plaintiff that he was not a bother and could continue contacting her, but nevertheless concluded that any reasonable person should have known that such a volume of communication could adversely affect M.P.

44.    The findings from Ms. Rodas allowed Plaintiff to continue at UMF. She issued a "Deferred Sanction," instituting a "No Contact Order" between Plaintiff and M.P. for the rest of Plaintiff's time at UMF. A violation of the No Contact Order would result in a one-year suspension of Plaintiff from UMS.

45.    The decision made no mention of B.L. or her false allegations against Plaintiff.

46.    M.P. appealed Ms. Rodas's findings. Under the terms of UMS's Student Conduct Code, any requested review of the initial decision of a Title IX claim is to be heard by a Student Conduct Code Committee (the "Committee"). The Committee is composed of at least three, but no more than seven, members; the "composition of the committee shall have equitable gender representation whenever practicable."

47.    A Committee of five members met on January 29, 2018, to conduct a hearing on M.P.'s appeal of Ms. Rodas's findings. Committee members spent an average of ten hours reviewing case materials before the hearing, in contrast to the 100 hours spent by Ms. Rodas.

48.     Ignoring the rule in the Student Conduct Code concerning equitable gender representation, the Committee was comprised of four women and one man. One of the women on the Committee was clearly biased and openly hostile to Plaintiff.

49.     At the appeal hearing, M.P. repeatedly mentioned B.L., even though she had been discredited as a witness. M.P. admitted having spoken to B.L. during the week leading up to the hearing.

50.     M.P. also contended that Plaintiff had a knife during their sexual encounter, even though Ms. Rodas's decision exonerating Plaintiff had explicitly found that "there was no knife present."

51.     By this point, B.L. had filed for a PFA against Plaintiff in civil court, using the same attorney who had represented M.P. That attorney introduced evidence of B.L.'s PFA Order in M.P.'s proceedings before the Committee.

52.     At the hearing, two expert witnesses testified on behalf of M.P. Both were a surprise, as Plaintiff had no notice concerning the anticipated substance of their testimony. Plaintiff was unable to cross-examine either witness.

53.     On January 31, 2018, the Committee overturned Ms. Rodas's decision and ruled for M.P., finding Plaintiff responsible for sexual assault and causing fear of physical harm.

54.     The Committee suspended Plaintiff from the University of Maine System through May 31, 2019, prohibiting him from stepping foot on any part of the UMF campus or any campus within the UMS. It specified that his "University-initiated withdrawal" would reflect that he was withdrawn for disciplinary reasons. Plaintiff timely appealed this decision.

55.     The Student Conduct Code provides that appeals from decisions of the Committee are to be heard by "the President or his/her designee."

56.     While waiting for the appeal, Plaintiff could not enter the UMF campus, could not attend classes, and could not go to his lifeguarding job at the FRC.

57.     Five weeks later, lacking any decision on the appeal, Plaintiff's parents wrote to UMF President Katherine Foster to express their concerns. Among their concerns were the gender inequities in the university's implementation of Title IX and the creation of a hostile environment for Plaintiff.

58.     On March 23, 2018, a three-member UMF President's Panel (the "Panel") met to review Plaintiff's appeal from the Committee decision. The Panel reviewed letters, evidence, and the recording of the Committee hearing.

59.     The Panel issued a decision dated March 27, 2018. The opening paragraph of the decision decried the Committee's actions: "The panel has determined that there was a deficiency in that process."

60.     The Panel decision described how the Committee hearing had been improperly stained with evidence from B.L.:

> The introduction of the recent PFA and alleged incident with [B.L.] created a situation for which [John Doe] had been assured he would not be required to defend. While the investigator did state that [B.L.] was not credible, at no point during the recording was the Committee requested to disregard the additional information. In addition, there was no statement in the evidence from [B.L.] yet the inclusion suggested a pattern to [John's] behavior.

