UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil No. 19-____-P-_

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNIVERSITY OF MAINE | ) |
| SYSTEM and DAVID FIACCO, | ) |
| | ) |
| Defendants | ) |

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION,
WITH INCORPORATED MEMORANDUM OF LAW**

Pursuant to Rules 65(a) and 65(b) of the Federal Rules of Civil Procedure, Plaintiff John Doe requests that this Court enter a temporary restraining order and preliminary injunction requiring Defendants University of Maine System and David Fiacco to terminate Plaintiff's suspension and restore his access to the University of Maine at Farmington so he can complete his degree requirements.

## INTRODUCTION

Plaintiff John Doe brings this action against Defendant University of Maine System ("UMS"), which operates a system of public post-secondary educational institutions, including the University of Maine at Farmington ("UMF"), and David Fiacco, UMS's Director of Community Standards, Rights and Responsibilities. Plaintiff is a student at UMF.

In 2017, Plaintiff, a man, reported to UMF that he had been sexually harassed and raped by another student, his female apartment-mate. The woman admitted the rape in writing. UMF violated federal law by failing to take any steps to investigate Plaintiff's report or to protect him.

When another female student falsely accused Plaintiff of sexual assault, however, UMF immediately launched an investigation. Following months of inquiry and hours of testimony at three separate hearings, UMF's Title IX investigator exonerated Plaintiff of the assault allegation.

Subsequently, nearly two years after graduating from UMF, Plaintiff's admitted rapist made an allegation of sexual assault against Plaintiff. Upon receiving this charge, Defendant Fiacco suspended Plaintiff from UMF without notice or hearing on March 1, 2019. The suspension barred him from all University of Maine System property while the matter was pending, and threatened him with arrest if he violated the terms of the suspension.

Despite six months having passed, the investigation of the new charge against Plaintiff has yet to occur. The investigator tapped to succeed Mr. Fiacco failed to contact any of Plaintiff's witnesses. On August 30, Plaintiff learned that Defendant was appointing a third investigator to work on his case, thereby prolonging Plaintiff's unjustified suspension and preventing him from attending the fall semester classes he needs to graduate. Mr. Fiacco then reappeared on September 7, 2019, informing Plaintiff of his intent to review Plaintiff's suspension to determine whether it should continue this semester, again without due process.

## FACTS[1]

***UMF took no action on Plaintiff's reports of sexual harassment and rape.***

In spring 2017, Plaintiff reported to a UMF employee that another student—one of Plaintiff's female apartment-mates (K.P.)—was being sexually aggressive toward him and using drugs. Defendant UMS is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"). Title IX requires that, if an educational institution knows or

---

[1] This statement of facts is drawn from the accompanying Declaration of John Doe.

reasonably should know about student-on-student harassment that creates a hostile environment, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX also requires a school to protect the complainant and ensure his or her safety, including taking any interim steps pending the outcome of the investigation. In spite of these requirements, the UMF employee took no steps to protect Plaintiff or investigate his report.

Later during the spring semester 2017, K.P. raped Plaintiff. In or about May 2017, K.P. admitted in writing that she had raped Plaintiff. After K.P. graduated from UMF that year, Plaintiff reported to three UMF administrators that his female apartment-mate had raped him. Despite this report, UMF still took no steps to commence an investigation, and it rebuffed demands from Plaintiff's attorney to conduct an investigation.

*UMF exonerated Plaintiff of sexual assault.*

During September 2017, Plaintiff was dating another female student (M.P.). The two of them had been dating since spring 2016. Their relationship was so close that (a) M.P.'s family invited Plaintiff to spend the 2016 Christmas recess with them at M.P.'s grandparents' home in Vermont; (b) M.P. maintained a long-distance relationship with Plaintiff while she spent the spring semester of 2017 in Alaska; (c) M.P.'s mother frequently texted Plaintiff throughout spring and summer 2017, inviting him over for dinner, offering to do his laundry, and saying how happy she was that he was dating her daughter; (d) during May 2017—and both prior to and after that month—M.P. sent nude photos of herself, along with sexually-themed texts, to Plaintiff; and (e) in August 2017, M.P. texted Plaintiff repeatedly to say that she was looking forward to seeing him at school that fall.

