UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| John Doe, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:19-cv-00415-NT |
| | ) | |
| University of Maine System and, | ) | |
| David Fiacco, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OBJECTION TO PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

Defendants University of Maine System ("UMS") and David Fiacco, by and through undersigned counsel, respectfully request that this Court deny Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order (the "Motion") (ECF No. 4).

The crux of Doe's claim in this Motion is that under the recent U.S. Court of Appeals for the First Circuit decision in Haidak v. University of Massachusetts-Amherst, 933 F.3d 56 (1st Cir. 2019), UMS denied him due process when imposing an interim suspension by failing to give him notice and a "hearing" before doing so.  Contrary to Doe's claim, in both March 2019 and September 2019, UMS afforded him due process, including notice and an opportunity to be heard on his interim suspension, consistent with the requirements under Haidak.  Given the violent nature of the allegations against Doe, his past discipline for admitted harassment/intimidation and stalking, the emerging reports of harassment and assault from additional women, and the pattern of egregious misconduct that emerged from the reports of

1

these women, this case differs from <u>Haidak</u> in that exigent circumstances[1] warranted his immediate suspension in March of 2019.  UMS nonetheless provided Doe with notice of the charges against him and an opportunity to respond in connection with his interim suspension immediately after it was issued.  Then, in September 2019, UMS reviewed the continuation of Doe's interim suspension.  In connection with that review, Doe received notice of the charges against him and an opportunity to be heard in response.  In sum, Doe has received and continues to receive full and constitutionally adequate due process.

## Introduction

John Doe is a student at the University of Maine at Farmington.  Between 2017 and March of 2019, five separate women made reports to UMS about Doe, alleging conduct that, if proven, constituted violations of the UMS Student Conduct Code ("SCC"), including stalking, harassment, sexual misconduct, and in some cases, sexual assault and physical assault. Following the adjudication of Roe 1's claims against Doe, during which Doe admitted violating two provisions of the SCC by harassing and stalking Roe 1, Doe was placed on deferred disciplinary probation status.  In March, given the publicity in Roe 1's matter, four additional women came forward with allegations against Doe.  Pursuant to its obligations under Title IX of the Education Amendments Act of 1972 ("Title IX"), UMS has or is currently investigating the formal complaints through the process set out in the SCC.

On March 1, as additional reports against Doe were emerging, one of the women, Jane Roe 2, reported to UMS that Doe had violently physically assaulted her and held her in his room for forty-five minutes, attempting to forcibly sexually assault her.  Roe 2's initial statement

---

[1] <u>Id.</u> at 72 ("[E]xigencies may properly provide an exception to the general rule [that notice and a hearing should precede a suspension]: 'Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.'").

contained specific allegations that resembled the conduct to which Doe had admitted during the adjudication of Roe 1's claims, specifically that Doe threatened suicide as a way of manipulating and coercing women to have unwanted contact with him.  The serious, violent, and coercive nature of Doe's reported behavior toward Roe 2, the resemblance to past admitted conduct in the Roe 1 matter, combined with Doe's existing status on deferred disciplinary probation, and the harassment and assault reports against Doe emerging from other women, led UMS to conclude that exigent circumstances existed to warrant immediate suspension of Doe on March 1, due to the potential risk to campus safety.  That same day, UMS provided Doe with written notice of the allegations that formed the interim suspension and a prompt opportunity to be heard.  In this regard, David Fiacco, the Director of Community Standards, Rights & Responsibilities for the University of Maine and a trained Title IX investigator for UMS[2], invited Doe to meet with him on March 6, 2019.  The express purpose of that meeting was to decide "whether the Interim Measures will be lifted or if they will remain in place."  Doe declined the opportunity to attend that meeting.

Then, UMS offered Doe the opportunity to appeal the interim suspension decision to the University President's Designee, which Doe exercised.  As part of the appeal process, Doe submitted additional evidence that was considered by UMS in reviewing the appropriateness of the interim suspension.  Following a thorough review of the basis for the interim suspension decision and the evidence Doe submitted, the President's Designee upheld the interim suspension decision, concluding that Doe's alleged behavior, if true, represented a "disturbing potential threat to campus safety."

---

[2] Mr. Fiacco is a neutral third party who would not be conducting the underlying investigation, but whose role is only to determine the appropriate interim measures pending the resolution of the proceedings.  (Fiacco Decl. ¶ 10.)

