UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil No. 19-cv-00415-NT

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNIVERSITY OF MAINE | ) |
| SYSTEM and DAVID FIACCO, | ) |
| | ) |
| Defendants | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff John Doe submits this memorandum of law in opposition to Defendants' motion to dismiss.

**STANDARD OF REVIEW**

Motions to dismiss brought by defendants under Rule 12(b)(6) are designed to test the legal sufficiency of a complaint; a court ruling on such a motion to dismiss must accept all well-pled factual averments in the complaint as true and must draw all reasonable inferences in the plaintiff's favor. *Miller v. Town of Wenham Massachusetts,* 833 F.3d 46, 51 (1st Cir. 2016). On any question of fact, the court's role is "limited to defining the outer boundaries of its answer—*i.e.*, the point at which a juror could

reasonably find only one way." *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40 (1st Cir. 2019).

## ARGUMENT

### I. The October 2018 Settlement Agreement does not release Plaintiff's claims set forth in Counts I and II of the Complaint.

Defendants first assert that Plaintiff's claims in Counts I and II of the Complaint have been released as a consequence of the settlement reached in October 2018 concerning the 2017-2018 academic year. *Def. Motion* at 8. This contention is incorrect, as Plaintiff has Title IX claims that arose after October 2018.

Count I alleges a "hostile environment" violation of Title IX, while Count II alleges a "selective enforcement" violation of Title IX. The settlement agreement releases only Plaintiff's claims relating to "incidents or matters related to the Dispute which occurred during the 2017-2018 academic year." A Title IX selective enforcement claim, however, accrues when the university starts proceedings or imposes punishment because of gender. *Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 410 (D.R.I. 2018). Even though Plaintiff previously had Title IX claims that arose during the 2017-2018 academic year and were released a year ago, the ones he seeks to pursue in this action arose after October 2018.

UMS began its investigation of Plaintiff concerning Roe 2's belated report in March 2019. The complaint alleges that UMS's suspension of Plaintiff and its commencement of proceedings against him in March 2019—when in the past it had refused to commence even an investigation of Plaintiff's complaint *against* Roe 2 and another female student—amounted to a violation of Title IX given the gender-based disparity of UMS's conduct. *Complaint* ¶ 136. The complaint also alleges that UMS's response to Roe 1's public accusations in the Bangor Daily News that implicated Plaintiff—all of which undercut the exculpatory conclusions UMS had reached through investigation and adjudication of Roe 1's claims—created a hostile environment for Plaintiff in violation of Title IX. *Complaint* ¶¶ 80, 82-86, 128-130. As these Title IX claims (along with the Title IX retaliation claim pleaded in Count III) accrued after the October 2018 settlement agreement, the release language in the agreement does not bar their consideration in this action.

**II.     FERPA did not prevent UMS from defending the fairness and thoroughness of its Title IX proceedings on Roe 1's complaint, nor does it excuse UMS's retaliatory conduct against Plaintiff.**

Next, Defendants attack Count III of the Complaint, which alleges retaliation against Plaintiff in violation of Title IX. UMS contends that its obligations under the Family Education Rights and Privacy Act ("FERPA")

-3-

required it to respond as it did to the highly flawed press accounts that attacked UMS's handling and resolution of Roe 1's accusations against Plaintiff.

FERPA, however, is not a general shield for a school to use in avoiding liability for comments made in the press concerning matters of student discipline. Rather, FERPA merely prohibits educational institutions from revealing students' education records and the "personally identifiable information" contained in those records. *See* 22 U.S.C. § 1232g; 34 C.F.R. Part 99; *U.S. v. Miami Univ.*, 294 F.3d 797, 812 (6th Cir. 2002). FERPA provides a limited definition of "personally identifiable information," identifying it as

> The student's name; The name of the student's parent or other family members; The address of the student or student's family; A personal identifier, such as the student's social security number, student number, or biometric record; Other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name; Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; or Information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the education record relates.

34 C.F.R. Part 99.3. UMS's only obligation under FERPA was not to provide such "personally identifiable information" when commenting publicly on the issues raised by Roe 1 following the conclusion of her Title IX proceedings.

