## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
|           Plaintiff, | ) |
| | ) |
| v. | )   Docket No. 1:19-cv-00415-NT |
| | ) |
| UNIVERSITY OF MAINE SYSTEM | ) |
| and DAVID FIACCO, | ) |
| | ) |
|           Defendants. | ) |

## ORDER ON PLAINTIFF'S MOTION TO PROCEED UNDER ALIAS AND DEFENDANTS' MOTION TO DISMISS

Before me is the Plaintiff's motion to proceed under an alias ("**Pl.'s Mot.**") (ECF No. 3) and the Defendants' motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. ("**Defs.' Mot.**") (ECF No. 26). In his Complaint, the Plaintiff claims that Defendant University of Maine System ("**UMS**") violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, by creating a hostile educational environment (Count I), engaging in selective enforcement of Title IX based on gender (Count II), and retaliating against the Plaintiff in response to his protected activity (Count III). Compl. ¶¶ 126–43 (ECF No. 1). In addition, the Plaintiff claims that UMS and David Fiacco, UMS's Director of Community Standards, Rights & Responsibilities, violated his procedural due process rights by suspending him without notice or hearing (Count IV). Compl. ¶¶ 144–50. For the following reasons, the Plaintiff's motion is **GRANTED**, and the Defendants' motion is **DENIED**.

# BACKGROUND[1]

Plaintiff John Doe has been a student of the University of Maine at Farmington ("**UMF**" or the "**University**") since the 2013–14 academic year. In the last few years, several women have filed complaints of misconduct against Doe. Jane Roe 1 filed the first complaint in October of 2017, alleging sexual harassment, sexual assault, dating violence, causing fear of physical harm, harassment/intimidation, and stalking. Compl. ¶¶ 31, 42–43. UMF fully adjudicated that claim, finding that Doe was not responsible for most of the allegations but was responsible for harassment/intimidation and stalking. Compl. ¶¶ 42–43, 61–65. In March of 2018, the University placed Doe on Deferred Disciplinary Probation. Compl. ¶ 65.

As Roe 1's allegations were being investigated, Doe reported to UMS officials that he had been sexually assaulted by another female student. Doe alleges that this other student, Jane Roe 2, had assaulted him during the spring 2017 semester and that he reported the assault to UMS officials in the spring of 2017, October of 2017, and the spring of 2019. Compl. ¶¶ 9–12, 16, 105. He asserts that UMS failed to investigate or act upon his complaint. Compl. ¶ 17.[2]

---

[1]     This factual background is drawn from the Complaint. *See Genzyme Corp. v. Fed. Ins. Co.*, 622 F.3d 62, 68 (1st Cir. 2010) (explaining that, in reviewing a 12(b)(6) motion, a district court "must assume the truth of all well-plead[ed] facts and give the plaintiff[s] the benefit of all reasonable inferences therefrom") (internal quotations omitted); *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010) ("When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor.").

[2]     In their motion, the Defendants counter that Doe did not identify the woman he claimed assaulted him and that he told UMS officials that he did not want to file a formal complaint. Defs.' Mot. Dismiss 4 ("**Defs.' Mot.**") (ECF No. 26). It appears that Doe may not have identified Jane Roe 2 as his attacker until May of 2019. *See* Compl. ¶ 105 (ECF No. 1).

In October of 2018, Doe entered into a Settlement Agreement and General Release ("**Settlement Agreement**") with UMS. (ECF No. 27-2.) The Settlement Agreement states, in part,

> WHEREAS, certain disputes and controversies have arisen between the parties related to student conduct proceedings in 2017-2018 involving [Doe] at Releasee's[3] University of Maine at Farmington, from which [Doe] has alleged due process and discrimination claims and other unfair treatment against Releasees ("the Dispute"). . . .
>
> [Doe] and his heirs and assigns release and give up any and all present, past, and future claims and/or rights, whether known or unknown, which [Doe] may have against Releasees. This releases all claims, losses, damages, liabilities and/or judgments including those which Releasor now alleges to have or which may hereafter accrue or otherwise be acquired, including those of which [Doe] is not yet aware and those not mentioned in this Release. This release applies to, but is not limited to, any and all claims resulting from anything which is in any way related to any incidents or matters related to the Dispute which occurred during the 2017-2018 academic year. The terms of this Release are contractual and not a mere recital. . . .
>
> [DOE] EXPRESSLY ACKNOWLEDGES THAT HE IS WAIVING CLAIMS THAT HE MAY HEREAFTER DISCOVER THAT MAY NOT BE PRESENTLY KNOWN OR SUSPECTED, OR FACTS IN ADDITION TO OR DIFFERENT FROM THOSE WHICH HE NOW KNOWS OR BELIEVES TO BE TRUE, WITH RESPECT TO THE MATTERS RELATED IN ANYWAY TO THE DISPUTE AND WHICH ARE EXPRESSLY RELEASED HEREIN. [DOE] NEVERTHELESS INTENDS TO AND DOES RELEASE ALL CLAIMS FOR INJURIES THAT WERE ALLEGEDLY CAUSED BY RELEASEES AS SET FORTH IN THE DISPUTE, WHETHER NOW KNOWN OR UNKNOWN AND WHETHER NOW IN EXISTENCE OR **WHICH MAY ARISE IN THE FUTURE.**

---

[3]    In the Settlement Agreement, "Releasees" refers to "the UNIVERSITY OF MAINE SYSTEM AND ITS SUCCESSORS, AFFILIATES, TRUSTEES, OFFICERS, AGENTS, AND EMPLOYEES PAST AND PRESENT." Settlement Agreement and General Release ("**Settlement Agreement**") (ECF No. 27-2).