61.     Due to this deficiency, the Panel found Plaintiff not responsible for sexual assault.

62.     The Panel made clear that, no matter how Plaintiff and M.P.'s testimony to the Committee had differed, both agreed that the September 2017 sexual encounter was consensual: "In the testimony of the alleged incident of September 27th both parties were very different but aligned on mutual, verbal consent. By both accounts, [M.P.]'s physical actions could have been viewed as continued consent." The decision specifically cited the action M.P. took that showed consent: "[M.P.] did have the opportunity to leave and was, in fact, outside the building but opted to return . . . ."

63.     In dismissing the charge of sexual assault, the Panel reiterated its belief that the Committee hearing had been unfairly tainted: "The Panel believes that the introduction of [B.L.]'s PFA influenced the Committee's findings."

64.     The Panel also rejected the finding of responsibility on the charge of causing fear of physical harm: "There was no knife" and "no available evidence demonstrates that there were times when [John] threatened [M.P.]'s physical safety."

65.     In vacating the Committee's decision, the Panel reinstated the deferred sanction that Ms. Rodas had originally imposed.

66.     One day later, on March 28, 2018, a civil court judge threw out B.L.'s PFA case against Plaintiff, relying on the exculpatory texts and B.L.'s admission on the stand that she had lied about Plaintiff.

67.     During the 2017-2018 academic year, Plaintiff endured three Title IX hearings—the first before Ms. Rodas, the second before the Committee, and the third before the President's Panel. His entire school year was lost.

68.     Despite the resolution of M.P.'s complaint against Plaintiff, the FRC Director, Jim Toner, refused to acknowledge the decision exonerating Plaintiff and continued to prohibit Plaintiff from returning to his lifeguarding job.

69.     UMF also would not allow Plaintiff to attend BAM, a campus dance group that had provided crucial emotional support for him. UMF's Amie Parker barred him from this group, despite lacking any legitimate reason for doing so. It appears that Ms. Parker's decision was premised on protecting B.L., even though she had falsely accused Plaintiff.

70.     Although Plaintiff had nothing to hide from his friends at BAM, having refuted M.P.'s claims, his absence implied guilt to the BAM membership. They responded by blocking him on social media; gossip and slander ensued.

71.     Plaintiff's parents wrote to UMF President Katherine Foster about his exclusion from both BAM and the FRC. They stressed that B.L. had been proven a liar in court and that it was unfair to punish Plaintiff and reward B.L. for her lies. UMF did nothing in response.

72.     In June 2018, Plaintiff emailed Celeste Branham, UMF's Vice President for Student and Community Services. He asked that UMS investigate B.L. for the following violations of the Student Conduct Code:

- Interference with Code Enforcement – Interference with a complainant, witness, investigation or the carrying out of procedures defined in this Code;

- Supplying False Information – Knowingly supplying false information to employees in pursuit of their official duties or to a Committee in the course of a disciplinary proceeding, or knowingly causing false information to be thus supplied;

- Harassment and Intimidation – Unwelcome behavior that creates a hostile or intimidating working, educational, or living environment or behavior that unreasonably interferes with an individual's academic or job performance and opportunities; and

- Hazing – Any action taken or situation created by a person or an organization, or with the knowledge or consent of an organization, which recklessly or intentionally endangers the mental or physical health of a student.

73.    Ms. Branham replied to Plaintiff a few weeks later. Her response indicated that B.L. had withdrawn from UMF with no intention of returning. She claimed that UMS no longer had jurisdiction over her. On this basis, Ms. Branham wrote that UMS was concluding its investigation into B.L.'s violations of the Student Conduct Code.

74.    Plaintiff's parents continued to press UMF President Foster for compensation in connection with the long Title IX investigation. Although Plaintiff had been exonerated, he had been forced to endure campus-wide gossip and slander due to UMF's "systemic gender discrimination" in administering its Title IX procedures.

75.    In October 2018, Plaintiff and UMS entered into a settlement agreement (the "Settlement Agreement") intended to resolve Plaintiff's claims for a 2017-2018 tuition refund, lost wages from his job at the FRC, and legal fees he had been forced to incur.

76.    The Settlement Agreement's release is strictly limited to disputes and controversies that had occurred during the 2017-2018 academic year.