On September 27, 2017, Plaintiff had consensual sexual contact with M.P. following their return to UMF. In the days after that contact, M.P. sent multiple friendly text messages to both Plaintiff and his friends, asking how Plaintiff was doing.

Unbeknownst to Plaintiff, M.P. had commenced a new relationship while in Alaska, and felt guilty that she had engaged in sex with Plaintiff. Five days after the sexual contact, M.P. contacted the Farmington police to report, falsely, that Plaintiff had assaulted her. The district attorney, however, opted not to press charges against Plaintiff because M.P.'s guilt about having another boyfriend had caused her to accuse Plaintiff falsely. Both sides agreed to enter into mutual Protection From Abuse ("PFA") orders in civil court on October 11, 2017.

Although UMF had failed to investigate Plaintiff's reports that he was sexually harassed by K.P., UMF did initiate a Title IX investigation of M.P.'s false allegations against Plaintiff. It assigned Laura Rodas to investigate. Throughout the investigation, M.P. said that she wanted UMF to give her "justice," because the court would not do what she wanted.

In November 2017, another female UMF student (B.L.) contacted Ms. Rodas. She made various allegations against Plaintiff, but provided no evidence. Ultimately, Ms. Rodas found B.L. not to be credible. Plaintiff told the Director of Student Life that, while he had not so much as touched B.L., she had been sexually aggressive toward him and had texts to support this. Despite this, UMF failed to commence a Title IX investigation against B.L.

At the hearing before Ms. Rodas, M.P. alleged concerns about Plaintiff returning to campus for the 2017-2018 academic year. But Plaintiff's attorney emphasized that M.P. had sent nude photos and sexual texts to Plaintiff, then told him in August 2017 how much she was looking forward to seeing him on campus that fall. M.P.'s mother also lied to Ms. Rodas, claiming that she had had concerns with Plaintiff since Christmas 2016, and indicated that she

4

had rarely texted him. Plaintiff's attorney, however, shared with Ms. Rodas the dozens of texts that M.P.'s mother had sent to Plaintiff through July 2017, many of which invited him over for dinner.

Ms. Rodas estimated that she spent 100 hours on the case before issuing her decision. In the end, she was not fooled by M.P.'s story. On December 15, 2017, based on all the evidence provided—including M.P.'s multiple friendly texts to Plaintiff after the sexual encounter, as well as M.P.'s admission that Plaintiff had asked for and received her ongoing consent during their sexual encounter—Ms. Rodas found that Plaintiff was "Not Responsible" on M.P.'s allegations of sexual harassment, sexual assault, dating violence, and causing fear of physical harm.[2]

The findings from Ms. Rodas allowed Plaintiff to continue at UMF. She issued a "Deferred Sanction," while instituting a "No Contact Order" between Plaintiff and M.P. for the rest of Plaintiff's time at UMF. M.P. appealed these findings to the Student Conduct Code Committee (the "Committee"). The Committee met on January 29, 2018, to conduct a hearing.

At the appeal hearing, M.P. repeatedly mentioned B.L., even though B.L. had been completely discredited as a witness. M.P. admitted having spoken to B.L. during the week leading up to the hearing. By this point, B.L. had filed for a PFA against Plaintiff in civil court, using the same attorney who had represented M.P. That attorney introduced evidence of B.L.'s PFA Order in M.P.'s proceedings before the Committee.

---

[2] While Ms. Rodas made a "Responsible" finding against Plaintiff for harassment/intimidation and stalking, she did so only based on the sheer volume of calls and texts from Plaintiff to M.P. over a two-month period. While her decision acknowledged that M.P. had indicated to Plaintiff that he was not a bother and that he could continue contacting her, Ms. Rodas concluded nevertheless any reasonable person should have known that such a volume of communication could adversely affect M.P.