More recently, after the First Circuit issued the <u>Haidak</u> opinion, UMS agreed to review Plaintiff's continued interim suspension for the 2019-2020 academic year.  Mr. Fiacco is currently conducting this review, which has included notice of the allegations against Doe and an opportunity to rebut them and the need for his continued interim suspension.  In March and, now again in September, UMS has provided Doe with all of the hallmarks of a "hearing" to which he is entitled under <u>Haidak</u>: notice as soon as practicable and the opportunity to rebut the allegations and the basis for his interim suspension.  UMS has not yet issued a determination as to whether Doe's interim suspension will continue through the 2019-2020 academic year.  Because Doe was provided with the due process required by <u>Haidak</u>, he cannot demonstrate that there is a likelihood of success on the merits of his claim.

Moreover, although Doe has chosen to omit these facts altogether from his filings, UMS has undertaken substantial efforts to accommodate Doe to allow him to complete the remaining credits he needs to graduate.  Among other things, UMS has issued Doe a proposal that will allow him to continue his academic progress toward his degree by taking his few remaining classes remotely.  These proffered accommodations eviscerate Doe's claim of "irreparable harm" particularly given that at the conclusions of Doe's disciplinary proceedings he may ultimately be suspended or permanently dismissed from UMS.

Finally, the balance of harms and public interest favor maintaining the status quo of Doe's interim suspension pending, at a minimum, UMS's current review of that suspension. Several women have alleged a pattern of egregious sexual misconduct and physical harm by Doe after he already admitted to violating the SCC twice by harassing/intimidating and stalking another woman on campus.  Given UMS's offer to allow Doe to take his final credits remotely, the balance clearly weighs in favor of allowing UMS to continue its review and, if it is upheld,

4

maintaining the interim suspension until the conclusion of Doe's disciplinary proceedings. Plaintiff's Motion is both premature and unwarranted, and this Court should deny the Motion.

### Factual Background

*Doe's Prior Disciplinary History*

John Doe is a senior at the University of Maine at Farmington.  (Lavoie Decl. ¶ 4.)  On October 4, 2017, a female student, Roe 1, reported to the UMS Title IX office that Doe had sexually assaulted Roe 1 and had engaged in a pattern of behavior in which he had repeatedly threatened suicide to coerce Roe 1 to have contact with him, calling her more than 500 times and texting her more than 700 times in one month.  (Lavoie Decl. ¶¶ 5-6.)  During the course of the investigation into Roe 1's complaint, Doe admitted that he violated the stalking and harassment sections of the SCC. (Lavoie Decl. ¶ 6.)  The Student Conduct Committee adjudicating Roe 1's complaint also found Doe responsible for sexual assault and placing her in fear of physical harm. (Lavoie Decl. ¶ 7.)  Despite finding that Doe had used suicidal ideation to coerce Roe 1 for sex and continuing contact, a review panel reversed the finding on those two alleged violations of the SCC.  (Lavoie Decl. ¶ 7.)  While UMS ultimately determined that Doe was not responsible for sexual assault under the SCC because there was not a preponderance of the evidence to support that finding, it did not – as Plaintiff claims – "exonerate" him.  (Lavoie Decl. ¶ 7.)  Ultimately, on March 27, 2018, UMS placed Doe on disciplinary probation status and issued him an official warning for his admitted stalking and harassing conduct.  (Lavoie Decl. ¶ 6.)

*Additional Reports of Assault and Harassment Surface Against Doe in late February 2019*

After the adjudication of Roe 1's allegations against Doe, a Bangor Daily News reporter, who had previously published an article about Roe 1's case against Doe, published a follow-up article stating that four additional women had reported that Doe sexually assaulted or harassed

them.  (Lavoie Decl. ¶ 9.)  In late February 2019, the UMS Title IX office requested the names of these women so that it could reach out to them to offer support services as well as conduct a preliminary inquiry to determine the need for interim protective measures and formal investigation. (Lavoie Decl. ¶ 10.)  The author agreed to notify the women that the UMS Title IX office wished to speak with them.  The March 5, 2019 story published in BDN included the names and communities of some of these women.  (Lavoie Decl. ¶¶ 10, 22.) Part of this preliminary inquiry to the women was to determine whether Doe's continued presence on campus was likely to pose a substantial threat to the community, necessitating an interim suspension under the SCC and pursuant to UMS's obligations under Title IX.   (Lavoie Decl. ¶ 10, 13-14.)