-4-

The BDN began printing articles in January 2019 asserting that Roe 1 had lost her Title IX case against Plaintiff because of "errors" in the way that UMS had handled her case, and that an intermediate-level finding in Roe 1's favor against Plaintiff had been "overturned in bizarre fashion" by UMS. The BDN reports suggested that UMS's erroneous behavior in Roe 1's case had permitted a rapist to go free, thereby threatening the safety of other women on campus. *Complaint* ¶ 79. The allegation of retaliation in Count III focuses on how UMS responded to these inaccurate press reports. As alleged in the Complaint, UMS opted not to dispel any of Roe 1's false accusations, even though it easily could have done so without compromising any personally identifiable information of the students involved; instead, UMS's comments fostered the public perception—including among the faculty and UMF's student body—that Plaintiff had victimized Roe 1. *Complaint* ¶¶ 80, 82-86.

The best proof that UMS could have responded in a non-retaliatory manner without compromising FERPA is the approach it took in responding to Roe 1's filing of a complaint with the Maine Human Rights Commission. With this memorandum of law, Plaintiff has submitted documentation of UMS's responses to Roe 1's Commission complaint, which paralleled the accusations she provided to the BDN. Although as a general rule, courts may not consider documents outside the complaint on a motion to dismiss, *see Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33

(1st Cir. 2001), UMS's responses to Roe 1's Commission complaint fit all three recognized exceptions to this rule. First, they are public records, obtained by Plaintiff's counsel through a request made under Maine's Freedom of Access Act ("FOAA"), 1 Me. Rev. Stat. § 400 *et seq.*[1] *See Krah v. County of Lincoln, Maine*, 2017 WL 1232409, \*1, \*2 (D. Me., Apr. 2, 2017) (considering MHRC filings on a Rule 12(b)(6) motion to dismiss). Second, they are central to Plaintiff's retaliation claim, which focuses on UMS's retaliatory public response to Roe 1's claim that the university had bungled her Title IX case against Plaintiff. Third, UMS cannot contest the authenticity of its own responses to the Commission, which it filed through the same law firm that now has moved to dismiss Plaintiff's retaliation claim. *See Wyman v. United States Surgical Corp.*, 2019 WL 1090763, \*1, \*4 (D. Me., Mar. 6, 2019) (considering document outside complaint on motion to dismiss under Rule 12(b)(6), where defendants did not contest its authenticity).

Before the Commission, Roe 1 lodged largely the same accusations against UMS as were published by the BDN—that her lower-level "win" in

---

[1] The FOAA provides that "a person has the right to inspect and copy any public record" and defines "public records" as "any written, printed or graphic matter or any mechanical or electronic data compilation from which information can be obtained, directly or after translation into a form susceptible of visual or aural comprehension, that is in the possession or custody of an agency or public official of this State or any of its political subdivisions, or is in the possession or custody of an association, the membership of which is composed exclusively of one or more of any of these entities, and has been received or prepared for use in connection with the transaction of public or governmental business or contains information relating to the transaction of public or governmental business." 1 Me. Rev. Stat. §§ 402, 408.

the Title IX proceedings had been unfairly overturned and that UMS had made significant mistakes in resolving her accusations against Plaintiff. UMS's response to Roe 1's Commission complaint was quite unlike the retaliatory public comments it made in the wake of the BDN articles. Before the Commission, UMS lauded and staunchly defended the fairness and thoroughness of its investigation and its adjudication of her claim.[2] It emphasized that it had provided a three-level Title IX review process to resolve Roe 1's complaint fairly. None of UMS's responses before the Commission concerning its Title IX processes and Plaintiff's exoneration on Roe 1's sexual assault charge—despite being significantly at odds with its public pronouncements to the BDN and the University community—required the provision of personally identifiable information in violation of FERPA.[3]

---

[2] In its August 2018 Commission filing, UMS vigorously defended the fairness and thoroughness of its process, stating that it had "conducted a prompt, thorough, and fair investigation into [Roe 1's] allegations and adjudicated the charges against [Plaintiff] in three levels of impartial and equitable review, during which time [Roe 1] was permitted to present any and all evidence to support her allegations and dispute any testimony or evidence presented by [Plaintiff]." UMS further stated that it "did not give preferential treatment to either party's evidence," that Roe 1's "allegation that she was denied the opportunity to see and respond to all of the evidence is false," and that her "allegation that she was discriminated against throughout the investigation and adjudication process is false." It also clearly stated to the Commission that it "ultimately found [Plaintiff] not responsible for sexual assault." *Bigelow Declaration,* Ex. 1.