Settlement Agreement 1–2. Doe alleges that UMS retaliated against him after he entered into the Settlement Agreement. Compl. ¶ 77. He points to news articles and a campus-wide email from early 2019, in which UMF's interim president made comments suggesting that Doe was guilty of assault and that there had been errors in the handling of Doe's disciplinary proceeding. Compl. ¶¶ 78–86, 103–04.

On March 1, 2019, Jane Roe 2 filed a formal complaint against Doe, alleging that between 2015 and 2017 Doe had physically and sexually assaulted her. Compl. ¶ 93. Based on those allegations, UMS placed Doe on interim suspension on March 1, 2019. Compl. ¶¶ 93–94.

On August 6, 2019, the First Circuit handed down its decision in *Haidak v. University of Massachusetts-Amherst*, holding that a university violated a student's due process rights by suspending him without a hearing when no exigent circumstances were present. 933 F.3d 56 (1st Cir. 2019). In light of the *Haidak* decision, Doe's attorney sent an email to James Thelen, UMS's general counsel, noting the similarities between that case and Doe's and requesting that UMS lift Doe's suspension. Compl. ¶¶ 110–11. Elizabeth Lavoie, UMS's Deputy Title IX Coordinator, responded that based on the *Haidak* decision, "the University will be conducting a review of [Doe's] continued Interim Suspension for the 2019-2020 academic year." Compl., Ex. B (ECF No. 1-2). Ms. Lavoie's response reportedly stated,

> The University will be reviewing the information collected in the course of the investigations to date and relevant prior disciplinary history. If, however, you would like to provide any additional information for the University to consider regarding your continued Interim Suspension, the University is affording you and the Reporting Party the opportunity

4

> to submit any statement, and/or supporting information for review of
> your continued Interim Suspension status.

Compl., Ex. B. Ms. Lavoie also provided a means for Doe to submit a written

statement and supporting information. Compl., Ex. B.

On September 7, 2019, Mr. Fiacco sent Doe a letter stating that he had been

"assigned to review the status of [Doe's] interim suspension." Compl., Ex. C (ECF No.

1-3). The letter continued,

> In an effort to provide you with an opportunity to be heard on the interim
> suspension status, I am asking that you schedule a time to meet with
> me as soon as possible. My preference is that we conduct our meeting
> via teleconference. I will send a specific email allowing you to schedule
> a 1-hour block of time that is most convenient for you. A similar
> opportunity will be provided to [Roe 2]. If I do not hear from you or you
> fail to schedule or attend the interview, I will need to make a decision
> regarding your interim suspension status without the benefit of your
> input.
>
> No decision on these allegations has been made. The singular purpose
> of my review is to determine whether, and under what circumstances,
> the interim suspension issued to you on March 1, 2019 should continue.
> I will consider any written documents, oral statements and other
> relevant material that has been provided to me. I will communicate my
> decision to you no later than close of business on Monday, September
> 16, 2019.
>
> If you wish to challenge the interim action or any modifications I make,
> you may seek review of this decision by requesting the President or
> designee to review the decision. The Campus President or designee will
> review the request within five (5) business days of receipt of your
> request.

Compl., Ex. C (emphasis omitted).

Doe commenced this action on September 9, 2019. On the same day, he filed

motions for a temporary restraining order and preliminary injunction, which he has

since withdrawn, and this pending motion to proceed under alias. In his Complaint,

Doe alleged that UMS had not interviewed any of his identified witnesses and that UMS had still not offered him a hearing. Compl. ¶¶ 116–17. I held a conference of counsel on September 11, 2019. At the time, the parties stated that Doe was scheduled to meet with Mr. Fiacco on September 12, 2019.[4] The Defendants subsequently filed this motion to dismiss for failure to state a claim and for lack of jurisdiction on October 3, 2019.

## DISCUSSION

### I.   Plaintiff's Motion to Proceed under Alias and to Seal Certain Documents

The Plaintiff moves to proceed under alias and to seal any documents that identify the Plaintiff by his true name. The Defendants have opposed the motion.

#### A.   Standard of Review

" 'There is a strong common law presumption favoring public access to judicial proceedings and records.' " *Flanders v. Maine*, No. 2:12-cv-00277-JAW, 2019 WL 2929500, at *2 (D. Me. July 8, 2019) (slip copy) (quoting *In re Salem Suede, Inc.*, 268 F.3d 42, 45 (1st Cir. 2001)). In a civil case, "the plaintiff instigates the action, and, except in the most exceptional cases, must be prepared to proceed on the public record." *Id.* (internal quotations omitted). In accordance with this practice, the Federal Rules of Civil Procedure direct that a case proceed in the real names of the parties. *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties."); Fed. R. Civ. P. 17(a)(1) (absent specified exceptions, "[a]n action must be

---

[4]   Neither of the parties' pleadings on these motions provided an update about any developments from that interview.

6

prosecuted in the name of the real party in interest"). The Rules themselves do not provide a means for a party to proceed anonymously.