77.    After entering into the Settlement Agreement, UMS retaliated against Plaintiff.

78.     In January 2019, M.P. and another woman, referred to here as C.W., both approached the Bangor Daily News ("BDN"). C.W. had been involved in a Title IX case at UMF, having brought charges against a different man. Both M.P. and C.W. had been represented by the same attorney, Nicole Bissonnette. Both women had lost their Title IX cases. They told their stories to a BDN reporter, Erin Rhoda.

79.     Ms. Rhoda published a one-sided story in the BDN on January 28, 2019, entitled "Step by step, 2 women detail Maine university's failings in their rape cases." The article's theme was that UMF had made mistakes in handling their cases, thereby causing two rapists to go free and threatening the safety of women on campus. The article asserted that "both students experienced errors in the handling of their cases and saw their findings overturned in bizarre fashion."

80.     In the article, UMF's interim president, Eric Brown, responded. Brown has a personal connection to M.P., as his son had been taught by M.P.'s mother. When asked to comment on the story, however, Brown did not disclose his prior relationship to M.P. He made no statement that the article was inaccurate or incomplete, and failed to defend UMF's decisions regarding the Title IX allegations made by M.P. and C.W. He did not mention how B.L.'s PFA had tainted the only decision that had gone in M.P.'s favor, or how B.L.'s PFA order had been vacated because B.L. had lied to the judge. Nor did Brown point out that M.P.'s allegations had been struck down by a Panel chosen by UMF's president, or that the Panel and Investigator Rodas had found that Plaintiff and M.P. had been "aligned on mutual, verbal consent" with respect to the September 2017 encounter. Instead, Mr. Brown said only that the two women "showed great courage."

13

81.     In an email to Plaintiff's attorney, Walter Hanstein, Ms. Rhoda stated that she had been given access to the Title IX case materials and had used them to write her article.

82.     The next day, January 29, 2019, Interim President Brown emailed all UMF staff, students, and members of the Board of Visitors about the BDN article. In the email, he neglected to mention any of the exculpatory evidence from any of the hearings. Instead, Brown supported the allegations of wrongdoing, implying that Plaintiff had in fact assaulted M.P. and calling her a "victim." Brown also stated that the BDN article recounted a painful experience that M.P. had had at UMF, and repeated his praise of M.P. for her "great courage." Mr. Brown closed the email by stating that he was "personally moved and saddened" by the article.

83.     Ms. Rhoda then wrote a follow-up story in the BDN on February 7, 2019, entitled "Students confront UMF officials about handling of rape cases." This article referred to a gathering of about 100 people on campus, assembled to ask questions of Brown. The article stated that the group's questions stemmed from a BDN report of how UMF had "made errors in the cases of two female students who reported being raped." Brown did not contradict the BDN's assertion; instead, he agreed that UMF had erred in its handling of the allegations against Plaintiff and stated that UMF needed to make changes: "I don't think we're at a point in time where we can depend on your faith. I don't think this tonight is about being convincing in that way. What I would say is, I think we have to be action oriented. We have to take steps that you can verify."

14

84.     Completely absent from Brown's statements was any mention of the verifiable steps that *had* in fact been taken in M.P.s Title IX case, such as conducting interviews, holding hearings, and reaching a finding that M.P. had given ongoing consent.

85.     Another article followed from Ms. Rhoda on February 16, 2019, entitled "More women step forward about sexual assault cases at UMF to spark changes." This article characterized the two women from the previous article as having "described in detail how the university failed them after they were raped."

86.     Although Interim President Brown knew that Plaintiff had been cleared of the rape charges, he continued his pattern of failing to correct the BDN's presumption that Plaintiff was guilty, thereby allowing public perception to stand that Plaintiff had raped M.P.

87.     On March 1, 2019, Plaintiff met with Brian Ufford, Hope Shore (Assistant Director of Student Life & Deputy Title IX Coordinator), and Liz Lavoie (Deputy Title IX & Sexual Assault & Violence Prevention Coordinator). They notified him that UMS was placing him on an "interim suspension." Effective immediately, UMS would not permit Plaintiff to go to class or to his job at the FRC. The stated reason for this suspension was that a new Title IX claim had been filed against him. The person filing the complaint was none other than K.P., the former roommate who had admitted raping Plaintiff.