On January 31, 2018, the Committee overturned Ms. Rodas's decision, ruling for M.P. by finding Plaintiff responsible for sexual assault and causing fear of physical harm. The Committee suspended Plaintiff from the University of Maine System through May 31, 2019, prohibiting him from entering any part of the UMF campus or any campus within the UMS.

Plaintiff timely appealed this decision. The appeal took weeks, during which his suspension continued. In March 2018, a three-member President's Panel (the "Panel") reviewed Plaintiff's appeal and found Plaintiff not responsible for sexually assaulting M.P. The Panel decision found that the Committee hearing had been improperly tainted with evidence from B.L., and also that—no matter how their testimony to the Committee had differed— Plaintiff and M.P. both agreed that the September 2017 sexual encounter was consensual. One day later, on March 28, 2018, a civil court judge threw out B.L.'s PFA case against Plaintiff, relying on the exculpatory texts and B.L.'s admission on the stand that she had lied about Plaintiff.

Though he was cleared in the end, Plaintiff's entire 2017-2018 school year was lost.

***UMF retaliated against Plaintiff by ignoring its own Title IX findings and instead suggesting publicly that he was guilty of sexual assault.***

In January 2019, M.P. and another woman both approached the Bangor Daily News ("BDN"). The other woman had also been involved in a Title IX case at UMF, having brought charges against a different man. Both women had lost their Title IX cases. They told their stories to a BDN reporter, Erin Rhoda.

Ms. Rhoda published a one-sided story in the BDN on January 28, 2019, entitled "Step by step, 2 women detail Maine university's failings in their rape cases." The article's theme was that UMF had made mistakes in handling their cases, thereby allowing two rapists to go free and threatening the safety of women on campus. The article asserted that "both students experienced errors in the handling of their cases and saw their findings overturned in bizarre fashion."

In the article, UMF's interim president, Eric Brown, failed to defend UMF's decisions regarding the Title IX allegations. He did not mention how B.L.'s PFA had tainted the only decision that had gone in M.P.'s favor, or how B.L.'s PFA order had been vacated because B.L. had lied to the judge. Nor did Brown point out that M.P.'s allegations had been struck down by the Panel, or that the Panel and Investigator Rodas had found that Plaintiff and M.P. had been "aligned on mutual, verbal consent" with respect to the September 2017 encounter. Instead, Interim President Brown commented that the two women "showed great courage."

The next day, January 29, 2019, President Brown emailed all UMF staff, students, and members of the Board of Visitors about the BDN article. In the email, Brown supported the allegations of wrongdoing, implying that Plaintiff had in fact assaulted M.P. and calling her a "victim." Brown repeated his praise of M.P.'s "great courage," and stated that he was "personally moved and saddened" by the BDN article.

Ms. Rhoda then wrote a follow-up story in the BDN on February 7, 2019, entitled "Students confront UMF officials about handling of rape cases." This article referred to a gathering of about 100 people on campus, assembled to ask questions of President Brown. The article stated that the group's questions stemmed from the BDN report of how UMF had "made errors in the cases of two female students who reported being raped." Brown did not contradict the BDN's assertion; instead, he agreed that UMF had erred in its handling of the allegations against Plaintiff and stated that UMF needed to make changes. Absent from Brown's statements was any mention of the verifiable steps that *had* in fact been taken, such as conducting interviews, holding hearings, and reaching a finding that M.P. had given ongoing consent.

*UMF suspended Plaintiff six months ago without prior notice or a hearing.*

On March 1, 2019, Defendant Fiacco issued a notice of suspension letter to Plaintiff. *Complaint*, Ex. A. Effective immediately, UMF would not permit Plaintiff to go to class or be anywhere on campus. The stated reason for this suspension was that a new Title IX claim had been filed against him. The person filing the 2019 complaint was none other than K.P., the former apartment-mate who had admitted raping Plaintiff and who had graduated and left the State of Maine in 2017.