*March 2019 Interim Suspension Decision*

On March 1, 2019, one of the women mentioned in the article, Roe 2, met with Ms. Lavoie to discuss her allegations against Doe.  (Lavoie Decl. ¶ 11.)  Roe 2 reported, among other things, that Doe had physically assaulted her, choked her, and threatened suicide to coerce her into engaging in sexual contact with him.  (Lavoie Decl. ¶ 11.)  Roe 2 also reported that on one occasion during a fight, Doe kept her from leaving his bedroom, physically forcing her and pinning her onto his mattress, forcibly removed her shorts and threatened to sexually assault her. (Lavoie Decl. ¶ 12.)  Roe 2 also reported that while doing so, Doe elbowed Roe 2 in the face, hitting her in the lip and causing her to bleed.  (Lavoie Decl. ¶ 12.)  That same day, UMS determined that Doe's continued presence on campus during the pendency of the investigation and disciplinary proceedings was likely to pose a substantial threat to the UMS community and that sufficient exigent circumstances existed to warrant an immediate interim suspension of Doe. (Fiacco Decl. ¶¶ 7-15.)  That decision was based on the following: (a) the serious, violent and

coercive nature of Doe's reported behavior toward Roe 2; (b) the fact that Doe had exhibited a pattern of threatening suicide and self-harm to get what he wanted with both Roe 1 and Roe 2; (c) the allegations of other women that Doe had harassed and/or assaulted them as relayed by the Bangor Daily News reporter; and (d) Doe's admission to intimidation/harassment and stalking Roe 1 resulting in him being on disciplinary probation status.  (Fiacco Decl. ¶¶ 16-17.)

That same day, March 1, the Deputy Title IX Coordinator, Elizabeth Lavoie, met with Doe and handed him the notice of his interim suspension, which included a summary of Roe 2's allegations. (Lavoie Decl. ¶ 15; Fiacco Decl. ¶ 18.)   Doe informed Ms. Lavoie that the allegations by Roe 2 were not true.  (Lavoie Decl. ¶ 16.)    Ms. Lavoie informed Doe that a meeting had been scheduled for Doe to meet with David Fiacco on March 6 to discuss Doe's response to Roe 2's allegations and any other information that would be relevant to the interim suspension decision. (Lavoie Decl. ¶¶ 16-17.)  Ms. Lavoie specifically informed Doe that in the March 6 meeting with Mr. Fiacco "further determinations will be made on whether the Interim Measures will be lifted or if they will remain in place." (Lavoie Decl. ¶ 18.)   Doe told Ms. Lavoie that he could not attend because he was "busy." (Lavoie Decl. ¶ 17.)    Ms. Lavoie then told Doe that he should reach out to Mr. Fiacco and reschedule the meeting for his earliest convenience, which would create no negative inference in his investigation. (Lavoie Decl. ¶¶ 16-17.)  Doe also sent an e-mail to Mr. Fiacco the night before the scheduled meeting canceling the meeting because Doe said he needed to meet with his attorney. (Fiacco Decl. ¶ 23.)  Mr. Fiacco responded by asking Doe to let him know when they could meet, and explaining that the meeting could be done telephonically if that worked better for Doe.  (Fiacco Decl. ¶¶ 22-23.)  Mr. Fiacco also told Doe that his attorney could be present for the rescheduled meeting.   (Fiacco Decl. ¶ 23.)   Nonetheless, Doe failed to reschedule that meeting.  (Lavoie Decl. ¶¶ 22-23.)

The Notice of Interim Suspension to Doe included an explanation that Doe had the right to appeal the interim suspension by notifying the University President or his Designee in writing as set out in the SCC. (Fiacco Decl. ¶¶ 20, 24.)  On March 7, 2019, Doe provided the Interim University President with a letter setting forth his position on the interim suspension.  (Fiacco Decl. ¶ 24.)  Following a review of that information, the President's Designee declined to lift the interim suspension. (Fiacco Decl. ¶ 25.)  On March 14, 2019, the day of the appeal decision, Mr. Fiacco met with Doe and his attorney in which the attorney provided two additional documents that he claimed relevant for the President's Designee. (Fiacco Decl. ¶ 26.)  This additional documentation related only to Doe's allegations of sexual assault against Roe 2, and did not change the decision by the President's Designee or Mr. Fiacco. (Fiacco Decl. ¶ 27.)  The President's Designee concluded that Doe's alleged behavior, if true, represented a "disturbing potential threat to campus safety." (Fiacco Decl. ¶ 27.)

*Additional Complaints Against Doe*

On March 5, 2019, the Bangor Daily News published the article relating to Doe.  (Lavoie Decl. ¶ 22.)  In that article, five women described how Doe had assaulted and/or harassed them. (Lavoie Decl. ¶ 22.)  They described Doe as someone who "coerced them into staying with him and sending him nude pictures, physically harmed women, harassed them online, grabbed them without their permission, pressured them to have sex after they said no, and performed sexual acts to which they didn't consent." (Lavoie Decl. ¶ 22.)