[3] UMS cannot explain why Interim President Brown would have been prevented from making the same statements concerning the thoroughness and correctness of the Title IX investigation and adjudicatory process in response to the accusations made in the BDN articles. Although Roe 1's name appears in her Commission

That Plaintiff's ultimate exoneration on Roe 1's sexual assault charge might be information that appears in his educational records does not mean that FERPA prevented UMS from confirming that its adjudication of Roe 1's claim properly exonerated the accused. *See Daniel S. v. Board of Educ. of York Community High Sch.*, 152 F. Supp. 2d 949, 954 (N.D. Ill. 2001) (FERPA does not protect information which might appear in school records but would also be known independently through other means)*; Frasca v. Andrews*, 463 F. Supp. 1043, 1050 (E.D.N.Y. 1979) (rejecting argument that FERPA prohibited comments on a student's suspension merely because it may appear in school records, where suspension was independently known). Plaintiff's exoneration was a particular focus of Roe 1's public comments to the BDN.

Neither of Defendants' cited cases support its position, as they do not concern a university administrator's retaliatory remarks to the press and public. *U.S. v. Miami Univ.*, 294 F.3d 797 (6th Cir. 2002), merely stands for a proposition that Plaintiff does not dispute: that student disciplinary records

---

filings and in UMS's response, Brown could have provided identical responses concerning UMS's investigation and adjudication while refusing to identify her, as was his practice in the public comments he chose to make. Although Defendants argue that the FERPA rights at risk here included those of reporting parties and third-party witnesses, the fact remains that UMS could have defended the fairness and thoroughness of its investigation and adjudication publicly—just as it did before the Commission—without compromising the identities of any of the parties or witnesses.

are "educational records" under FERPA. As set forth above, UMS's Commission filing demonstrates that it could have addressed its processing of the allegations against Plaintiff in a non-retaliatory manner without reference to his disciplinary records or any other personally identifiable information. Similarly, *Doe v. W. New England Univ.*, 228 F. Supp. 3d 154 (D. Mass. 2017), is not apposite, as it deals with an accused student's attempt to obtain other students' educational records ("These were not Plaintiff's 'educational records' because they did not 'directly relate[ ]' to him. 20 U.S.C. § 1232g(a)(4)(A)."); *id.* at 177. The Court should deny Defendants' request to dismiss Count III on FERPA grounds.

### III. Mr. Fiacco is a "person" subject to a Fourteenth Amendment damages claim under 42 U.S.C. § 1983.

As the Complaint makes clear, Count IV is alleged against Defendant Fiacco for damages in his personal capacity as a state official; it does not make a damages claim against UMS. Defendants assert, however, that David Fiacco may not be sued for violating Plaintiff's constitutional rights. Their arguments offer no ground on which to dismiss Count IV.

The Supreme Court has consistently held that a state official is a "person" for purposes of section 1983 damages actions, and that officials can be held liable in their personal capacity for actions taken under color of law. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991) ("[O]fficers sued in their personal

capacity come to court as individuals. A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term 'person.'"). The Supreme Court has specified that, "to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Unlike the state, such a personal-capacity plaintiff is not entitled to immunity under the Eleventh Amendment. *Hafer*, 502 U.S. at 31 ("[T]he Eleventh Amendment does not erect a barrier against suits to impose individual and personal liability on state officials under § 1983.").

The Complaint in this case seeks compensatory damages against Defendant Fiacco, under section 1983, for actions taken under color of state law. It is clear that he is being sued for damages in his individual capacity. *Complaint* ¶ 5. Fiacco is therefore a "person" under *Hafer*'s interpretation of section 1983.

To the extent Defendants argue that Fiacco is entitled to qualified immunity, the Court must reject that affirmative defense at this stage of the proceedings if the Complaint sufficiently alleges that his conduct violated Plaintiff's constitutional rights, and the law to this effect was clearly established under then-existing law, so that a reasonable official would have known that his behavior was unlawful. *Dwan v. City of Boston*, 329 F.3d 275,

278 (1st Cir. 2003). This court denied a similar motion to dismiss a section 1983 procedural due process claim against Defendant Fiacco fifteen years ago, when he was sued in his personal capacity under section 1983 by another university student. *See Gomes v. University of Maine System*, 304 F. Supp. 2d 117 (D. Me. 2004). The *Gomes* complaint alleged that Mr. Fiacco had violated the plaintiffs' due process rights by imposing discipline based on allegations of sexual assault. In weighing the two *Dwan* factors, the *Gomes* court found that the plaintiffs were "entitled to the protections of due process, since they were facing expulsion or suspension from a public educational institution and their interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property." *Id*. at 128. "At a minimum," the court noted, "students facing disciplinary action, such as a suspension, must be given 'some kind of notice and afforded some kind of hearing.'" *Id.*, *quoting Goss v. Lopez*, 419 U.S. 565, 574-75 (1975). The factual underpinnings of this matter are strikingly similar to *Gomes*, and also satisfy both *Dwan* factors; Plaintiff faced suspension from the same institution, never received a hearing, and now has invoked his Fourteenth Amendment due process protections. As a result, Defendant Fiacco is not entitled to qualified immunity on Count IV.