However, federal courts have permitted parties to proceed under pseudonym in certain cases. *See Doe v. Trustees of Dartmouth Coll. (Dartmouth I)*, No. 18-cv-040-LM, 2018 WL 2048385, at *7 (D. Mass. May 2, 2018). Neither the U.S. Supreme Court nor the First Circuit has "definitively articulated" when a plaintiff may proceed under a pseudonym. *See id.* at *2. In the related context of a request to seal judicial records, the First Circuit has stated that the "starting point must always be the common-law presumption in favor of public access." *Nat'l Org. For Marriage v. McKee*, 649 F.3d 34, 70 (1st Cir. 2011). The First Circuit has emphasized that there must be a compelling countervailing interest to justify limiting that access, though it has indicated that "privacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records." *Id.* at 72 (internal quotations omitted); *Dartmouth I*, 2018 WL 2048385, at *3–4.

Other federal courts of appeals have developed balancing tests specifically for assessing whether the use of a pseudonym should be permitted. These courts seem to agree that " 'district courts should balance a plaintiff's interest and fear against the public's strong interest in an open litigation process.' " *Dartmouth I*, 2018 WL 2048385, at *4 (quoting *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011)). However,

7

they have developed tests with slightly different factors.[5] Because the parties in this case have applied the test adopted by the Third Circuit and because other courts in this Circuit have used the same test, I will apply the Third Circuit's multifactor test. *See Dartmouth I*, 2018 WL 2048385, at *4–5 (noting that the "Third Circuit's test is consistent with the overall aim of the First Circuit's framework for sealing judicial records"); *Doe v. Standard Ins. Co.*, No. 1:15-cv-00105-GZS, 2015 WL 5778566, at *2–3 (D. Me. Oct. 2, 2015) (applying the Third Circuit test).

Under the Third Circuit test, courts should consider:

(1) the extent to which the identity of the litigant has been kept confidential; (2) the bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases; (3) the magnitude of the public interest in maintaining the confidentiality of the litigant's identity; (4) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities; (5) the undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified; . . . (6) whether the party seeking to sue pseudonymously has illegitimate ulterior motives . . . . [(7)] the universal level of public interest in access to the identities of litigants; [(8)] whether, because of the subject matter of this litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained; and [(9)] whether the opposition to pseudonym by counsel, the public, or the press is illegitimately motivated.

*Megless*, 654 F.3d at 409. The core issue in the Third Circuit's test is "whether a litigant has a reasonable fear of severe harm that outweighs the public's interest in open litigation." *Id.* Mere embarrassment or economic harm is generally insufficient.

---

[5]     The Second, Third, Fourth, and D.C. Circuits have adopted tests for this determination. *See Doe v. Trustees of Dartmouth Coll. (Dartmouth II)*, No. 1:18-cv-690-JD, 2018 WL 5801532, at *1–2 (D.N.H. Nov. 2, 2018).

*Id.* at 408; *see also Dartmouth I,* 2018 WL 2048385, at *4; *Siedle v. Putnam Investments, Inc.,* 147 F.3d 7, 10 (1st Cir. 1998) ("The mere fact that judicial records may reveal potentially embarrassing information is not in itself sufficient reason to block public access.").

### B.    Analysis

The first factor considers the extent to which the litigant's identity has been kept confidential. The allegations against Doe have generated a fair amount of discussion within the UMF community and beyond, as evidenced by news articles from early 2019. In fact, the filing of this action appears to have sparked more coverage. None of these news articles, however, identified Doe by name. It is true that members of the UMF community seem aware of the allegations against Doe, as Doe himself alleges that he has been the subject of "gossip and slander" and excluded from certain campus groups. Compl. ¶¶ 70, 102. At the same time, there is nothing in the record suggesting that Doe's identity is widely known beyond his social circle or among the general public. *See Dartmouth I*, 2018 WL 2048385, at *5 n.2. In addition, the University's disciplinary proceedings have remained confidential. As such, I find that this factor weighs against disclosure.

The second factor addresses the basis upon which disclosure is feared and the substantiality of that basis. In *Dartmouth I*, the district court permitted a plaintiff to proceed under an alias in circumstances similar to this case. 2018 WL 2048385, at *2. There, a male student claimed that Dartmouth College discriminated against him based on his sex when it expelled him for misconduct stemming from a sexual encounter with a female student. The district court agreed that the plaintiff's

"potential harms [were] severe and reasonable." *Id.* at *5. Specifically, the court noted that "the mere accusation that one has committed a sexual assault can subject the accused to lasting reputational damage and harassment," even where the accused is ultimately found not culpable. *Id.* Thus, the case was not one that would "afford plaintiff an opportunity to clear his name in the community." *Id.* at *6 (internal quotations omitted). "Even more salient," the court continued, was the alleged victim's interest in anonymity. *Id.* Because the public identification of the plaintiff would likely identify the victim, who was not a party in the case, the court held that the second factor weighed heavily against disclosure. *Id.* at *6–7.