88.     UMS still had taken no action on Plaintiff's reports of K.P.'s assault against him, but now was suspending him based on K.P.'s allegations against him.

89.     Mr. Ufford, Ms. Shore, and Ms. Lavoie told Plaintiff that UMS had assigned the investigation to Defendant Fiacco. They praised Mr. Fiacco as an excellent Title IX investigator who would leave no stone unturned.

90.     Ms. Lavoie admitted during this meeting that UMS should have started investigations of both K.P. and B.L. in response to Plaintiff's reports. Ms. Lavoie explained that K.P.'s graduation did not protect her from Title IX allegations, nor did B.L.'s withdrawal from UMF shield her from Plaintiff's allegations of Student Conduct Code violations. UMS continues to be able to pursue investigations against former students and sanctions can include placing the investigation results on that student's record or even revoking a previously issued diploma.

91.     Despite Ms. Lavoie's statements, UMS continued to take no action against both K.P. and B.L. on Plaintiff's behalf.

92.     That same day, although the next BDN story had yet to be published, one of Plaintiff's co-workers told people at the FRC about the upcoming article. Somehow she was aware of what Ms. Rhoda was going to write even before it was printed.

93.     Following the March 1 meeting, UMS notified Plaintiff of the suspension in a letter issued by Defendant Fiacco. The letter alleged that between fall 2015 and spring 2017, Plaintiff had engaged in prohibited conduct against K.P.: (i) engaging in sexual intercourse with K.P. multiple times through the use of coercion; (ii) on one occasion preventing K.P. from leaving a room in their residence for 45 minutes; and (iii) on one occasion striking K.P. with his elbow, causing her to bleed from her lip. A true, redacted copy of this March 1 letter from Defendant Fiacco is attached as **Exhibit A**.

94.     Although Defendant Fiacco's letter did not offer any prior notice or hearing of any kind to Plaintiff, it essentially reinstated the punishment from the vacated Committee decision. It stated that Plaintiff's suspension barred him from UMF and all University of

16

Maine System property, and from attending classes, while the matter was pending. It instructed him to vacate the campus property immediately and threatened him with arrest if he returned.

95.    The suspension letter from Defendant Fiacco offered Plaintiff the chance to challenge the interim suspension: "If you wish to challenge the interim action, you may seek review of this decision by requesting the President or designee to review the decision. The Campus President or designee will review the request within five (5) business days of receipt of your request."

96.    K.P., having graduated in 2017, was no longer on campus at the time UMF suspended Plaintiff in 2019. Plaintiff's attorney, Thomas Carey, challenged the interim suspension as unwarranted and burdensome in a letter to Interim President Brown: "[K.P.] is currently residing in California and is not a student at the University of Maine at Farmington. [John] is still a student and the interest of him attending classes in order to graduate UMF certainly outweighs these unfounded and defamatory allegations. [John's] employment is also connected to UMF. This interim suspension has the effect of not allowing him to work and earn an income, which he needs to earn to pay his bills and pay for the necessities of life."

97.    Mr. Carey's letter also stated that K.P.'s allegations were false, especially in light of her written admission that she had been sexually aggressive to Plaintiff. The letter emphasized that Plaintiff had reported K.P.'s actions to UMS, and that UMS had taken no action in response. Attorney Carey's letter characterized the new allegations against Plaintiff

as retaliatory, most likely connected with M.P. and B.L., as they had solicited K.P. to come forward with these false allegations.

98.     Defendant UMS responded to Plaintiff in a letter from Kim-Marie M. Jenkins, Ed. D., dated March 14, 2019. The letter neglected to address that K.P. had graduated and was in no danger on the UMF campus. Instead, the letter repeated that the alleged behavior was "serious" and a "potential threat to campus safety."

99.     Ms. Jenkins reasoned: "[T]his is not the first time allegations of this nature have been made against you. Though an appropriate investigation and due process remain to be concluded, there is initially sufficient reason to believe your behavior has endangered multiple women." The letter, however, did not identify any other women, nor did it acknowledge that Plaintiff had been cleared of the charges made by M.P. or that a judge had rejected B.L.'s claims as false.