UMF admitted to Plaintiff at this time that it should have started investigations of both K.P. and B.L. upon Plaintiff's reports of their behavior. K.P.'s graduation did not protect her from Title IX allegations, nor did B.L.'s withdrawal from UMF shield her from allegations of Student Conduct Code violations. UMF continues to be able to pursue investigations against former students; sanctions can include placing the investigation results on that student's record or even revoking a previously issued diploma.

The Fiacco suspension letter summarizes K.P.'s allegations: (i) that between fall 2015 and spring 2017, Plaintiff had engaged in sexual intercourse with K.P. multiple times through the use of coercion; (ii) that, on one occasion, he prevented K.P. from leaving a room in their residence for 45 minutes; and (iii) that, on one occasion, Plaintiff struck K.P. with his elbow, causing her to bleed from her lip. Plaintiff denies all of these false allegations.

The Fiacco letter, issued without prior notice or any hearing, reinstated the punishment from the vacated Committee decision, as it barred Plaintiff from UMF and all University of Maine System property, including participation in all classes, while the matter was pending. It instructed him to vacate the campus property immediately or risk arrest.

Plaintiff's attorney, Thomas Carey, challenged the interim suspension as unwarranted and burdensome in a letter to Interim President Brown: "[K.P.] is currently residing in California and is not a student at the University of Maine at Farmington. [John] is still a student and the interest of him attending classes in order to graduate UMF certainly outweighs these unfounded and defamatory allegations." Attorney Carey's letter also stated that K.P.'s allegations were false, and brought up her written admission that she had been sexually aggressive to Plaintiff. Attorney Carey's letter called the new allegations against Plaintiff retaliatory, most likely connected with M.P. and B.L., as they had solicited K.P. to make these false allegations.

Defendant responded to Plaintiff in a letter from Kim-Marie M. Jenkins, Ed. D., dated March 14, 2019. The letter neglected to address that K.P. had graduated from UMF; instead, it repeated that the alleged behavior was "serious" and a "potential threat to campus safety." Although the letter asserts that "there is initially sufficient reason to believe your behavior has endangered multiple women," it identifies no such women and fails to acknowledge that Plaintiff had been cleared of M.P.'s charges or that a judge had rejected B.L.'s claims as false.

UMF did not schedule and has not scheduled any hearing relating to K.P.'s allegations against Plaintiff. Defendant replaced Mr. Fiacco with a new investigator, Scott Helmke, without explanation. As of August 30, 2019, Helmke had yet to complete his investigation.

On March 5, 2019, Ms. Rhoda published another article in the BDN, entitled "UMF takes 'immediate steps' to ensure safety after multiple women say student assaulted them." For a third time, she quoted Interim President Brown, who went further than ever before. Brown suggested (contrary to UMF's Panel decision) that Plaintiff was responsible for sexual assault: "Any allegation of sexual abuse or violence on our campus must be taken seriously no matter when it

occurs, and that is especially important when the claims all involve conduct and actions by a single individual, *as appears to be the case here*." (Emphasis added.)

Plaintiff and his attorney, Thomas Carey, met with the newly-assigned Title IX investigator on May 3, 2019. Plaintiff provided the details about the occasion on which K.P. raped him. He showed Mr. Helmke the text in which K.P. admitted the rape. Mr. Helmke confirmed at the meeting that K.P. would lose her diploma if what Plaintiff said was true. Plaintiff also provided names of witnesses who could tell Mr. Helmke about prior instances of K.P. threatening him, but Mr. Helmke did not contact them even once with so much as an email or phone call.

For months after May 3, 2019, Mr. Helmke went silent and would not respond to emails or calls from Plaintiff's attorney. Given UMF's silent treatment, Plaintiff was trapped. He could not refute K.P.'s Title IX claims and clear his name; there were no scheduled proceedings and no deadlines for action. He was unable to complete the three remaining classes he needs to graduate.