Following the report by Roe 2, two additional women (Jane Roe 3 and Jane Roe 4)[3] came forward to UMS's Title IX Office to report allegations of sexual harassment and/or misconduct against Doe. (Lavoie Decl. ¶ 23.)  UMS's internal investigators were assigned to investigate

---

[3] Another woman, Jane Roe 5, who had publicly identified herself to the BDN reporter, told the UMS Title IX office that she did not want to make a formal complaint against Doe. (Lavoie Decl. ¶ 23.)

these three complaints against Doe. (Lavoie Decl. ¶ 23.) On March 11, 2019, the investigator interviewed Roe 3 who stated that Doe had threatened to kill one of his roommates, repeatedly asked her to send nude pictures of herself, repeatedly asked to have sex with her, kissed her without her consent, tried to put his hand down her pants without her consent, and followed her to the laundry room in the fitness center, where they both worked, and blocked her in there. (Lavoie Decl. ¶ 24.)  On March 14, 2019, the investigator interviewed Roe 4 who stated that during consensual sex with Doe, without warning or permission, he placed a pillow over Roe 4's face and held it there for approximately ten seconds.  Roe 4 reported that she could not breathe and was frightened.  Roe 4 said that she pushed the pillow off her face, told Doe that they were done and stopped the sexual encounter.  (Lavoie Decl. ¶ 25.)

Doe was given notice of the allegations on March 1, 2019 (Roe 2), May 1, 2019 (Roe 4), and May 1, 2019 (Roe 3), respectively. (Lavoie Decl. ¶ 27.)  On March 18, 2019, the investigator interviewed Jane Roe 2 and collected electronic evidence regarding her allegations.  (Lavoie Decl. ¶ 21.)  On May 3, 2019, the investigator met with Doe and his attorney in person for the purpose of interviewing Doe about the allegations being made by Roe 2, Roe 4, and Roe 3. During that meeting, Doe refused to provide a statement or any substantive information related to the allegations. (Lavoie Decl. ¶ 28.)   Doe's attorney provided the investigator with some electronic evidence regarding Doe's counter allegation of sexual assault against Roe 2.  Doe suggested witnesses for the investigator to contact and the investigator has reached out to them for an interview.  (Lavoie Decl. ¶ 29.)  The investigation into Roe 2's complaint is ongoing.  The investigation into Roe 4's complaint is complete and nearly ready for an Administrative Hearing under the SCC.  (Lavoie Decl. ¶ 29.)

*Doe's Claim that UMS Failed to Investigate his Allegation of Sexual Assault against Jane Roe 2*

Contrary to Doe's claims that the University failed to investigate his allegations of sexual assault against Jane Roe 2, Doe never identified Roe 2 until she brought forward allegations against him in March 2019.  (Lavoie Decl. ¶ 30.)  Instead, Doe made vague statements to a UMF counselor in the spring of 2017 that a female had been sexually aggressive towards him and, in October of 2017, to the investigators in the Roe 1 matter that he had been sexually assaulted by a female.  (Lavoie Decl. ¶ 30; Thelen Decl. ¶ 5.)  Doe did not identify this female and, instead, affirmatively stated that he did not want to pursue formal charges against this person.  (Lavoie Decl. ¶ 30; Thelen Decl. ¶ 5.)  Then, in the wake of the disciplinary matter involving Roe 1, Doe alleged various legal claims against UMS, including that UMS discriminated against him based on his gender under Title IX by failing to investigate his sexual assault allegations against the unidentified female. (Thelen Decl. ¶ 5.)  In the context of settlement negotiations regarding Doe's claims against UMS, including this gender discrimination claim, Doe again declined to provide the female's name and reiterated that he did not want to pursue a complaint against this individual. (Thelen Decl. ¶ 5.)  In the settlement negotiations, the UMS General Counsel explicitly informed Doe that any settlement would include a complete waiver and release of all Doe's claims against UMS, including his gender discrimination claim.  (Thelen Decl. ¶ 6.)  The explicit terms of the Settlement Agreement included a release of all claims by Doe, including specifically Doe's discrimination and unfair treatment claims.  (Thelen Decl. ¶¶ 6-7.)  When Doe finally provided Roe 2's name to UMS in response to learning she had filed a complaint against him, UMS informed Doe that it does not as a matter of practice investigate cross-claims until after it completed the initial investigation.  (Lavoie Decl. ¶ 31.)  By that time, however, Doe had already waived his claim that UMS failed to investigate his allegation of sexual assault in the

Settlement Agreement and he resurrected these allegations against Roe 2 only defensively in response to her complaint.[4]

*Haidak and UMS' Review of Doe's Continued Interim Suspension for 2019-2020 Academic Year*