### IV. Plaintiff's claims became ripe when UMS suspended him for several months while refusing to grant him a hearing.

While it lasts, a suspension from a public university deprives a student of all of the benefits of being enrolled. *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56, *slip op.* at 30 (1st Cir. 2019). A deprivation of this magnitude requires notice and a hearing to comport with the constitutional protection of due process. *Id.*, *citing Goss v. Lopez*, 419 U.S. 565, 579 (1975). As a general rule, notice and hearing must precede any suspension from a public university. *Haidak*, *slip op.* at 31. The only exception to this rule is in cases of exigency—where the state institution must act quickly in the face of a true emergency, such that it would be impractical to offer a pre-deprivation process. *Id.* In *Haidak*, the First Circuit held that a public university violated a student's due process rights by suspending him for five months with no hearing or prior notice. *See id.* at 33.

Where there is no exigency, the *Haidak* court held that due process requires "something more than an informal interview with an administrative authority of the college." *See id.* at 32. The *Haidak* court deemed a telephone interview with an administrator to be insufficient. *See id.* at 8, 32. In this case, UMS, acting through Defendant Fiacco, suspended Plaintiff immediately upon learning that he was named in allegations of sexual assault leveled by a UMF graduate, Roe 2; this new accuser had admitted to

having raped Plaintiff and had not been in Maine for the prior two years. *Complaint* ¶ 87, 93, 96. Plaintiff's suspension was immediate and barred him from campus, including participation in his classes and job, indefinitely. *Complaint* ¶ 87.

Plaintiff's Complaint alleges that Defendants never offered Plaintiff a hearing in connection with this suspension. *Complaint* ¶ 100. Although Defendants allege in their response that "Plaintiff was, in fact, provided with the opportunity for a hearing at the time of his interim suspension," *Motion* at 2, the Court must ignore this unsupported contention in view of the Complaint's well-pleaded allegations.[4] There was no exigency, so Plaintiff's due process claim under *Haidak* is plainly ripe. Defendants' cited case, *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63 (1st Cir. 2003), is inapposite, as it addressed a contingency that may never occur. In this case, Plaintiff's suspension not only has occurred, but continues today. Further, it is not

---

[4] Also accompanying UMS's Motion is a Declaration of Elizabeth Lavoie, which purports to present a factual account contrary to the Complaint. *Compare, e.g., Lavoie Dec.* ¶ 16 (Plaintiff "has continually refused to make himself available for an interview") *with Complaint .* ¶¶ 107-108 (UMS investigator went silent and ignored six months of emails, letters, and phone calls from Plaintiff's attorney). The Court should strike the Lavoie Declaration as improper at this stage of the proceedings. *See McMillan ex rel. Estate of McMillan v. College Pro Painters (U.S.) Ltd.*, 350 F. Supp. 2d 132, 133-135 (D. Me. 2004) (although court may need to resolve potential issues of fact raised by an affidavit, "[a] Motion to Dismiss cannot be the proper vehicle to decide that question"). Viewing the facts in the light most favorable to Plaintiff—as the Court must on this motion—his only accuser at the time he was suspended in March 2019 was Roe 2.

accurate that the eventual result of Defendants' investigation and adjudication of Roe 2's allegations will moot Plaintiff's due process claim; *Haidak* establishes the opposite: "the Supreme Court has ruled that a violation of procedural due process rights, even in the absence of actual injury, justifies a finding in favor of the student and an award of nominal damages." *Haidak* at 73, *citing Carey v. Piphus*, 435 U.S. 247, 266 (1978).

## CONCLUSION

For the reasons stated here, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.

Dated:  October 24, 2019.

/s/ Richard L. O'Meara
Richard L. O'Meara
Francis D. Bigelow
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651
*E-mail:  romeara@mpmlaw.com*