The Defendants cite a handful of cases in which courts rejected requests to proceed under aliases. In *Doe v. Temple University*, another case in which a male student challenged the disciplinary process after an alleged sexual assault, the district court held that the plaintiff had failed to assert a cognizable harm. *Doe v. Temple Univ.*, No. 14-cv-4729, 2014 WL 4375613, at *2 (E.D. Pa. Sept. 3, 2014). The student had argued that the use of his real name would damage his personal and professional reputation and would diminish his chances of attending medical school. *Id.* The court likened these concerns to "embarrassment [and] economic harm" and noted that the plaintiff chose not to appeal the school's decision internally and confidentially. *Id.* (internal quotations omitted). The court emphasized that "[s]exual assaults on college campuses, and the measures universities are taking to respond to these incidents, are important issues commanding national attention." *Id.*

In this case, however, the Plaintiff fears more than reputational harm. He has stated that he fears "harassment and even physical assault if [his] true identity is revealed." Pl.'s Reply Ex. 1, Reply Decl. John Doe ¶ 3 ("**Doe Decl.**") (ECF No. 23-1). He points to a Facebook post responding to a news article about this case, in which an individual refers to the Plaintiff as a "scumbag" and states, in part, "[D]o I still know anyone around Farmington with a good brick-throwing arm?" Doe Decl. ¶¶ 1– 2. Given that this potential threat appears to have been prompted by publicity about the case and because I share the same concerns as the *Dartmouth I* court regarding the alleged victims' privacy, I find that the second factor favors the Plaintiff's motion.

The third factor considers whether there is a public interest in maintaining the Plaintiff's anonymity. The underlying concern is that, if the plaintiff's identity is exposed, other similarly situated litigants might be deterred from litigating claims that that the public wants to see litigated. *See Megless*, 654 F.3d at 410. The Plaintiff does not fully develop an argument on this factor, aside from quoting the court in *Dartmouth I*, which noted that "there is authority for the proposition that precluding pseudonymous litigation in college disciplinary cases may have a chilling effect on future plaintiffs who seek to challenge the adequacy of the process." 2018 WL 2048385, at *6. I recognize this proposition, but as the court in *Dartmouth I*, I consider this factor to be neutral. *Id.*

The fourth factor is whether there is an atypically weak public interest in knowing the litigant's identity due to the purely legal nature of the dispute. Because the dispute here is not purely legal, this factor weighs against granting the motion.

11

The fifth factor asks if the litigant will choose to sacrifice a claim to preserve his anonymity. The Plaintiff has stated that he intends to withdraw the lawsuit if he is not permitted to proceed under an alias. Doe Decl. ¶ 4. Thus, this factor weighs in the Plaintiff's favor.

The sixth factor considers whether the litigant is seeking a pseudonym for any nefarious reason. The Defendants do not assert that there is a nefarious reason, and there is nothing in the record to suggest that there is one.

The seventh, eighth, and ninth factors disfavor anonymity. The seventh simply acknowledges that there is a "universal interest in favor of open judicial proceedings." *Megless*, 654 F.3d at 411. I consider this as a factor supporting disclosure. The eighth factor weighs the public's interest in knowing the litigant's identity. In assessing this interest, I consider the "subject matter of the litigation, the status of the litigant as a public figure, or any other reason." *Dartmouth I*, 2018 WL 2048385, at *7. Here, unlike in *Dartmouth I*, the Defendants include a public institution and a public official and the allegations concern disciplinary proceedings conducted by a public university. These facts suggest that the public's interest in the litigation might be greater than in *Dartmouth I*. However, the Plaintiff himself is not a public figure, and the public's interest in the subject matter "will not be impeded merely because plaintiff's identity is kept private." *See id.* Finally, the ninth factor asks whether the opposition to the use of a pseudonym is illegitimately motivated. Neither party has given any indication that this is the case.

12

Based on these factors, I conclude that the Plaintiff can proceed under the alias "John Doe." The "most compelling situations involve matters which are highly sensitive, such as social stigmatization, real danger of physical harm, or where the injury litigated against would occur as a result of the disclosure of the plaintiff's identity." *Standard Ins. Co.*, 2015 WL 5778566, at *1 (internal quotation omitted). Although some factors weigh against the Plaintiff's motion, the highly sensitive nature of the case for both the Plaintiff and the non-party complainants strongly weighs in favor of granting the motion.

## II.   Defendants' Motion to Dismiss

The Defendants seek dismissal of Count I (Hostile Educational Environment), Count II (Selective Enforcement), portions of Count III (Retaliation), and Count IV (Section 1983 Due Process) for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defs.' Mot. 1. The Defendants also seek dismissal of Counts III and IV pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure on the grounds that they are not yet ripe for adjudication. Defs.' Mot. 1.

### A.   Failure to State a Claim

The Defendants assert that Count I and Count II should be dismissed for failure to state a claim because the Plaintiff has already "expressly released these claims in a written settlement agreement with UMS." Defs.' Mot. 2. They further contend that portions of Count III should be dismissed because the Family Educational Rights and Privacy Act ("**FERPA**"), 20 U.S.C. § 1232g, prohibits UMS from releasing information about the Plaintiff's disciplinary proceedings and thus the

13

Plaintiff cannot sustain a claim against UMS for failing to disclose exculpatory information to the press. Defs.' Mot. 2. And finally, the Defendants argue that Count IV fails as a matter of law because the Defendants are not "persons" under 42 U.S.C. § 1983 and have immunity from the claims. Defs.' Mot. 2.

### 1.    Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Such a motion may be based on "(1) a challenge to the sufficiency of the pleading under Rule 8(a)(2); or (2) a challenge to the legal cognizability of the claim." *Fusco v. Rogers*, No. 2:18-cv-00290-JAW, 2019 WL 1387686, at *2 (D. Me. Mar. 27, 2019) (internal quotations omitted).

A complaint need not contain "an exposition of [the plaintiff's] legal argument," nor must it "pin [the] plaintiff's claim for relief to a precise legal theory." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). However, the complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal alterations and quotations omitted). In this vein, the Plaintiff cannot rely on "a formulaic recitation of the elements of a cause of action" and must instead put forth sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level." *Id*. Dismissal is proper if the facts in the complaint "lend themselves to no viable theories of recovery." *Tyler v. Michael Stores, Inc.*, 840 F. Supp. 2d 438, 441 (D. Mass. 2012) (internal quotations omitted) (citing *Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir. 2007)).