100.     UMS did not schedule and has not scheduled any hearing relating to K.P.'s allegations against Plaintiff.

101.     About one week after Plaintiff had been told that Defendant Fiacco was a thorough investigator, Defendant UMS replaced him without explanation. It assigned the investigation to Scott Helmke, a 2015 law school graduate.

102.     Around this same time, Leah Brackett, the director of UMF's FRC, posted a warning to all students on Facebook: "Heads up—[John Doe] is not permitted to enter the FRC. If he does, you are to call public safety immediately."

103.     On March 5, 2019, Ms. Rhoda published another article in the BDN, entitled "UMF takes 'immediate steps' to ensure safety after multiple women say student assaulted

18

them." For a third time, she quoted Interim President Brown, who persisted in his failure to mention any of the evidence in Plaintiff's favor.

104.    Brown's comments in this article went further, suggesting (contrary to UMS's Panel decision) that Plaintiff was responsible for sexual assault:  "Any allegation of sexual abuse or violence on our campus must be taken seriously no matter when it occurs, and that is especially important when the claims all involve conduct and actions by a single individual, **as appears to be the case here**." (Emphasis added.)

105.    Plaintiff and his attorney, Thomas Carey, met with the newly-assigned Title IX investigator on May 3, 2019. Plaintiff provided the details about the occasion on which K.P. raped him. He showed Mr. Helmke the text in which K.P. admitted the rape. Mr. Helmke confirmed at the meeting that K.P. would lose her diploma if what Plaintiff said was true. Plaintiff also provided names of witnesses who could tell Mr. Helmke what really happened, such as about prior instances of K.P. threatening him. Mr. Helmke never contacted any of Plaintiff's witnesses.

106.    Plaintiff offered to enter into mediation with K.P. to resolve the matter, but Mr. Helmke said that mediation is generally not allowed in matters involving sexual allegations. Then he changed course and stated that he would look into mediation, as this was a unique case given Plaintiff's allegations against K.P.

107.    For months after May 3, 2019, Mr. Helmke went silent. Plaintiff's attorney wrote three emails or letters to him, all without response. Plaintiff's attorney also called and left messages for Mr. Helmke on multiple occasions, again without a reply.

108.     Given UMS's silent treatment, Plaintiff was trapped. He could not refute K.P.'s Title IX claims and clear his name; there were no scheduled proceedings and no deadlines for action. Due to the "interim" suspension that has been in place for over six months, he has not been able to return to school or work.

109.     On August 26, 2019, Plaintiff's new attorney sent a draft of this complaint to James Thelen, general counsel for Defendant UMS.

110.     The following day, August 27th, Plaintiff's attorney sent Mr. Thelen a copy of the recent decision from the United States Court of Appeals for the First Circuit, *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56, slip op. at 30 (1st Cir. 2019), which held that a university was required to grant a hearing to a student prior to suspending pending an investigation.

111.     In the email, Plaintiff's attorney asked that—based on how closely *Haidak* mirrors the facts of this case—Defendant UMS immediately agree to terminate the pending suspension and restore Plaintiff's access to UMF, so that he can complete the classes required for issuance of his degree. Plaintiff's attorney emphasized that classes at UMF were about to begin, and that the suspension needed to end so that Plaintiff could be on campus and participate in classes.

112.     After these communications from Plaintiff's attorneys, Plaintiff received a letter dated August 30, 2019 from Liz Lavoie, Deputy Title IX Coordinator for the UMS system. A true, redacted copy of Lavoie's August 30th letter is attached as **Exhibit B.** In her letter—although Plaintiff had never received any hearing—Ms. Lavoie characterized UMS's decision whether to admit Plaintiff to classes for fall 2019 as a "review": "It has been

20

brought to my attention that based on a recent court case <u>Haidak v. University of Massachusetts – Amherst</u> {No. 18-1248 (1st Cir. 2019), relating to the process requirements for imposing Interim Suspensions, the University will be conducting a review of your continued Interim Suspension for the 2019-2020 academic year."