On August 26, 2019, Plaintiff's new counsel sent a draft complaint to James Thelen, counsel for Defendant UMS in this case, in an attempt to resolve the stalemate. Plaintiff's counsel also provided a copy of the recent First Circuit decision in *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56, slip op. at 30 (1st Cir. 2019). *O'Meara Declaration*, ¶¶ 2-3. Plaintiff's attorney requested—based on *Haidak*—that Defendant UMS immediately terminate Plaintiff's suspension and restore his access to UMF, as classes were about to begin. *Id.*

Plaintiff then received a letter dated August 30, 2019, from Elizabeth Lavoie, Defendant's Deputy Title IX Coordinator. *Complaint*, Ex. B. Despite the complete lack of procedural due process in connection with the March 2019 suspension order, Ms. Lavoie sought to "review" the suspension order to see if it should continue. *Id.* The letter also addresses what

evidence UMS will consider, citing the need for a "re-review" of information "collected in the course of the investigations to date and relevant prior disciplinary history." She gave Plaintiff the opportunity to provide additional information until September 4 (later extended to September 9).

Defendant then names a new investigator to replace Scott Helmke, tapping Kenda Scheele to take over because Mr. Helmke allegedly was "too busy." The new investigator indicated to Plaintiff that she would be using what Helmke had gathered already and continuing her own investigation, thereby causing further delay. She scheduled a telephone interview with one of Plaintiff's witnesses for Friday, September 6, then canceled and rescheduled it, and then canceled the rescheduled call. The witness interview still has yet to occur.

On September 7, Plaintiff received another letter from Mr. Fiacco, the author of his suspension notice, indicating that Fiacco was re-entering the case for the purpose of "review[ing] the status" of the March 2019 suspension. *Complaint*, Ex. C. The newest Fiacco letter states that the "singular purpose of my review is to determine whether, and under what circumstances, the interim suspension issued to you on March 1, 2019 should continue." Mr. Fiacco has afforded Plaintiff only an opportunity to participate in a one-hour telephone interview for this purpose, and has provided him with no other due process protections.

## MEMORANDUM OF LAW

As Plaintiff continues to be directly and adversely affected by Defendants' suspension order and continuing failure to provide him with the basic constitutional protection of procedural due process, he requests that this Court enter a temporary restraining order and preliminary injunction directing Defendants to lift his suspension forthwith and restore his access to UMF so he can begin attending fall semester classes immediately.

To obtain preliminary injunctive relief, Plaintiff must demonstrate:

(1) "a likelihood of success on the merits,

(2) a likelihood of irreparable harm absent interim relief,

(3) a balance of equities in the plaintiff's favor, and

(4) [that the injunction will be in] service of the public interest."

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements*, 794 F.3d 168, 171 (1st Cir. 2015) (citing *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Plaintiff as the moving party "bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## I.  PLAINTIFF IS PROVIDING NOTICE TO DEFENDANTS.

The Rules state that a temporary restraining order may be issued without written or oral notice to the adverse party or its attorney in certain circumstances. Fed. R. Civ. P. 65(b). The Rules are silent as to the applicable standard when notice *has* been provided. *See id.*

Plaintiff is providing counsel for Defendants with notice through provision of all the pleadings being filed with the Court. *O'Meara Declaration* at ¶ 4. Plaintiff submits that this notice is sufficient and that a temporary restraining order either should be granted without a hearing or that a hearing should be scheduled as soon as possible.

## II.  PLAINTIFF LIKELY WILL PREVAIL ON THE MERITS.

While it lasts, a suspension from a public university deprives a student of all of the benefits of being enrolled at a university. *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56, *slip op.* at 30 (1st Cir. 2019). A deprivation of this magnitude requires notice and a hearing. *Id.*, citing *Goss v. Lopez*, 419 U.S. 565, 579 (1975).