On August 26, 2019, counsel for the Plaintiff contacted the UMS General Counsel and claimed – as he alleges in this case – that based upon the First Circuit decision in Haidak, UMS had not complied with the requisite procedural due process requirements in imposing Doe's interim suspension. In light of the clarified requirements set out in Haidak, Mr. Fiacco agreed to review whether continuing Doe's interim suspension for the 2019-2020 academic year was appropriate based on the information gathered in the investigations and after giving Doe and Roe 2 another opportunity to be heard. (Fiacco Decl. ¶¶ 28-29.) That review is currently ongoing. (Fiacco Decl. ¶¶ 30-31.) On September 9, 2019, Doe submitted a written statement to Mr. Fiacco. On September 12, 2019, Doe and his attorney had a telephonic meeting with Mr. Fiacco, in which Doe was able to provide any rebuttal or additional information relating to Doe's interim suspension. (Fiacco Decl. ¶ 30.) Doe was also given the opportunity to review, in person and with his attorney, certain electronic evidence being considered in the interim suspension review. (Fiacco Decl. ¶ 33.) Doe was also given the opportunity to posit questions to Roe 2 through Mr. Fiacco. (Fiacco Decl. ¶ 33.)

Pending the outcome of the review of his continued interim suspension, UMS has worked with Doe extensively to obtain accommodations so that Doe may continue to make academic progress toward completion of his degree and graduate, including the ability to take classes remotely. (Lavoie Decl. ¶ 33.) Specifically, Ms. Lavoie has worked extensively with the faculty in the History Department at UMS to provide Doe with the following proposed accommodations:

---

[4] See Haidak, 933 F.3d at 74 ("[Plaintiff's] accusations came second in time and arose only defensively. And when expressly told that he could initiate a charge under the [Code of Conduct], he demurred.").

(a) credit for two (2) history classes in which he received a D grade, eliminating his need to re-take those classes; (b) being given a withdrawal pass for his incomplete Spring 2019 classes; (c) being allowed to take his remaining eight credits remotely and without charge in any class for that is open and for which he meets the prerequisites; and (d) being provided accommodations to take his thesis course remotely.  (Lavoie Decl. ¶ 34.)  Doe is currently in the process of working through these accommodations with UMS.  Critically, however, Doe's ability to timely complete his courses and graduate from UMS depends on the outcome of the UMS's proceedings into the reported serious violations by Doe of the SCC.

On September 13, 2019, the UMS Title IX office notified Doe that following the media coverage of his Complaint and this Motion, another woman, Jane Roe 6, has come forward to UMS with similar allegations against Doe, which will be considered as part of the review of his continued interim suspension.  (Lavoie Decl. ¶ 32.)

**Argument**

**1.**     **Plaintiff has a Heavy Burden of Proof to Establish that a Temporary Restraining Order is Necessary.**

To obtain preliminary injunctive relief, including a temporary restraining order, a plaintiff must demonstrate: (a) a likelihood of success on the merits; (b) a likelihood of irreparable harm absent interim relief; (c) a balance of equities in the plaintiff's favor; and (d) that the injunction will be in service of the public interest.  See, e.g., Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, 794 F.3d 168, 171 (1st Cir. 2015); Waldron v. George Weston Bakeries, Inc., 570 F.3d 5, 9 (1st Cir. 2009).  The moving party "bears the burden of establishing that these four factors weigh in its favor."  Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).  "This burden is a heavy one: 'Because a preliminary injunction is an

extraordinary remedy, the right to relief must be clear and unequivocal.'" L.L. Bean, Inc. v. Bank of Am., 630 F. Supp. 2d 83, 86 (D. Me. 2009).  Doe's Motion should be denied on this standard.

**2.      Doe is Seeking Extraordinary Relief.**

Doe is not seeking typical preliminary injunctive relief that maintains the status quo. Instead, Doe is seeking mandatory relief that would require UMS to take affirmative action to lift his interim suspension.  See, e.g., L.L. Bean, Inc. v. Bank of Am., 630 F. Supp. 2d 83, 89 (D. Me. 2009) "[T]his 'Court should only sparingly exercise its authority to issue an interlocutory injunction which requires a defendant to take affirmative action.'") (collecting cases); Lu v. Hulme, No. CA No. 12-11117, 2013 WL 1331028, at *10 (D. Mass., Mar. 30, 2013) ("[W]here, as here, the injunction would require an affirmative act by the non-moving party, the 'request warrants extra scrutiny.'").

A party seeking mandatory injunctive relief bears an even heavier burden, and must demonstrate that "the exigencies of the situation demand such relief."  Braintree Labs., Inc. v. Citigroup Global Markets Inc., 622 F.3d 36, 41 (1st Cir. 2010); see also Mass. Coal. of Citizens with Disabilities v. Civil Defense Agency, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

Here, there are no special "exigencies" that favor granting mandatory relief, nor does "the law clearly favor the moving party."  Doe was placed on an interim suspension because he was deemed to pose a substantial threat to campus safety following the reports of several women that Doe engaged in violent and harassing behavior toward them.  This interim suspension has remained in effect while UMS has undergone its required investigation and adjudicatory process to determine whether Doe has violated its SCC.  For these reasons, and as set forth in detail below, Doe's Motion should be denied.