A court considering a motion under Rule 12(b)(6) must take the complaint's well-pleaded facts as true and must draw all reasonable inferences in the plaintiff's favor. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018). Ordinarily, a court "may not consider any documents 'outside of the complaint, or not expressly incorporated therein,' without converting the motion into one for summary judgment." *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 716 (1st Cir. 2014) (quoting *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2011)). However, there is a "narrow exception for documents—the authenticity of which is not challenged—that are central to the plaintiff's claim or sufficiently referred to in the complaint, even if those documents are not physically attached to the pleading." *Id.* at 717.

### 2.   Analysis

#### a.   The Settlement Agreement

The Defendants argue that the hostile educational environment and selective enforcement claims should be dismissed because the Plaintiff expressly released those claims in the Settlement Agreement. Defs.' Mot. 2. The Plaintiff counters that these claims stem from conduct that occurred after the time period covered in the Settlement Agreement. Pl.'s Response Defs.' Mot. Dismiss 2 ("**Pl.'s Response**") (ECF No. 30).

In the Settlement Agreement,[6] Doe agreed to "release and give up any and all present, past, and future claims and/or rights, whether known or unknown, which

---

[6]    The Complaint discusses the Settlement Agreement, *see* Compl. ¶¶ 75–77, and the Plaintiff has not challenged the authenticity of that document. Thus, I will consider the contents of the

[Doe] may have against [UMS and its employees]." Settlement Agreement 1. The Agreement specifically "applies to, but is not limited to,[7] any and all claims resulting from anything which is in any way related to any incidents or matters related to the Dispute which occurred during the 2017-2018 academic year." Settlement Agreement 1. "Dispute" in this context refers to "certain disputes and controversies" that arose "between the parties related to student conduct proceedings in 2017-2018 involving [Doe] and [UMF], from which [Doe] has alleged due process and discrimination claims and other unfair treatment against [UMS]." Settlement Agreement 1.

Release acquired from a settlement agreement is an affirmative defense. *See* Fed. R. Civ. P. 8(c); *Citibank Glob. Mkts., Inc. v. Rodríguez Santana*, 573 F.3d 17, 23 (1st Cir. 2009); *Acoustic Processing Tech., Inc. v. KDH Elec. Sys., Inc.*, 697 F. Supp. 2d 146, 159–60 (D. Me. 2010). The First Circuit has held that, "[i]n an appropriate case, an affirmative defense may be adjudicated on a motion to dismiss for failure to state a claim." *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 16 (1st Cir. 2003). However, a dismissal can occur only where (1) the affirmative defense is "definitively

---

Settlement Agreement in deciding this motion to dismiss. *See Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 716 (1st Cir. 2014).

The Defendants attach several additional documents to their motion to dismiss and to their reply. *See* Declaration of James Thelen (ECF No. 26-1); Emails between James Thelen and John Doe (ECF No. 27-1); First Declaration of Elizabeth Lavoie (ECF No. 26-4); January 28, 2019 *Bangor Daily News* article (ECF No. 26-5); February 16, 2019 *Bangor Daily News* article (ECF No. 26-6); Second Declaration of Elizabeth Lavoie (ECF No. 33-1). The Complaint refers to both *Bangor Daily News* articles, and thus those are properly considered in a motion to dismiss. *See* Compl. ¶¶ 79, 85. However, the Complaint does not refer to any of the other documents, and therefore I will not consider their contents in my Rule 12(b)(6) analysis.

[7]     Despite this language, the Defendants do not appear to argue that the Settlement Agreement should be read more broadly so as to preclude claims that are unrelated to the dispute from the 2017–18 school year.

ascertainable from the complaint and other sources of information that are reviewable at this stage, and (2) the facts establish the affirmative defense with certitude." *Citibank Glob. Mkts.*, 573 F.3d at 23; *see also Colonial Mortg. Bankers Corp.*, 324 F.3d at 16.

Here, the Complaint discusses the Settlement Agreement, and thus the affirmative defense of release is readily ascertainable. However, I find that, at this stage, the facts do not establish the affirmative defense with absolute certitude. Although Doe reported to UMS in 2017 that Roe 2 had sexually assaulted him, the Complaint indicates that it was not until May of 2019 that Doe provided UMS with details about this claim, including identifying Roe 2 by name, showing a text message in which Roe 2 admitted to the assault, and providing names of witnesses who could confirm his account. Compl. ¶ 105. There may be an argument that Doe's report of these details—which occurred after the Settlement Agreement—was a new starting point for assessing how UMS responded to his allegations. If so, any failure by UMS to investigate those allegations, while actively investigating the complaints against Doe, could potentially be a new act of selective enforcement or could have contributed to a hostile environment for Doe. Drawing inferences in the Plaintiff's favor, I find that the Complaint contains sufficient factual allegations to allow the selective enforcement and hostile environment claims to proceed.