113.   Ms. Lavoie's letter addresses what evidence UMS intends to consider, this time calling the process a "re-review": "The University will be reviewing the information collected in the course of the investigations to date and relevant prior disciplinary history. If, however, you would like to provide any additional information for the University to consider regarding your continued Interim Suspension, the University is affording you and the Reporting Party the opportunity to submit any statement, and/or supporting information for review of your continued Interim Suspension status. If you would like to submit a statement and/or supporting information for re-review of your Interim Suspension, please submit this information to me via email [email address], by 4:30pm (EST) on Wednesday, September 4th, 2019."

114.   As recently as September 6, 2019, Plaintiff has been in touch with the witnesses whose names and contact information he provided to UMS in order to specifically refute all of K.P.'s allegations. Those witnesses confirmed to Plaintiff that they had never been contacted by Scott Helmke, but indicated that they had just that same day received phone messages from the new (third) investigator, Kenda Scheele, on behalf of Defendant UMS.

115.   Ms. Lavoie's letter promises to respond to Plaintiff's request for a resolution no later than 4:30pm EST on Wednesday, September 11, 2019.

116.    After Plaintiff received this letter, he called Ms. Lavoie and had a conversation with her and the newly assigned investigator, Ms. Scheele. They explained that Mr. Helmke had been "too busy" to investigate the case. Ms. Scheele indicated that she would be using the information Mr. Helmke had gathered and continuing the investigation, thereby causing further delay. She scheduled a telephone interview with one of Plaintiff's witnesses for Friday, September 6, then canceled and rescheduled it, and then canceled the rescheduled call. The witness interview still has yet to occur.

117.    UMS has made no mention of providing Plaintiff with a hearing on this issue.

118.    Next, on September 7, 2019, Defendant Fiacco emailed a letter to Plaintiff, indicating that he had been assigned to review Plaintiff's suspension. A true, redacted copy of Fiacco's September 7 letter is attached as **Exhibit C**.

119.    The September 7th letter reiterated the allegations of K.P., but contained no updates, such as any statements from Plaintiff's witnesses who refute those allegations.

120.    Nor did the letter specify how—given that K.P. graduated two years ago and is currently not living on any UMS campus, but instead in California—Plaintiff represents a threat to the university community.

121.    The letter echoed UMS's earlier verbiage about conducting a "review" of the status of Plaintiff's suspension; it stated "I have been assigned to review the status of your interim suspension that was issued on March 1, 2019" and that he would decide "whether, and under what circumstances, the interim suspension issued to you on March 1, 2019 should continue." Defendant Fiacco promised to communicate his decision to Plaintiff no later than the close of business on Monday, September 16, 2019.

122.    Notably, in the September 7th letter, Defendant Fiacco still did not offer a hearing to Plaintiff, but instead merely offered to allow him to schedule a 1-hour telephone interview with Defendant Fiacco, and provided Plaintiff with no other due process protections.

123.    Plaintiff has been deeply affected by UMS's actions. He has lost 25 pounds. He has nightmares and trouble sleeping. He worries about being harassed and assaulted. He has sought counseling, and has been on medication, both of which generate significant costs.

124.    Plaintiff is just three classes away from graduating from UMF, but he cannot complete his degree because of the unjustifiable suspension.

125.    UMS has also prevented Plaintiff from performing his job at the FRC, thereby causing him to lose wages.

<u>COUNT I</u>
**(Violation of Title IX by Defendant UMS – Hostile Educational Environment)**

126.    Plaintiff repeats the allegations contained in paragraphs 1 through 125.

127.    In separate incidents, Plaintiff was subjected to harassment based on his sex by two other students at UMF.

128.    UMS created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* in that (i) Plaintiff was a member of a protected class; (ii) UMS had actual knowledge of the other students' sexually harassing behavior against Plaintiff; (iii) the sexually harassing behavior was in UMS's programs and activities; (iv) the sex-based harassment of Plaintiff was so severe, pervasive, and objectively offensive that it deprived him of access to educational opportunities and benefits provided by UMS; and (v) UMS was deliberately

indifferent to the harassment, such that its lack of response was clearly unreasonable in light of the known circumstances.