As a general rule, notice and hearing should precede any suspension from a public university. *Haidak*, *slip op.* at 31. The only exception to this rule is in cases of exigency—where the state must act quickly in the face of a true emergency, and it would be impractical to offer pre-deprivation process. *Id*. In *Haidak*, the First Circuit held that a public university violated a student's due process rights by suspending him for five months with no hearing or prior notice. *See Haidak* at 33. According to the court of appeals, the "key issue" on any such suspension is whether the student at issue represents "a threat to the university community." *Id.* at 32. On that issue, the *Haidak* court rejected the university's argument because: (1) Haidak had disputed his accuser's story in a way that could be verified; and (2) the school easily could have gleaned the truth: "The university could easily have confronted [the accuser] with the information provided by Haidak, and even a rudimentary hearing would have revealed that Haidak's contact with [the accuser] was welcomed and reciprocated." *Id.*

Notably, where there is no exigency, the *Haidak* court held that due process requires "something more than an informal interview with an administrative authority of the college." *See id*. at 32. The court deemed the telephone conference interview provided in *Haidak* to be insufficient. *See id*. at 8, 32. The First Circuit also confirmed in *Haidak* that, where the response depends on credibility, "a university must do more than presume one version to be correct." *Id.* at 32-33.

Here, exactly as in *Haidak*, Defendants presumed the complainant's version to be correct. And even though the complainant had graduated two years previously and no longer was on campus, Defendants slapped Plaintiff with a lengthy suspension without prior notice or hearing, despite the absence of any exigency. There was no process for determining, based on any evidence, that Plaintiff actually posed some real threat to the university community that could

not be managed in a manner less restrictive than a complete ban from campus and from all classes. As indicated by the Interim President's multiple statements published in the Bangor Daily News, Defendants already had predetermined—despite the actual evidence—that Plaintiff had "endangered multiple women." These statements, of course, contradict UMF's own Title IX findings about Plaintiff, which the school reached after months of exhaustive investigation lasting nearly the entire 2017-2018 school year. Plaintiff has witnesses who can verify what actually occurred between him and K.P.—in direct rebuttal to the latest allegations leveled against him—yet Defendants' investigators have spent the past six months avoiding this evidence, presumably due to the predetermined narrative of the Interim President.

Plaintiff expects Defendants to tout the fact that, upon being provided notice of the complaint to be filed and the *Haidak* decision, they have recently agreed to provide Plaintiff with a process to "re-review" the continuation of his interim suspension. Defendant Fiacco, who issued the initial suspension order without due process, has resurfaced as of Saturday, September 7, for the express purpose of conducting this review. Defendants' proposed course of action, however, still fails to comply with the Constitution.

First, any decision concerning Plaintiff's suspension must take into account that his March 2019 suspension order was constitutionally defective, for the reasons described in *Haidak*. In other words, Plaintiff does not enter the 2019-2020 school year as a validly suspended student, but as a non-suspended student; he must be treated in this manner during the course of any future proceedings. A "review" proceeding, therefore, cannot be legitimate when it purports simply to look again at whether the suspension should "continue" when it was not valid at the outset.

Second, placing Defendant Fiacco in charge of the "review" proceeding taints the result in an unconstitutional manner. Having plainly violated Plaintiff's rights in March 2019, Fiacco

has every incentive now to find reasons to support his prior suspension order, in an attempt to moot Plaintiff's claim.

Third, the process outlined by Defendant Fiacco in his September 7 communication continues to violate Plaintiff's constitutional rights. Fiacco still has yet to articulate any issue concerning why Plaintiff poses a direct threat to the safety of the university community—other than the yet-to-be investigated allegations of K.P.—so it is impossible for Plaintiff to offer evidence on this issue, other than to deny that he is a threat to anyone. Nor does the proceeding propose to consider any less-restrictive means of protecting the community while permitting Plaintiff to participate fully in classes and in other on-campus activities. The proposed process also continues to violate the Constitution, as it will consist merely of separate one-hour telephone interviews with Plaintiff and his accuser; Plaintiff will have no opportunity to hear what he is being accused of and no opportunity to rebut those accusations or cross-examine. Defendant Fiacco also has not pledged to hear evidence from the other witnesses that Plaintiff identified months ago. As explained in *Haidak,* Plaintiff is entitled to notice and a hearing prior to be suspended, and he still has been offered neither by Defendants.