13

3.      **Doe Cannot Demonstrate a Likelihood of Success on the Merits.**

In his Motion, Doe argues that he is likely to succeed on the merits of his claim that he was not provided the due process required by <u>Haidak</u>, prior to his interim suspension.  (Motion for TRO, ECF No. 3 at 12-15.)  Doe did in fact receive the due process required under <u>Haidak</u> at the time of his interim suspension, and he is receiving due process again during UMS's current review process.  As is set forth in detail above, at the time of Doe's interim suspension, UMS provided Doe with: (a) notice of the allegations against him; (b) an opportunity to submit any information relating to those allegations; and (c) an opportunity to have an in-person hearing with Mr. Fiacco to respond in detail and to rebut the allegations, and to determine whether Doe's interim suspension would be lifted or remain in place. (Fiacco Decl. ¶ 16.)  Mr. Fiacco initially set this hearing for March 6, 2019, just two business days after UMS issued the interim suspension. (Fiacco Decl. ¶ 21.)  On March 5, 2019, Doe informed Mr. Fiacco that he would be unable to attend the hearing on that date. (Fiacco Decl. ¶ 23.)  Mr. Fiacco offered to have the hearing by telephone if that worked better for Doe's schedule.  Doe never sought to reschedule. (Fiacco Decl. ¶ 23.)

Universities need not provide any right to appeal a student disciplinary decision.  <u>See, e.g.</u>, <u>Gomes v. Univ. of Maine Sys.</u>, 365 F. Supp. 2d 6, 51 (D. Me. 2005).  Despite this, UMS also provided Doe with an opportunity to appeal his interim suspension, which Doe opted to do. (Fiacco Decl. ¶ .)  During the appeal, Doe submitted a written response to the allegations that were then pending against him. (Fiacco Decl. ¶ 24.)  Ultimately, the suspension decision was upheld by UMS.  (Fiacco Decl. ¶ 25.) As such, UMS provided Doe with more than the required due process at the time of his interim suspension.  <u>See Goss v. Lopez</u>, 419 U.S. 565, 581 (1975)

14

(holding that the due process requirements consist of giving the student notice of the charges, an explanation of the evidence, and an opportunity to present the student's side of the story).

In <u>Haidak</u>, the First Circuit held that "[a]s a general rule, both notice and a hearing should precede a suspension." 933 F.3d at 72.   However, the First Circuit went on to explain that sometimes "exigencies may properly provide an exception to this general rule: 'Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.  In such cases, the necessary notice and **rudimentary** hearing should follow as soon as practicable . . .'" <u>Id.</u> (quoting <u>Goss</u>, 419 U.S. at 582-83) (emphasis added)).    Here, women had alleged a pattern of egregious sexual misconduct and violent behavior by Doe after he already admitted to violating UMS's policies by harassing and stalking another woman on campus. (Fiacco Decl. ¶ 16.)  In these exigent circumstances, UMS was well within its rights to issue an interim suspension pending investigation of those charges.  In effect, Doe seeks appellate review of the underlying facts and circumstances upon which UMS based its interim suspension decision. That is not the court's role in this case.  <u>See</u> <u>Doe v. Brown Univ.</u>, C.A. No. 16-017S, 2016 WL 5409241, at *1 (D.R.I. Sept. 28, 2016) ("This Court is not a super-appeals court for sexual misconduct cases, nor is it an advisor to [the school] on how it should handle these messy and unfortunate situations."); <u>see also</u> <u>Yu v. Vassar Coll.</u>, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015) ("The Court's role, of course, is neither to advocate for best practices or policies nor to retry disciplinary proceedings.").

This case can be distinguished from <u>Haidak</u> in several important ways.  Specifically, in <u>Haidak</u>, the university was dealing with potential violation of a no-contact order following a charge of physical assault against.  933 F.3d at 62.  There, the university waited thirteen days after learning about the charges against the student before issuing the suspension, which negated

15

any claim to exigent circumstances, and provided the student with no prior notice or an opportunity to be heard. Id. at 72. Additionally, the court relied heavily on the fact that even a rudimentary proceeding would have revealed that the violation of the no-contact order was welcomed and reciprocated. Id. at 73. Here, in contrast, UMS issued the interim suspension immediately and–two business days later–scheduled with Doe an opportunity to be heard in rebuttal, which Doe declined to attend. The Haidak Court also specified that a university can satisfy the due process requirements "in stages" by having the student respond to the charges and continuing the process from there. Id. at 72-73. Additionally, Doe does not argue that Mr. Fiacco misapprehended an important fact that would have reversed the interim suspension; instead, Doe flatly denies the allegations against him and raised allegations against Roe 2.