My denial of the motion to dismiss does not mean that the Defendants' affirmative defense is not available or will fail at a later stage. Simply put, the validity of that defense cannot be established at this early stage. *See Acoustic*

*Processing Tech., Inc.*, 697 F. Supp. 2d at 159–61 (noting that defendant "may prevail on its affirmative defense at trial, but [the court] cannot conclude on the record before [it] that [defendant]'s affirmative defense has been established with certitude"); *Am. Lung Ass'n of N.H. v. Am. Lung Ass'n*, 1:07-cv-129-PB, 2007 WL 4284848, at *3 (D.N.H. Dec. 4, 2007). Accordingly, I decline to dismiss Counts I and II on the grounds that they are barred by the Settlement Agreement.

### b.   FERPA

In Count III, the Plaintiff alleges that UMS retaliated against him "in response to his protected activity by engaging in a series of adverse actions." Compl. ¶ 140. The Plaintiff alleges five types of adverse actions. The Defendants challenge two of them on 12(b)(6) grounds: that UMS "ma[de] public statements suggesting that although Plaintiff had been fully exonerated of sexual assault in both disciplinary proceedings, those findings had been in error" and "fail[ed] to disclose to the press that the disciplinary proceedings against Plaintiff for sexual assault and/or rape had been dismissed for exculpatory reasons." Compl. ¶ 140; Defs.' Mot. 10. The Defendants contend that they "have a legal obligation under FERPA not to disclose student educational records to any person other than the student, with limited exceptions that do not apply to Plaintiff's claims." Defs.' Mot. 11. They add that, "[u]nder any reading of Title IX's retaliation prohibition, colleges and universities cannot be required to violate students' FERPA rights by publicly sharing the details of

disciplinary proceedings in order to avoid the perception of 'retaliating' against one party or the other."[8] Defs.' Mot. 11.

The Defendants do not seek dismissal of all of Count III based on their FERPA obligations. Rather, they attempt to parse out two particular allegations within the claim. At this stage, I decline to dismiss a portion of a count "if any of the individual theories are sufficient to state a claim to relief" and the scope of discovery will not be significantly affected. *Charette v. St. John Valley Soil & Water Conservation Dist.*, No. 1:17-cv-35-GZS, 2017 WL 2683951, at *7 (D. Me. June 20, 2017) ("Once the Court determines that a count is adequately pleaded to survive a motion to dismiss, the Court will not separately analyze each individual theory if the scope of discovery will not be significantly affected by doing so."); *see also Pollack v. Reg'l School Unit 75*, 12 F. Supp. 3d 173, 189 (D. Me. 2014) ("Because the Plaintiffs' . . . retaliation claim survives under at least one of the adverse actions [pleaded in complaint], the Court need not determine whether the other adverse actions alleged would also support their claim."). Because most of Count III would survive this motion and the Defendants do not argue that these two allegations will significantly expand the scope of discovery, this portion of the motion to dismiss is denied.

### c.   Section 1983

In their motion to dismiss, the Defendants argue that the Plaintiff "does not clearly identify the relevant Defendants (or capacities) in Count IV." Defs.' Mot. 12.

---

[8]    Although the Defendants argue that both adverse actions "relate to UMS's alleged 'failure' to disclose information that, if disclosed, would have been in violation of FERPA," it is unclear how "making public statements suggesting that . . . [the Plaintiff's exoneration] had been in error" amounts to a "failure to disclose." Defs.' Mot 10–11.

The Defendants further contend that, "[t]o the extent that . . . [the] Plaintiff claims that UMS and Mr. Fiacco violated 42 U.S.C. § 1983 . . . it is longstanding law that neither a state university nor a state official acting in his official capacity may be sued for damages in a Section 1983 action." Defs.' Mot. 12. Finally, the Defendants assert that the Eleventh Amendment gives them immunity from liability under § 1983. Defs.' Mot. 12.

The heading of Count IV states that it is a "Claim for Damages against Defendant Fiacco," and the Plaintiff's response emphasizes that Count IV "does not make a damages claim against UMS." Compl. Count IV; Pl.'s Response 9. In addition, the Complaint states that Mr. Fiacco is being sued in his "individual and official capacities." Compl. ¶ 5. A state official can be sued under § 1983 in his individual capacity for damages and in his official capacity for prospective relief. *See Rodondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 7 (1st Cir. 2005). The Defendants do not develop any argument as to whether either of these bases of liability is unavailable against Mr. Fiacco.[9] Accordingly, this portion of the motion to dismiss is denied.

### B.    Ripeness

The Defendants argue that Counts III and IV should be dismissed as unripe because the UMS investigations into the Plaintiff's conduct are still ongoing.[10]

---

[9]    The motion to dismiss states that "*Defendants* are immune from liability under Section 1983 because they have sovereign immunity under the Eleventh Amendment." Defs.' Mot. 12 (emphasis added). However, the rest of the discussion focuses solely on UMS, and the Defendants do not develop any argument that Mr. Fiacco is entitled to immunity.

[10]    Since March of 2019, additional women have filed complaints about Doe. In their October 3, 2019 motion to dismiss, the Defendants asserted that there were three open cases against Doe at

Specifically, they contend that, if UMS subsequently determines that the Plaintiff violated the UMS code of conduct and suspension or dismissal is appropriate, the Plaintiff's claims for damages would be moot or nominal. Defs.' Mot. 3.

### 1.    Standard of Review

Under Rule 12(b)(1), a court must dismiss a case over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1); *Portland Pipe Line Corp. v. City of South Portland*, 164 F. Supp. 3d 157, 173–74 (D. Me. 2016). A challenge based on the ripeness of the plaintiff's claims raises a question of justiciability and falls under the "large umbrella" of this rule. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362–63 (1st Cir. 2001). "The 'basic rationale' of the ripeness inquiry is to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' " *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). The Plaintiff bears "the burden of alleging facts sufficient to demonstrate ripeness." *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017). In assessing whether that burden is met, a court evaluates "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. Generally, both prongs must be satisfied for a claim to be ripe.[11] *Roman Catholic Bishop*, 724 F.3d at 89.