129.    Plaintiff has suffered damages, including interference with his educational opportunities, as a direct and proximate result of UMS's violation of his Title IX rights.

130.    UMS's actions have caused Plaintiff harm, including but not limited to emotional distress.

## COUNT II
### (Violation of Title IX by Defendant UMS – Selective Enforcement)

131.    Plaintiff repeats the allegations contained in paragraphs 1 through 130.

132.    When Plaintiff, a man, reported that he had been sexually assaulted by K.P., UMS took no action.

133.    However, when two women, M.P. and K.P., both falsely accused Plaintiff of sexual assault, UMS took action under Title IX.

134.    Plaintiff, M.P., and K.P. were all similarly situated as Title IX complainants when they reported to UMS that they had been sexually assaulted.

135.    Regardless of the accused student's guilt or innocence, both the severity of the penalties against Plaintiff and the decisions to launch Title IX investigations were due to Plaintiff's gender.

136.    UMS was motivated by Plaintiff's gender in its inconsistent decisions not to initiate any investigation in response to his reports of sexual assault, while initiating investigations against Plaintiff for similar allegations.

## <u>COUNT III</u>
### (Retaliation under Title IX by Defendant UMS)

137.   Plaintiff repeats the allegations contained in paragraphs 1 through 136.

138.   Plaintiff engaged in protected activity under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX").

139.   UMS was aware of Plaintiff's protected activity.

140.   UMS undertook action against Plaintiff in response to his protected activity by engaging in a series of adverse actions, including but not limited to (i) barring Plaintiff from his place of employment; (ii) suspending Plaintiff; (iii) making public statements suggesting that although Plaintiff had been fully exonerated of sexual assault in both disciplinary proceedings, those findings had been in error; (iv) improperly providing the Title IX case files against Plaintiff to the press and others; and (v) failing to disclose to the press that the disciplinary proceedings against Plaintiff for sexual assault and/or rape had been dismissed for exculpatory reasons.

141.   A retaliatory motive played a substantial part in prompting UMS's negative actions against Plaintiff.

142.   By virtue of the foregoing, UMS has violated Plaintiff's right to be free from retaliation, intimidation, coercion, and intimidation related to his protected activity.

143.   UMS's actions have caused Plaintiff harm, including damage to his reputation and emotional distress.

## COUNT IV
### (42 U.S.C. § 1983: Violation of Procedural Due Process by Defendants)
### (Claim for Damages against Defendant Fiacco)

144.    Plaintiff repeats the allegations contained in paragraphs 1 through 143.

145.    Plaintiff has a property interest to which the Fourteenth Amendment's due process protection applies, which is the benefit of being enrolled at and progressing toward a degree from UMF.

146.    UMS is a state actor that has deprived Plaintiff of that property interest without due process of law, by suspending him in March 2019 with no prior notice and no hearing, either before or since.

147.    Defendant Fiacco acted under color of state law in depriving Plaintiff of that property interest without due process of law, by suspending him in March 2019 with no prior notice and no hearing, either before or since.

148.    While on suspension, Plaintiff can enjoy none of the benefits of being enrolled at UMF and cannot progress toward obtaining his degree.

149.    UMS has continued the suspension for over six months and has refused to grant Plaintiff a hearing.

150.    As a result of his unlawful suspension, Plaintiff has suffered damages, including the inability to progress toward his degree, damage to his reputation, and severe emotional distress.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor against Defendants University of Maine System and David Fiacco, and award him:

    a.  Injunctive relief sufficient to vacate his suspension and permit him to complete his degree requirements at UMF;

    b.  Compensatory damages in an amount that is reasonable in the premises;

    c.  Reimbursement of his reasonable costs and attorney's fees; and

    d.  Such other relief as the court may deem just and proper.

Dated:  September 9, 2019.

/s/ Richard L. O'Meara
Richard L. O'Meara

MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651
*E-mail:  romeara@mpmlaw.com*

Counsel for Plaintiff