### IV.    PLAINTIFF WILL SUFFER IRREPARABLE INJURY UNLESS THE COURT GRANTS INJUNCTIVE RELIEF.

Irreparable harm is a substantial injury that is not accurately measurable or adequately compensable by money damages. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 19 (1st Cir. 1996). In *Brown v. Board of Education*, 347 U.S. 483 (1954), the Supreme Court explained that "education is perhaps the most important function of state and local governments . . . It is required in the performance of our most basic public responsibilities . . . it is the very

foundation of good citizenship." *Id*. at 493. The loss of educational opportunity is an injury not compensable by money damages. Its loss, therefore, is irreparable in the legal sense.

Courts have held that deprivation of one's education inflicts harm that cannot be remedied by money damages. *See, e.g., Johnson v. Collins*, 233 F. Supp. 2d 241, 251 (D.N.H. 2002) ("I find that the Johnsons have made an adequate showing that Andrew is likely to suffer irreparable harm absent injunctive relief if he continues to be deprived of an education during the pendency of this lawsuit"); *Murphy v. Fort Worth Independent School Dist*., 258 F. Supp. 2d 569, 575 (N.D. Tex.) ("No form of compensation is available to [plaintiff] for the injury he would suffer if he were not to be returned in his home school for the continuation of his education"), *vacated on other grounds*, 334 F.3d 470 (5th Cir. 2003).

If injunctive relief is not promptly issued, Plaintiff will suffer immediate and irreparable harm, because he cannot attend any classes on any campus in the UMS system. He already has missed an entire academic year due to the protracted Title IX investigation surrounding M.P.'s discredited allegations. The March 2019 suspension once again blocked him from attending classes at the conclusion of the spring 2019 semester; now that unconstitutional suspension threatens to keep him out of classes for the fall 2019 semester as well. Defendants have delayed investigating the merits of the false charges leveled against Plaintiff, while barring him from campus. He is only three classes away from completing his graduation requirements. Without an injunction to end Plaintiff's unlawful suspension, he will suffer irreparable harm.

## V. THE INJURY TO PLAINTIFF IN THE ABSENCE OF A PRELIMINARY INJUNCTION OUTWEIGHS ANY HARM TO DEFENDANT.

This Court must weigh the balance of equities, which is "whether the harm caused plaintiff without the injunction, in light of the plaintiff's likelihood of eventual success on the

merits, outweighs the harm the injunction will cause defendants." *Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987).

The harm to Plaintiff without the injunction is that he will lose yet another academic year while Defendants mire him in a never-ending investigation. Defendants have yet to identify any demonstrable harm that would result from lifting the suspension, especially since Plaintiff's accuser has graduated and is no longer on campus or even in the State of Maine. There has yet to be any finding against Plaintiff that he engaged in any form of sexual assault. He poses no danger. Despite the negative press in the Bangor Daily News, and UMF's baffling decision to ignore its own findings exonerating Plaintiff, the entire narrative being pinned on Plaintiff is baseless.

## VI. GRANTING THIS TEMPORARY RESTRAINING ORDER SERVES THE PUBLIC INTEREST.

"The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005).

Here the public interest weighs in favor of requiring Defendants to provide its students due process before depriving them of their property interest in their education. Given that UMF has never demonstrated that Plaintiff poses any danger—and has in fact made its own detailed Title IX findings to the contrary—the public interest will not be adversely affected by lifting Plaintiff's suspension. *See Johnson v. Collins*, 233 F.Supp.2d 241 (D.N.H. 2002) (public interest weighs in Plaintiff's favor where he was expelled without hearing and there was no finding that he was a danger to the school community.)

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his motion for temporary restraining order and preliminary injunctive relief requiring Defendants to lift the suspension order and restore his access to UMF so he can complete his degree.

Dated:  September 9, 2019.

>/s/ Richard L. O'Meara
>Richard L. O'Meara
>
>MURRAY, PLUMB & MURRAY
>75 Pearl Street, P.O. Box 9785
>Portland, ME  04104-5085
>(207) 773-5651
>E-mail:  *romeara@mpmlaw.com*
>
>Counsel for Plaintiff John Doe