And, as Doe is well aware, UMS is currently reviewing Doe's interim suspension. As part of that process, UMS is **again** providing Doe with the due process that is required under Haidak. Specifically, UMS has provided Doe with: (a) notice of the allegations against him; [5] (b) an opportunity to submit any additional information responding to those allegations; and (c) an opportunity to have a conference with Mr. Fiacco to respond to those allegations and the need to continue his interim suspension; (d) an opportunity to review key electronic evidence being considered in the interim suspension review; (e) and an opportunity to posit questions to the reporting party through Mr. Fiacco. At this time, Doe has submitted information and has attended, with his attorney present, a conference with Mr. Fiacco to respond to the allegations and the need to continue his interim suspension.

Doe argues that the review process being offered by UMS is insufficient because it does not provide him with an ability to rebut the allegations against him or to cross-examine his

---

[5] Doe does not argue that he was not provided with adequate notice of the charges against him.

accusers.  (See Motion for TRO, ECF No. 3 at 15.)  This argument is deficient in two respects.
First, UMS has allowed Doe to submit written materials responding to the allegations against
him and has given Doe an opportunity to meet with Mr. Fiacco to rebut those allegations, which
Doe has done. (Fiacco Decl. ¶¶ 20-23.)  Second, with respect to cross-examination, in Haidak,
the First Circuit held that, even at the adjudicatory hearing stage, public institutions do **not** need
to conduct a hearing that involves the right to cross-examination by the accused or his
representative, stating that it "take[s] seriously the admonition that student disciplinary
proceedings need not mirror common law trials."  Haidak, 933 F.3d at 69.  Specifically, the
Court stated that it would not hold that there is a categorical rule requiring that an institution
provide for cross-examination by the accused or his representative in all cases "because we have
no reason to believe that questioning of a complaining witness by a neutral party is so
fundamentally flawed as to create a categorically unacceptable risk or erroneous deprivation."
Id.  This holding is in accord with prior First Circuit cases.  See, e.g., Gorman v. Univ. of Rhode
Island, 837 F.2d 7, 16 (1st Cir. 1988) ("[T]he right to unlimited cross-examination has not been
deemed an essential requirement of due process in school disciplinary cases.").

In fact, the First Circuit in Haidak found that the university's separate, iterative
interviews of the complaining and responding parties was sufficient to satisfy due process.  Id. at
70-71 ("All in all, the Board managed to conduct a hearing reasonably calculated to get to the
truth by allowing Haidak to be heard after Gibney testified and by examining Gibney in a
manner reasonably calculated to expose any relevant flaws in her claims…").  That same process
is being followed by UMS in the case at hand.

Second, as Doe is fully aware, UMS is currently reviewing his interim suspension for the
2019-2020 academic year based on the information gathered in the investigations and after

giving Doe and Roe 2 an opportunity to be heard.  As such, this Court should allow UMS to proceed with its review process, and Doe is free to raise this claim after the process concludes if he believes the review was deficient under the Due Process Clause.[6]

In sum, the process being offered to Doe is in complete accord with the due process requirements set forth in <u>Haidak</u> and other cases.[7]  "[T]he question presented is whether, in the particular case, the individual has had an opportunity to answer, explain, and defend, and not whether the hearing mirrored a common law criminal trial."  <u>Gorman</u>, 837 F.3d at 14, 16.

**4.    Doe cannot demonstrate a likelihood of irreparable harm if a TRO is not issued.**

It is well-established that irreparable harm is "a substantial injury that is not accurately measurable or adequately compensable by money damages."  <u>Ross-Simons of Warwick v. Baccarat, Inc.</u>, 102 F.3d 12, 19 (1st Cir. 1996).  Moreover, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  <u>Charlesbank Equity Fund II v. Blinds To Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004).  Doe cannot meet his burden of showing that, without injunctive relief, he likely will suffer immediate irreparable substantial injury.

Doe claims that he will be irreparably harmed "because he cannot attend any classes on any campus in the UMS system" and states that he "is only three classes away from completing his graduation requirements."  (Motion for TRO, ECF No. 3 at 16.)  As a preliminary matter, Doe's claims are entirely speculative because the review of his interim suspension is ongoing.

---

[6]  Moreover, Defendants contend that Doe's complaint as a whole is not ripe for review.  <u>See, e.g.</u>, <u>Texas v. United States</u>, 523 U.S. 296, 300 (1998) (quotations omitted); <u>McInnis-Mienor v. Maine Med. Ctr.</u>, 319 F.3d 63, 67 (1st Cir. 2003).