---

various stages of investigation and adjudication. Defs.' Mot. 6. However, they have provided no subsequent updates on their progress in addressing those cases.

[11]    Unlike a motion under 12(b)(6), a court considering a motion under 12(b)(1) may consider materials outside the pleadings. *Groden v. N&D Transp. Co.*, 866 F.3d 22, 24 n.3 (1st Cir. 2017) (citing *González v. United States*, 284 F.3d 281, 288 (1st Cir. 2002)); *Carroll v. United States*, 661 F.3d 87, 94

The fitness prong "has both jurisdictional and prudential components." *Roman Catholic Bishop*, 724 F.3d at 89. The jurisdictional component "concerns whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." *Id.* The key question of this component is " 'whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all,' thus rendering any opinion [I] might offer advisory." *Algonquin Gas Transmission, LLC. v. Weymouth, Mass.*, 919 F.3d 54, 62 (1st Cir. 2019) (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995)). The prudential component "asks whether resolution of the case turns on legal issues not likely to be significantly affected by further factual development." *Id.* (internal quotations omitted). The underlying idea is that, "if elements of the case are uncertain, delay may see the dissipation of the legal dispute without need for decision." *Roman Catholic Bishop*, 724 F.3d at 89 (internal quotations omitted); *see also Ernst & Young*, 45 F.3d at 535 ("This [fitness] branch of the test typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed.").

The hardship prong of the ripeness inquiry is "entirely prudential" and "evaluates the extent to which withholding judgment will impose hardship." *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (internal quotations omitted).

---

(1st Cir. 2011). Thus, in evaluating this portion of the Defendants' motion, I consider all of the exhibits discussed in note 6, *supra*.

In answering this question, a court considers "whether the challenged action creates a direct and immediate dilemma for the parties" and "whether granting relief would serve a useful purpose." *Algonquin Gas Transmission*, 919 F.3d at 62 (internal quotations omitted); *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322*, 651 F.3d 176, 188 (1st Cir. 2011) (internal quotations omitted).

### 2.    Analysis

The Defendants argue that the retaliation and due process claims are not ripe for adjudication because UMS is currently conducting investigations of multiple complaints against Doe,[12] including the complaint by Roe 2 that led to his suspension in March of 2019.[13] They contend that the outcome of those investigations "could moot [Doe's] claim for damages" because the "merit of [Doe's] claims hinge on [that] outcome" and because any damages amount "is, at best, contingent at this time." Defs.' Mot. 14. As to the prudential factors, the Defendants note that, " 'by waiting until a case is fully developed before deciding it, courts benefit from a focus sharpened

---

[12]    In conjunction with the earlier motion for a preliminary injunction, the Defendants stated that they were conducting a review of Doe's suspension. However, Mr. Fiacco's September 7, 2019 letter to Doe stated that a final decision on that review would be communicated by September 16, 2019. Compl., Ex. C (ECF No. 1-3). In addition, the Defendants' motion to dismiss makes no mention of any review and nowhere contends that the review is ongoing. Because the motion only discusses the broader investigations into complaints against Doe, I presume that those are the only pending investigations.

[13]    Although the motion to dismiss seeks dismissal of only Counts III and IV on ripeness grounds, the Defendants' reply suggests that their ripeness challenge extends beyond Counts III and IV. *See* Defs.' Mot. 1, 15; Defs.' Reply 1 (ECF No. 33) ("Dismissal of This Case Is Appropriate on Ripeness Grounds"); *Id.* at 5–6 (discussing the claims of "discrimination" and "hostile environment" and arguing that "[t]hese claims depend in part on the final outcome of the student conduct process and should be addressed in a unified proceeding when all the facts have been sufficiently developed"). Because ripeness is a jurisdictional matter, I can consider the ripeness of Counts I and II *sua sponte* to ensure that a case or controversy exists for Article III purposes. *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–808 (2003). Nevertheless, I find that the Plaintiff's claims for hostile environment (Count I) and selective enforcement (Count II) are also ripe because they allege past patterns of conduct by the Defendants and are not contingent on future factual development.

by particular facts.' "[14] Defs.' Reply 2 (ECF No. 33) (quoting *Doe v. Bush*, 323 F.3d 133, 138 (1st Cir. 2003)). Comparing UMS's disciplinary review process to an administrative agency's adjudicative process, the Defendants argue that judicial intervention would interfere with UMS's own processes and expertise. Defs.' Reply 2–3.

On the hardship prong, the Defendants assert that practical concerns will arise if the case proceeds to discovery and argue that postponing resolution of this case will promote judicial economy. Defs.' Reply 4–6. They add that, because the Plaintiff has withdrawn his preliminary injunction motion, he will suffer no further injury by waiting to bring his claims until after the university's investigations are complete, and thus his relative hardship is minimal. Defs. Mot. Dismiss 15; Defs.' Reply 5–6.