[7]  Doe's argument that having Mr. Fiacco review Doe's interim suspension "taints the results in an unconstitutional manner" is completely tenuous and should be disregarded.  <u>See Gorman</u>, 837 F.2d at 15 ("[a]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences.") (quotations omitted).

That review may result in Doe's suspension being lifted.  Doe's claim of "irreparable" harm is premature and a preliminary injunction should be denied on that basis alone.  See, e.g., B.P.C. v. Temple Univ., No. CIV.A. 13-7595, 2014 WL 4632462, at *4 (E.D. Pa., Sept. 16, 2014) (denying preliminary injunction where respondent's disciplinary proceeding was not completed).

Second, Doe's claim of "irreparable harm" fails because the contemplated harm is compensable with monetary damages.  See, e.g., Doe v. Amherst Coll., No. 14-CV-30114-MGM, 2014 WL 12597613, at *3 (D. Mass. July 28, 014) (denying preliminary injunctive because anticipated missed educational or career opportunities due to being unable to obtain a degree are compensable with money damages) (citing Powell v. City of Pittsfield, 221. F. Supp. 2d 119 (D. Mass. 2002)).

Third, Doe completely fails to mention anywhere in his Motion that on September 4, 2019, UMS offered him several accommodations that would allow him to complete his remaining credits in order to graduate, including taking courses remotely.  UMS's offer negates Doe's claim of irreparable harm.  For this reason alone, Doe's Motion should be denied.

Fourth, as explained in more detail in Section insert above, Doe has received the due process that he is entitled to under Haidak on two separate occasions.  This also prevents Doe from demonstrating irreparable harm, which necessitates denial of his Motion.  See, e.g., Braintree Labs., Inc., 622 F.3d at 40 (describing irreparable harm as "the essential prerequisite for equitable relief") (quotation omitted).

**5.    The balance of the harms and public interest weigh against injunctive relief.**

To demonstrate that the balance of harms and public interest weigh in favor of granting his request for a TRO, Doe claims that "he will lose yet another academic year" while UMS has "yet to identify any demonstrable harm that would result from lifting the suspension, especially

since [his] accuser had graduated and is no longer on campus or even in the State of Maine."
(See Motion for TRO, ECF No. 3 at 17.)

First, contrary to Doe's allegations, Roe 2 is not Doe's only accuser.  As set forth in detail, above, multiple women have made reports against Doe, all of which can and should be considered in evaluating whether suspension is warranted on an interim basis for the protection of the UMS community.  Further, Doe has already admitted to harassment and stalking of Roe 1 in circumstances materially similar to the allegations made by Roe 2.  Given this alleged pattern of behavior, UMS – very reasonably – determined that Doe potentially represented a continuing danger to other women on campus and the UMS community.  As was explicitly stated in Haidak,

> A state university . . . has an important interest in protecting itself and other students from those whose behavior violates the basic values of the school, and in balancing the need for fair discipline against the need to allocate resources toward 'promot[ing] and protect[ing] the primary function of institutions that exist to provide education.'

933 F.3d at 66 (quoting Gorman, 837 F.2d at 14).  As such, UMS properly exercised its discretion to impose an interim suspension on Doe while the investigation and adjudication of the complaints against him are pending.   It is well-settled that Courts should not lightly interfere with these judgments.  See Havlik v. Johnson & Wales Univ., 509 F.3d 25, 35 (1st Cir. 2007) (courts must accord a school some measure of deference in matters of discipline); Morale v. Grigel, 422 F. Supp. 988, 1004-05 (D.N.H. 1976) ("[F]ederal courts do not sit in judgment of the wisdom of school administrators, students or even attorneys.").

Given all of the above, the balance of equities and the public interest favor maintaining Doe's interim suspension at this time.

**Conclusion**

In sum, because Doe has not met the heavy burden to demonstrate that UMS's process for interim suspension was so procedurally deficient as to warrant his immediate return to campus, and given the substantial public interest in the protection and safety of UMS' Farmington campus, this Court should defer to the fact-finder in the review of Doe's interim suspension and deny Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated: September 13, 2019                    Respectfully submitted,

                                            */s/ Shiloh D. Theberge* _____
                                            Shiloh D. Theberge
                                            Kathryn W. McGintee
                                            Tara A. Walker
                                            BERNSTEIN SHUR
                                            100 Middle Street, P.O. Box 9729
                                            Portland, Maine 04104-5029
                                            (207) 774-1200
                                            stheberge@bernsteinshur.com
                                            kmcgintee@bernsteinshur.com
                                            twalker@bernsteinshur.com

                                            Attorneys for Defendant