In *Haidak*, the First Circuit held that a university violated a student's procedural due process rights by suspending him without a hearing. 933 F.3d at 71–72 ("While it lasts, a suspension more or less deprives a student of all the benefits of being enrolled at a university. The Supreme Court has held that a deprivation of this sort requires notice and a hearing."). The court came to this conclusion after the school had completed its investigation into the student's misconduct and had expelled him. Importantly, the First Circuit's analysis of the university's actions during the suspension phase was independent from its analysis of the university's actions during

---

[14] The Defendants cite two out-of-circuit cases in which courts declined to intervene in university disciplinary procedures. *See* Defs.' Reply 3 (citing *Wiley v. Tex. State Univ.*, No. 1:18-cv-930, 2019 WL 317247 (W.D. Tex. Jan. 24, 2019); *Peloe v. Univ. of Cincinnati*, No. 1:14-cv-404, 2015 WL 728309 (S.D. Ohio Feb. 19, 2015)). However, neither of those cases involved an initial suspension, which is what forms the basis for the Plaintiff's due process claim here. *See* Compl. ¶¶ 146–50.

the expulsion phase. Although that "final penalty of expulsion was imposed in accordance with due process," the First Circuit held that the absence of a hearing before the initial suspension violated the student's rights and entitled him to nominal damages. *Id.* at 73. The court explained that "the Supreme Court has ruled that a violation of procedural due process rights, even in the absence of actual injury, justifies a finding in favor of the student and an award of nominal damages."[15] *Id.*

*Haidak* undermines the Defendants' argument that the merit of the Plaintiff's due process claim (Count IV), which stems from his suspension, hinges on the outcome of the university's investigation. Because *Haidak* shows that the two processes and their analyses are distinct, the fact that the university's investigation is ongoing does not mean that Doe's claims stemming from his suspension are unripe. Importantly, the resolution of Doe's due process claim does not require "further factual development" because the facts surrounding the initial suspension and the amount of process provided are already ascertainable. *Algonquin Gas Transmission*, 919 F.3d at 62 (internal quotations omitted). Any future developments would not alter a determination that the university's suspension of Doe complied with—or failed to comply with—due process.

In addition, the considerations under the hardship prong support proceeding with Doe's case. The underlying controversy—Doe's suspension—has created a

---

[15]   In *Haidak*, the First Circuit also indicated that the university's delay in convening the student's expulsion hearing may have constituted an independent violation of the student's procedural due process rights. *See Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 73 (1st Cir. 2019) ("To a large extent, this argument is simply the flipside of the argument that we have already accepted, *i.e.*, that he should not have been suspended for so long without a hearing.").

"direct and immediate dilemma for the parties," and any decision here would be useful in putting that dispute to rest. *See Algonquin Gas Transmission*, 919 F.3d at 62 (internal quotations omitted); *Verizon New England*, 651 F.3d at 188. Doe's suspension continues to deprive him "of all the benefits of being enrolled at [UMF]," and delaying consideration of his claims related to that suspension imposes a hardship on him. *See Haidak*, 933 F.3d at 71–72.

The Plaintiff's retaliation claim (Count III) is also ripe. The Plaintiff alleges that UMS had a "retaliatory motive" when it took several adverse actions against him. *See* Compl. ¶¶ 137–43. Those adverse actions appear to be complete. *See* Compl. ¶ 140 (actions include barring Doe from his employment, suspending Doe, making public statements about Doe's Title IX case, providing Doe's Title IX case files to the press and others, and failing to disclose that Doe's disciplinary proceedings had been dismissed for exculpatory reasons). Again, future developments will not determine the outcome of this dispute.

Finally, the Defendants contend that the Court would be interfering with the UMS investigatory process by permitting the case to proceed. Specifically, they argue that UMS should be allowed "to apply its own expertise to its internal student disciplinary process." Defs.' Reply 3. On a practical note, they assert that Doe would obtain information in discovery that would give him an unfair advantage over the complainants in the school disciplinary process, causing UMS to "run afoul" of statutory obligations. Defs.' Reply 4–5. However, these arguments again confuse the suspension phase with the university's ongoing investigations. A determination on

the process offered at the suspension phase need not upend the final conclusion of UMS's ongoing investigations. *See Haidak*, 933 F.3d at 73. In addition, at this stage, I find it inappropriate to preclude the Plaintiff from having his case heard based on hypothetical issues with discovery. Almost a year has passed since Roe 2's allegations were made, and I find that the Defendants' concerns about discovery are not so weighty as to render the Plaintiff's claims unripe.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiff's motion to proceed under alias and **DENIES** the Defendants' motion to dismiss. In accordance with this Order,

- The parties shall use the pseudonym "John Doe" for the Plaintiff and shall refer to the female complainants as "Jane Roe" with a corresponding number.

- The parties shall redact the true names of the Plaintiff and the complainants from all publicly filed documents and shall file any documents containing their true names under seal.

- The Plaintiff shall re-file a redacted version the Complaint, the withdrawn motion for a preliminary injunction, and all attachments to those documents by February 28, 2020. The re-filed documents shall refer to the complainants as "Jane Roe" with a corresponding number, rather than by their initials.

- The Clerk shall seal the Complaint (ECF No. 1), the withdrawn motion for a preliminary injunction (ECF No. 4), and all attachments to those documents.

- Although this Order omits personally identifiable information of the Plaintiff and complainants, it contains quotations from documents filed under seal. Thus, this Order will initially be filed under seal. The parties have until February 24, 2020, to object to the public filing of any specific portion of this Order. If an objection is filed, I will decide whether a redacted version of this Order should be filed on the public docket. If no objection is filed, this Order will be unsealed.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 20th day of February, 2020.