UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil No. 19-cv-00415-NT

JOHN DOE,                                    )
                                             )
                    Plaintiff                )
                                             )
          v.                                 )
                                             )
UNIVERSITY OF MAINE                          )
SYSTEM, TRUSTEES OF                          )
THE UNIVERSITY OF                            )
MAINE SYSTEM, ERIC                           )
BROWN, DAVID FIACCO,                         )
SCOTT HELMKE,                                )
ELIZABETH LAVOIE,                            )
and KENDA SCHEELE,                           )
                                             )
                    Defendants               )

**AMENDED COMPLAINT**

Plaintiff John Doe complains against Defendants University of Maine System: the

Trustees of the University of Maine System, in their official capacities acting on behalf of the

University of Maine System; Eric Brown, individually and as Interim President of the University of

Maine at Farmington; David Fiacco, individually and as Director, Community Standards, Rights, and

Responsibilities for the University of Maine System; Scott Helmke, individually and as Title IX

Investigator for the University of Maine System; Elizabeth Lavoie, individually and as Coordinator

of Title IX Services for the University of Maine System; and Kenda Scheele, individually and as

Associate Vice President for Student Life and Senior Associate Dean for the University of Maine

System, as follows:

1

## PARTIES AND JURISDICTION

1.     Plaintiff John Doe is a resident of California. He was formerly a resident of Farmington, Maine, and a student at the University of Maine at Farmington ("UMF").

2.     Defendant University of Maine System ("UMS") operates a system of public post-secondary educational institutions, including UMF, which receive federal funds, making it subject to the requirements of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"). UMS is a state actor; all of its relevant actions have been taken under color of law.

3.     Defendant Trustees of the University of Maine System ("Trustees") accepted the Student Conduct Code, the contract between UMS and its students. The Trustees are required to act in the event of any need for an amendment to the Student Conduct Code. In all of their acts described in this complaint, the Trustees were acting under color of state law. They are sued in their official capacities, acting on behalf of UMS.

4.     Defendant Eric Brown ("Brown") served as the Interim President of the University of Maine at Farmington from May 2018 to July 2019. In all of Brown's acts described in this complaint, Brown was acting under color of state law and in his capacity as Interim President. He is sued in his individual and official capacities.

5.     Defendant David Fiacco ("Fiacco") is the Director of Community Standards, Rights & Responsibilities for UMS. In all of Fiacco's acts described in this complaint, Fiacco was acting under color of state law and in his capacity as Director of Community Standards, Rights & Responsibilities for UMS. He is sued in his individual and official capacities.

2

6.     Defendant Elizabeth Lavoie ("Lavoie") is the Coordinator of Title IX Services for UMS.  In all of Lavoie's acts described in this complaint, Lavoie was acting under color of state law and in her capacity as Coordinator of Title IX Services. She is sued in her individual and official capacities.

7.     Defendant Kenda Scheele ("Scheele) is the Associate Vice President for Student Life and Senior Associate Dean for UMS.  In all of Scheele's acts described in this complaint, Scheele was acting under color of state law and in her capacity as Senior Associate Dean.  She is sued in her individual and official capacities.

8.     Defendant Scott Helmke ("Helmke") is a Title IX Investigator for UMS.  In all of Helmke's acts described in this complaint, Helmke was acting under color of state law and in his capacity as Title IX Investigator.  He is sued in his individual and official capacities.

9.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331.

## FACTS COMMON TO ALL COUNTS

10.     Plaintiff has been a student at UMF since the 2013-2014 academic year.

11.     In addition to being a student at UMF, Plaintiff has worked part-time since 2016 as a lifeguard at UMF's Fitness & Recreation Center ("Fitness Center").

12.     In spring 2017, Plaintiff approached Bob Pederson, a UMF employee in the counseling office. Plaintiff reported that another student—a female in the same apartment as Plaintiff (referred to here as Jane Roe 2, a senior at UMF)—was being sexually aggressive toward him and using drugs.

3

13.     Title IX requires that, if an educational institution knows or reasonably should know about student-on-student harassment that creates a hostile environment, it must take immediate and appropriate steps to investigate or otherwise determine what occurred.

14.     In addition, once such a report of harassment is made, Title IX requires a school to protect the complainant and ensure his or her safety, including taking any interim steps pending the outcome of the investigation.

15.     In spite of these Title IX requirements, Mr. Pederson took no steps to protect Plaintiff or investigate his report. Instead, Mr. Pederson told Plaintiff to either sleep on a friend's couch or try talking directly to Jane Roe 2 about the issue.

16.     Later during the spring semester 2017, Jane Roe 2 raped Plaintiff.

17.     In or about May 2017, Jane Roe 2 admitted in writing that she had raped Plaintiff. She made this admission in the following text exchange with Plaintiff:

> Plaintiff:      See this is how I know you don't care you won't admit to what you did you just say you didn't mean to
>
> Jane Roe 2:     I have admitted it [John]. I have said I did it. I raped you. And I am very very sorry. I feel awful

18.     Jane Roe 2 graduated from UMF in May 2017.

19.     In October 2017, Plaintiff reported the rape to three people: UMF's Director of Student Life (Brian Ufford), a UMF counselor (Gavin Pickering), and U. Maine Augusta's Associate Dean of Students and Title IX Investigator (Laura Rodas).

20.     Despite Plaintiff's report that he had been raped, none of the three UMS employees commenced an investigation or took any steps to provide Plaintiff with options or guidance.

21.     Plaintiff's attorney contacted UMS in late October 2017 to demand action on his report, but UMS took no action in response.

22.     A UMF employee, Amie Parker, called Plaintiff concerning the report. She told him there was nothing UMS could do in response to his report as Jane Roe 2 already had graduated.

23.     During September 2017, Plaintiff was dating another female student, referred to as Jane Roe 1. The two of them had been dating since spring 2016.

24.     Their relationship was so close that Jane Roe 1's family invited Plaintiff to spend the 2016 Christmas recess with them at Jane Roe 1's grandparents' home in Vermont.

25.     Jane Roe 1 spent the spring semester of 2017 in Alaska, maintaining a long-distance relationship with Plaintiff.

26.     Jane Roe 1's mother frequently texted Plaintiff throughout spring and summer 2017, to invite him over for dinner, to offer to do his laundry, and to say how happy she was that he was dating her daughter.

27.     During May 2017—and both prior to and after that month—Jane Roe 1 sent nude photos of herself, along with sexually-themed texts, to Plaintiff.

28.     In August 2017, Jane Roe 1 texted Plaintiff repeatedly to say that she was looking forward to seeing him at school that fall.

29.     On September 27, 2017, Plaintiff had consensual sexual contact with Jane Roe 1 following their return to UMF.

30.     In the days following that contact, Jane Roe 1 sent multiple friendly text messages to both Plaintiff and his friends, asking how Plaintiff was doing.

31.     Unbeknownst to Plaintiff, Jane Roe 1 had commenced a relationship with a new boyfriend while she was in Alaska; she felt guilty that she had engaged in sex with Plaintiff.

32.     Five days after the sexual contact, Jane Roe 1 contacted the Farmington police to report, falsely, that Plaintiff had assaulted her.

33.     The district attorney opted not to proceed with any charges against Plaintiff. The Farmington Police determined that Jane Roe 1's guilt about having another boyfriend had caused her to accuse Plaintiff falsely. Both sides agreed to enter into mutual Protection From Abuse ("PFA") orders in civil court on October 11, 2017.

34.     Although UMF had failed to initiate any investigation of Plaintiff's reports that he had been sexually harassed by Jane Roe 2, UMF did initiate a Title IX investigation of Jane Roe 1's false allegations against Plaintiff.

35.     Throughout the Title IX investigation, Jane Roe 1 told UMF that she wanted UMF to give her "justice," because she could not get the court to do what she wanted.

36.     Jane Roe 1's attorney, Nicole Bissonnette, encouraged Laura Rodas, UMF's Title IX investigator, to trap Plaintiff by suggesting she request the nude photos Jane Roe 1 had sent him, even though the PFA orders prevented Plaintiff from showing them to anyone.

37.     In November 2017, another female UMF student (referred to as Jane Roe 7) contacted Ms. Rodas about the case. She made various allegations against Plaintiff, but provided no evidence. Ultimately, Ms. Rodas found Jane Roe 7 not to be credible.

38.     Brian Ufford, UMF's Director of Student Life, asked Plaintiff about his interactions with Jane Roe 7. Plaintiff stated that he had only been in the same room with her in two locations: one was at the FRC pool, where he worked as a lifeguard, and the other was at UMF dance club practices. At both locations, many other individuals were present and Plaintiff had not so much as touched Jane Roe 7.

39.     Plaintiff also told Mr. Ufford that Jane Roe 7 had been sexually aggressive toward him, including coming on to him at the FRC pool and suggesting that he meet her in the woods for sex. Plaintiff said he had texts that could prove these facts.

40.     Repeating his prior conduct in response to Plaintiff's report concerning Jane Roe 2, Mr. Ufford again failed to commence a Title IX investigation against Jane Roe 7. Instead, he told Plaintiff not to worry and said it was not necessary for Plaintiff to provide the texts. Although Mr. Ufford instituted a No Contact Order between Jane Roe 7 and Plaintiff, he did nothing further.

41.     Although Jane Roe 1 alleged that she had concerns about Plaintiff returning to campus for the 2017-2018 academic year, Plaintiff's attorney pointed out to Ms. Rodas that Jane Roe 1 had sent nude photos and sexual texts to Plaintiff, then told him in August 2017 how much she was looking forward to seeing him on campus that fall.

42.     Jane Roe 1's mother also lied, telling Ms. Rodas that she had had concerns and problems with Plaintiff since Christmas 2016. She claimed that she had rarely texted him. Plaintiff's attorney intervened, sharing with Ms. Rodas the dozens of texts that Jane Roe 1's mother had sent to Plaintiff through July 2017, many of which invited him over for dinner.

43.     Jane Roe 1's roommate testified during the investigation that Jane Roe 1 had felt guilty and worried about what other people would think if they found out that she had been cheating on her new boyfriend with Plaintiff.

44.     Jane Roe 1 also lied to Ms. Rodas about her boyfriend, asserting that (a) he was never abusive toward her, (b) he had never assaulted her, and (c) she had never wanted a protection from abuse order against him. Plaintiff proved all of these statements false by providing Ms. Rodas with texts that Jane Roe 1 had sent him.

45.     Ms. Rodas estimated that she spent 100 hours investigating the case before issuing her decision. In the end, she was not fooled by Jane Roe 1's story. On December 15, 2017, based on all the evidence provided—including Jane Roe 1's multiple friendly texts to Plaintiff after the sexual encounter, as well as Jane Roe 1's admission that Plaintiff had asked for and received her ongoing consent during their sexual encounter—Ms. Rodas issued her finding that Plaintiff was "Not Responsible" on Jane Roe 1's allegations of sexual harassment, sexual assault, dating violence, and causing fear of physical harm.

46.     Ms. Rodas did make a "Responsible" finding against Plaintiff for harassment/intimidation and stalking, but did so based only on the sheer volume of calls and texts from Plaintiff to Jane Roe 1 over a two-month period. Ms. Rodas's decision acknowledged that Jane Roe 1 had indicated to Plaintiff that he was not a bother and could continue contacting her, but nevertheless concluded that any reasonable person should have known that such a volume of communication could adversely affect Jane Roe 1.

47.     The findings from Ms. Rodas allowed Plaintiff to continue as a student at UMF. She issued a "Deferred Sanction," instituting a "No Contact Order" between Plaintiff

and Jane Roe 1 for the rest of Plaintiff's time at UMF. A violation of the No Contact Order would result in a one-year suspension of Plaintiff from UMS.

48.     The decision made no mention of Jane Roe 7 or her false allegations against Plaintiff.

49.     Jane Roe 1 appealed Ms. Rodas's findings. Under the terms of UMS's Student Conduct Code, any requested review of the initial decision of a Title IX claim is to be heard by a Student Conduct Code Committee (the "Committee"). The Committee is composed of at least three, but no more than seven, members; the "composition of the committee shall have equitable gender representation whenever practicable."

50.     A Committee of five members met on January 29, 2018, to conduct a hearing on Jane Roe 1's appeal of Ms. Rodas's findings. Committee members spent an average of ten hours reviewing case materials before the hearing, in contrast to the 100 hours spent by Ms. Rodas.

51.     Ignoring the rule in the Student Conduct Code concerning equitable gender representation, the Committee was comprised of four women and one man. One of the women on the Committee was clearly biased and openly hostile to Plaintiff.

52.     At the appeal hearing, Jane Roe 1 repeatedly mentioned Jane Roe 7, even though she had been discredited as a witness. Jane Roe 1 admitted having spoken to Jane Roe 7 during the week leading up to the hearing.

53.     Jane Roe 1 also contended that Plaintiff had a knife during their sexual encounter, even though Ms. Rodas's decision exonerating Plaintiff had explicitly found that "there was no knife present."

9

54.     By this point, Jane Roe 7 had filed for a PFA against Plaintiff in civil court, using the same attorney who had represented Jane Roe 1. That attorney introduced evidence of Jane Roe 7's PFA Order in Jane Roe 1's proceedings before the Committee.

55.     At the hearing, two expert witnesses testified on behalf of Jane Roe 1. Both were a surprise, as Plaintiff had no notice concerning the anticipated substance of their testimony. Plaintiff was unable to cross-examine either witness.

56.     On January 31, 2018, the Committee overturned Ms. Rodas's decision and ruled for Jane Roe 1, finding Plaintiff responsible for sexual assault and causing fear of physical harm.

57.     The Committee suspended Plaintiff from the University of Maine System through May 31, 2019, prohibiting him from stepping foot on any part of the UMF campus or any campus within the UMS. It specified that his "University-initiated withdrawal" would reflect that he was withdrawn for disciplinary reasons. Plaintiff timely appealed this decision.

58.     The Student Conduct Code provides that appeals from decisions of the Committee are to be heard by "the President or his/her designee."

59.     While waiting for the appeal, Plaintiff could not enter the UMF campus, could not attend classes, and could not perform his lifeguarding job at the FRC.

60.     Five weeks later, lacking any decision on the appeal, Plaintiff's parents wrote to UMF's then-President, Katherine Foster, to express their concerns. Among their concerns were the gender inequities in the university's implementation of Title IX and the creation of a hostile environment for their son.

61.     On March 23, 2018, a three-member UMF President's Panel (the "Panel") met to review Plaintiff's appeal from the Committee decision. The Panel reviewed letters, evidence, and the recording of the Committee hearing.

62.     The Panel issued a decision dated March 27, 2018. The opening paragraph of the decision decried the Committee's actions: "The panel has determined that there was a deficiency in that process."

63.     The Panel decision described how the Committee hearing had been improperly stained with evidence from Jane Roe 7:

> The introduction of the recent PFA and alleged incident with [Jane Roe 7] created a situation for which [John Doe] had been assured he would not be required to defend. While the investigator did state that [Jane Roe 7] was not credible, at no point during the recording was the Committee requested to disregard the additional information. In addition, there was no statement in the evidence from [Jane Roe 7] yet the inclusion suggested a pattern to [John's] behavior.

64.     Due to this serious procedural deficiency, the Panel found Plaintiff not responsible for sexual assault.

65.     The Panel made clear that, despite differences between the testimony of Plaintiff and Jane Roe 1, both agreed that the September 2017 sexual encounter was consensual: "In the testimony of the alleged incident of September 27th both parties were very different but aligned on mutual, verbal consent. By both accounts, [Jane Roe 1]'s physical actions could have been viewed as continued consent." The decision specifically cited the action Jane Roe 1 took that showed consent: "[Jane Roe 1] did have the opportunity to leave and was, in fact, outside the building but opted to return . . . ."

11

66.     In dismissing the charge of sexual assault, the Panel reiterated its belief that the Committee hearing had been unfairly tainted: "The Panel believes that the introduction of [Jane Roe 7]'s PFA influenced the Committee's findings."

67.     The Panel also rejected the finding of responsibility on the charge of causing fear of physical harm: "There was no knife" and "no available evidence demonstrates that there were times when [John] threatened [Jane Roe 1]'s physical safety."

68.     In vacating the Committee's decision, the Panel reinstated the deferred sanction that Ms. Rodas had originally imposed.

69.     One day later, on March 28, 2018, a civil court judge threw out Jane Roe 7's PFA case against Plaintiff, relying on the exculpatory texts and Jane Roe 7's admission on the stand that she had lied about Plaintiff.

70.     During the 2017-2018 academic year, Plaintiff endured three rounds of Title IX hearings—the first before Ms. Rodas, the second before the Committee, and the third before the President's Panel. His entire school year was lost.

71.     Despite the resolution of Jane Roe 1's complaint against Plaintiff, the Fitness Center Director, Jim Toner, refused to acknowledge the decision exonerating Plaintiff. He barred Plaintiff from returning to his lifeguarding job.

72.     UMF also would not allow Plaintiff to attend BAM, a campus dance group that had provided crucial emotional support for him. UMF's Amie Parker barred him from participating with this group, despite lacking any legitimate reason for doing so. It appears that Ms. Parker's decision was premised on protecting Jane Roe 7, even though she had falsely accused Plaintiff.

73.     Although Plaintiff had nothing to hide from his friends at BAM, having refuted Jane Roe 1's claims, his absence implied guilt to the BAM membership. They responded by blocking him on social media; gossip and slander ensued.

74.     Plaintiff's parents wrote to UMF President Katherine Foster about his exclusion from both BAM and his job at the Fitness Center. They stressed that Jane Roe 7 had been proven a liar in court and that it was unfair to punish Plaintiff, while rewarding Jane Roe 7 for her lies. UMF did nothing in response.

75.     In June 2018, Plaintiff emailed Celeste Branham, UMF's Vice President for Student and Community Services. He asked that UMS investigate Jane Roe 7 for the following violations of the Student Conduct Code:

- Interference with Code Enforcement – Interference with a complainant, witness, investigation or the carrying out of procedures defined in this Code;

- Supplying False Information – Knowingly supplying false information to employees in pursuit of their official duties or to a Committee in the course of a disciplinary proceeding, or knowingly causing false information to be thus supplied;

- Harassment and Intimidation – Unwelcome behavior that creates a hostile or intimidating working, educational, or living environment or behavior that unreasonably interferes with an individual's academic or job performance and opportunities; and

- Hazing – Any action taken or situation created by a person or an organization, or with the knowledge or consent of an organization, which recklessly or intentionally endangers the mental or physical health of a student.

76.     Ms. Branham replied to Plaintiff a few weeks later. Her response indicated that Jane Roe 7 had withdrawn from UMF with no intention of returning. She claimed that UMS no longer had jurisdiction over her. On this basis, Ms. Branham wrote that UMS was concluding its investigation into Jane Roe 7's violations of the Student Conduct Code.

13

77.     Although Plaintiff had been exonerated, he had been forced to endure campus-wide gossip and slander due to UMF's systemic gender discrimination in administering its Title IX procedures.

78.     Plaintiff's parents continued to press UMF President Foster for compensation in connection with the long Title IX investigation. In October 2018, Plaintiff and UMS entered into a settlement agreement (the "Settlement Agreement") intended to resolve Plaintiff's claims for a 2017-2018 tuition refund, lost wages from his job at the Fitness Center, and legal fees he had been forced to incur.

79.     The Settlement Agreement's release is strictly limited to disputes and controversies that had occurred during the 2017-2018 academic year.

80.     After entering into the Settlement Agreement, UMS retaliated against Plaintiff.

81.     In January 2019, Jane Roe 1 and another woman, referred to as Jane Roe 8, both approached the Bangor Daily News ("BDN"). Jane Roe 8 had been involved in a separate Title IX case at UMF, having brought charges against a different man. Both Jane Roe 1 and Jane Roe 8 had been represented by the same attorney, Nicole Bissonnette. Both women had lost their Title IX cases. They shared their allegations with a BDN reporter, Erin Rhoda.

82.     Ms. Rhoda published a one-sided story in the BDN on January 28, 2019, entitled "Step by step, 2 women detail Maine university's failings in their rape cases." The article's theme was that UMF had made mistakes in handling their cases, thereby causing two rapists to go free and threatening the safety of women on campus. The article asserted that

14

"both students experienced errors in the handling of their cases and saw their findings overturned in bizarre fashion."

83.    In the article, UMF's then-interim president, Eric Brown, responded on behalf of the University. Defendant Brown has a personal connection to Jane Roe 1, as his son had been taught by Jane Roe 1's mother. When asked to comment on the story, however, Brown did not disclose his prior relationship to Jane Roe 1. He made no statement that the article was inaccurate or incomplete, and failed to explain and defend UMF's investigation and decisions regarding the Title IX allegations made by Jane Roe 1 and Jane Roe 8. He did not mention how Jane Roe 7's PFA had tainted the only decision that had gone in Jane Roe 1's favor, or how Jane Roe 7's PFA order had been vacated because Jane Roe 7 had lied to the judge. Nor did Defendant Brown point out that Jane Roe 1's allegations had been struck down by a Panel chosen by UMF's president, or that both the Panel and Investigator Rodas had found that Plaintiff and Jane Roe 1 had been "aligned on mutual, verbal consent" with respect to the September 2017 encounter. Instead, Defendant Brown told the BDN that the two women "showed great courage."

84.    In an email to Plaintiff's attorney, Walter Hanstein, Ms. Rhoda stated that she had been given access to the Title IX case materials and had used them to write her article.

85.    The next day, January 29, 2019, Interim President Brown emailed all UMF staff, students, and members of the Board of Visitors about the BDN article. In the email, he neglected to mention any of the exculpatory evidence from any of the hearings. Instead, Brown supported the allegations of wrongdoing, implying that Plaintiff had in fact assaulted Jane Roe 1 and calling her a "victim." Brown also stated that the BDN article recounted a

15

painful experience that Jane Roe 1 had had at UMF, and repeated his praise of Jane Roe 1 for her "great courage." Defendant Brown closed the email by stating that he was "personally moved and saddened" by the article.

86.     Ms. Rhoda then wrote a follow-up story in the BDN on February 7, 2019, entitled "Students confront UMF officials about handling of rape cases." This article referred to a gathering of about 100 people on campus, assembled to ask questions of Brown. The article stated that the group's questions stemmed from a BDN report of how UMF had "made errors in the cases of two female students who reported being raped." Brown did not contradict the BDN's assertion; instead, he agreed that UMF had erred in its handling of the allegations against Plaintiff and stated that UMF needed to make changes: "I don't think we're at a point in time where we can depend on your faith. I don't think this tonight is about being convincing in that way. What I would say is, I think we have to be action oriented. We have to take steps that you can verify."

87.     Completely absent from Brown's statements was any mention of the verifiable steps that *had* in fact been taken in Jane Roe 1's Title IX case, such as conducting interviews, holding hearings, and reaching a finding that Jane Roe 1 had given ongoing consent.

88.     Another article followed from Ms. Rhoda, dated February 16, 2019, and entitled "More women step forward about sexual assault cases at UMF to spark changes." This article characterized the two women from the previous article as having "described in detail how the university failed them after they were raped."

16

89.     Although Defendant Brown knew that Plaintiff had been cleared of the rape charges, he continued his pattern of failing to correct the BDN's presumption that Plaintiff was guilty, thereby allowing public perception to stand that Plaintiff had raped Jane Roe 1.

90.     On March 1, 2019, Plaintiff met with Brian Ufford, Hope Shore (Assistant Director of Student Life & Deputy Title IX Coordinator), and Defendant Liz Lavoie (Deputy Title IX & Sexual Assault & Violence Prevention Coordinator). They notified him that UMS was placing him on an "interim suspension." Effective immediately, UMS would not permit Plaintiff to go to class or to his job at the Fitness Center. The stated reason for this suspension was that a new Title IX claim had been filed against him. The person filing the complaint was none other than Jane Roe 2, the former roommate who had graduated in 2017 after admitting in writing that she had raped Plaintiff.

91.     Despite having taken no action on Plaintiff's reports of Jane Roe 2's assault against him, UMS suspended him based on her allegations against him, made long after she had graduated.

92.     Mr. Ufford, Ms. Shore, and Defendant Lavoie told Plaintiff that UMS had assigned the investigation to Defendant Fiacco. They praised Mr. Fiacco as an excellent Title IX investigator who would leave no stone unturned.

93.     Defendant Lavoie admitted during this meeting that UMS should have started investigations of both Jane Roe 2 and Jane Roe 7 in response to Plaintiff's reports. Defendant Lavoie explained that Jane Roe 2's graduation did not protect her from Title IX allegations, nor did Jane Roe 7's withdrawal from UMF shield her from Plaintiff's allegations of Student Conduct Code violations. UMS is able to pursue investigations against former

17

students; sanctions can include placing the investigation results on that student's record or even revoking a previously issued diploma or degree.

94.    Despite Defendant Lavoie's statements, UMS continued to take no action against either Jane Roe 2 or Jane Roe 7 on Plaintiff's behalf.

95.    That same day, although the next BDN story had yet to be published, one of Plaintiff's former co-workers told people at the Fitness Center about the upcoming article. Somehow she was aware of what Ms. Rhoda was going to write even before it was printed.

96.    During the March 1 meeting, UMS notified Plaintiff of the suspension in a letter issued by Defendant Fiacco. The letter alleged that between fall 2015 and spring 2017, Plaintiff had engaged in prohibited conduct against Jane Roe 2: (i) engaging in sexual intercourse with Jane Roe 2 multiple times through the use of coercion; (ii) on one occasion preventing Jane Roe 2 from leaving a room in their residence for 45 minutes; and (iii) on one occasion striking Jane Roe 2 with his elbow, causing her to bleed from her lip. A true, redacted copy of this March 1 letter from Defendant Fiacco is attached as **Exhibit A**.

97.    Although Defendant Fiacco's letter did not offer Plaintiff any prior notice or a hearing of any kind, it essentially reinstated the punishment initially ordered in the vacated Committee decision. It stated that Plaintiff's suspension barred him from UMF and all UMS property, and from attending classes, while the matter was pending. It instructed him to vacate campus property immediately and threatened him with arrest if he returned.

98.    The suspension letter from Defendant Fiacco offered Plaintiff one option for challenging the interim suspension: "If you wish to challenge the interim action, you may seek review of this decision by requesting the President or designee to review the decision.

The Campus President or designee will review the request within five (5) business days of receipt of your request."

99.     Jane Roe 2, having graduated in 2017, was no longer on campus at the time UMF suspended Plaintiff in 2019. Plaintiff's attorney, Thomas Carey, challenged the interim suspension as unwarranted and burdensome in a letter to Defendant Brown: "[Jane Roe 2] is currently residing in California and is not a student at the University of Maine at Farmington. [John] is still a student and the interest of him attending classes in order to graduate UMF certainly outweighs these unfounded and defamatory allegations. [John's] employment is also connected to UMF. This interim suspension has the effect of not allowing him to work and earn an income, which he needs to earn to pay his bills and pay for the necessities of life."

100.    Attorney Carey's letter also stated that Jane Roe 2's allegations were false, especially in light of her written admission that she had been sexually aggressive to Plaintiff. The letter emphasized that Plaintiff had reported Jane Roe 2's actions to UMS, and that UMS had taken no action in response. Attorney Carey's letter characterized the new allegations against Plaintiff as retaliatory, most likely connected with Jane Roe 1 and Jane Roe 7, as those two women had solicited Jane Roe 2 to come forward with these false allegations.

101.    Defendant UMS responded to Plaintiff in a letter from Kim-Marie M. Jenkins, Ed. D., dated March 14, 2019. The letter neglected to address that Jane Roe 2 had graduated and was in no danger on the UMF campus. Instead, the letter repeated that the alleged behavior was "serious" and a "potential threat to campus safety."

102.    Ms. Jenkins reasoned: "[T]his is not the first time allegations of this nature have been made against you. Though an appropriate investigation and due process remain to be concluded, there is initially sufficient reason to believe your behavior has endangered multiple women." The letter, however, did not identify any other women, nor did it acknowledge that Plaintiff had been cleared of the charges made by Jane Roe 1 or that a judge had rejected Jane Roe 7's claims as false.

103.    UMS did not schedule any hearing relating to Jane Roe 2's allegations against Plaintiff.

104.    About one week after Plaintiff had been told that Defendant Fiacco would perform a thorough investigation, Defendant UMS replaced him without explanation and reassigned the investigation to Defendant Scott Helmke, a 2015 law school graduate.

105.    Around the same time Ms. Jenkins issued her decision (March 14, 2019), Leah Brackett, the director of UMF's Fitness Center, posted a warning to all students on Facebook, using Plaintiff's real name: "Heads up—[John Doe] is not permitted to enter the [Fitness Center]. If he does, you are to call public safety immediately."

106.    On March 5, 2019, Ms. Rhoda published another article in the BDN, entitled "UMF takes 'immediate steps' to ensure safety after multiple women say student assaulted them." For a third time, she quoted Defendant Brown, who persisted in his failure to mention any of the evidence or determinations in Plaintiff's favor.

107.    Brown's comments in this article went further, suggesting (contrary to UMS's Panel decision) that Plaintiff was responsible for sexual assault: "Any allegation of sexual abuse or violence on our campus must be taken seriously no matter when it occurs, and that

is especially important when the claims all involve conduct and actions by a single individual,

***as appears to be the case here***." (Emphasis added.)

108.    When Plaintiff realized that Ms. Brackett had posted about him on Facebook

using his real name, he emailed Hope Shore, Assistant Director of Student Life & Deputy

Title IX Coordinator, providing her a screenshot of the Facebook post:

> So that is the head boss at the [Fitness Center] posting on a student page. I thought
> these matters were suppose[d] to be private. I was informed she has also been talking
> to students about the matter since a former employee told me about it. I've also
> heard rumors that UMF is investigating itself for leaks at the administrative level can
> you confirm this? Last investigation a UMF admin talked to my land lord about what
> had occurred and a former student harassed me and told me the campus police are
> telling people about me. I told Brian about the harassment and the campus police.
> Does UMF not believe in following their own rules? I hope for a response as soon as
> possible.

109.    A few days later, Ms. Shore emailed a response that seemed to ignore the

screenshot that Plaintiff had sent:

> Thank you for your email and phone message. I want you to know that we do handle
> these matters privately and do not disclose information to those individuals who do
> not need to know. If you feel that there is a specific employee who is telling
> information about you to a person, who does not need to know, please provide me
> with their name, what information has been shared and to whom. I would be happy
> to address is [sic] or pass it on to someone who can look into the matter.

110.    Plaintiff wrote back to Ms. Shore: "So are you saying it was appropriate for

Leah Brackett to post this information to Facebook student pages? And not a violation of

privacy?"

111.    Ms. Shore never responded to Plaintiff. Instead, she referred his concerns to

another UMF employee, Amie Parker.

112.    Plaintiff emailed Defendant Lavoie about his privacy concerns, stating that he

had no confidence in Ms. Parker because, among other things, Ms. Parker (1) was the one

21

who told him in 2017 that the school could not investigate or do anything about Jane Roe 2's assault of him; and (2) refused to allow him to attend the BAM dance club or his job in spite of the court's PFA—agreed to by Jane Roe 1—that allowed Plaintiff to attend both.

113.   Defendant Lavoie responded to Plaintiff that Leah Brackett had committed no violation by posting to Facebook using Plaintiff's full name.

114.   Next, on or about April 12, 2019, Defendant Brown sent a campus-wide email, stating that UMS was "in the process of establishing an ongoing Student Advocacy group" whose intent would be "to assure that by bringing together representative faculty, staff, alumni, and community partners, the campus does not lose the momentum or direction it has generated over the past few months."

115.   Mr. Brown's email gave authority for shaping this UMF Student Advocacy group to an Facebook group called "Look Us In The Eyes," which was not an official UMF student group: "Both the Campus Violence Prevention Coalition and Look Us In The Eyes, among other entities, are involved in determining the final shape and responsibilities of this standing Advocacy group."

116.   Late in the day on or about May 1, 2019, Plaintiff received two new Title IX complaints against him, from Jane Roe 3 and Jane Roe 4.

117.   Plaintiff and his attorney, Thomas Carey, met with the newly-assigned Title IX investigator, Defendant Helmke, on May 3, 2019, to discuss the allegations made by Jane Roe 2. Plaintiff provided the details about the occasion on which Jane Roe 2 raped him. He showed Helmke the text in which Jane Roe 2 admitted the rape. Defendant Helmke confirmed at the meeting that Jane Roe 2 would lose her diploma if what Plaintiff said was

true. Plaintiff also provided names of witnesses who could tell Helmke what had really happened, including prior instances when Jane Roe 2 had threatened him. Defendant Helmke never contacted any of Plaintiff's witnesses as part of his so-called investigation.

118.    Plaintiff offered to enter into mediation with Jane Roe 2 to resolve the matter, but Helmke responded that mediation is generally not allowed in matters involving sexual allegations. Then he changed course and stated that he would look into mediation, as this was a unique case given Plaintiff's allegations against Jane Roe 2.

119.    As for the new Title IX allegations filed by Jane Roe 3 and Jane Roe 4, Defendant Helmke had told Attorney Carey before the May 3rd meeting that Plaintiff would not be expected to respond to those allegations so soon after both complaints had been filed.

120.    Defendant Helmke did not record the May 3rd meeting, so there is no recording or transcript of it.

121.    After the May 3rd meeting, Attorney Carey emailed Helmke, again providing names and contact information for witnesses who could relate what had really happened with respect to Jane Roe 2. He urged Helmke to contact them.

122.    For months after that, Defendant Helmke went silent. Plaintiff's attorney wrote three emails or letters to him, all without response. Plaintiff's attorney also called and left messages for Helmke on multiple occasions, again without a reply.

123.    Given UMS's silent treatment, Plaintiff was trapped. He could not refute Jane Roe 2's Title IX claims and clear his name; there were no scheduled proceedings and no

deadlines for action. Due to the "interim" suspension remaining in place for over six months, he was not able to return to school or work.

124.    On August 26, 2019, Plaintiff's new attorney sent a draft of the initial complaint in this action to James Thelen, general counsel for Defendant UMS.

125.    The following day, August 27th, Plaintiff's attorney sent Mr. Thelen a copy of a recent decision from the United States Court of Appeals for the First Circuit, *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56 (1st Cir. 2019), which held that a public university is required to grant a hearing to a student prior to a suspension pending investigation.

126.    In the email, Plaintiff's attorney asked that—based on how closely *Haidak* mirrored the facts of this case—Defendant UMS immediately agree to terminate the pending suspension and restore Plaintiff's access to UMF, so he could complete the classes required to complete his degree. Plaintiff's attorney emphasized that classes at UMF were about to begin, and that the suspension needed to end so that Plaintiff could be on campus and participate in classes.

127.    After these communications from Plaintiff's attorneys, Plaintiff received a letter dated August 30, 2019, from Defendant Lavoie. A true, redacted copy of Lavoie's August 30th letter is attached as **Exhibit B.** In her letter—although Plaintiff had never received any hearing, as required—Lavoie characterized UMS's anticipated decision whether to admit Plaintiff to classes for fall 2019 as being based on a "review": "It has been brought to my attention that based on a recent court case Haidak v. University of Massachusetts – Amherst {No. 18-1248 (1st Cir. 2019), relating to the process requirements for imposing

Interim Suspensions, the University will be conducting a review of your continued Interim Suspension for the 2019-2020 academic year."

128.   Defendant Lavoie's letter addressed what evidence UMS intended to consider, this time calling the process a "re-review": "The University will be reviewing the information collected in the course of the investigations to date and relevant prior disciplinary history. If, however, you would like to provide any additional information for the University to consider regarding your continued Interim Suspension, the University is affording you and the Reporting Party the opportunity to submit any statement, and/or supporting information for review of your continued Interim Suspension status. If you would like to submit a statement and/or supporting information for re-review of your Interim Suspension, please submit this information to me via email [email address], by 4:30pm (EST) on Wednesday, September 4th, 2019."

129.   Plaintiff was in touch with the witnesses whose names and contact information he had provided to UMS to refute Jane Roe 2's allegations. Those witnesses confirmed to Plaintiff that they had never been contacted by Defendant Helmke, but one of them indicated that she had just received phone messages from a new (third) investigator, Defendant Kenda Scheele.

130.   Defendant Lavoie's letter promised to respond to Plaintiff's request for a resolution no later than 4:30pm EST on Wednesday, September 11, 2019.

131.   After Plaintiff received this letter, he called Defendant Lavoie and had a conversation with her and the newly assigned investigator, Defendant Scheele. They explained that Defendant Helmke had been "too busy" to investigate the case. Scheele

indicated that she would be using the information Helmke had gathered and continuing the investigation, thereby causing further delay. She scheduled a telephone interview with one of Plaintiff's witnesses for Friday, September 6, then canceled and rescheduled it, and then canceled the rescheduled call. She never interviewed this witness.

132.    UMS never offered Plaintiff a hearing on the issue of his suspension.

133.    Next, on September 7, 2019, Defendant Fiacco emailed a letter to Plaintiff, indicating that he had been assigned to conduct the review of Plaintiff's suspension. A true, redacted copy of Fiacco's September 7 letter is attached as **Exhibit C**.

134.    The September 7th letter reiterated the allegations of Jane Roe 2, but contained no updates, such as any statements from Plaintiff's witnesses who refuted her allegations.

135.    Nor did the letter specify how—given that Jane Roe 2 had graduated two years prior and was living in California—Plaintiff represented a threat to the university community.

136.    The letter echoed UMS's earlier verbiage about conducting a "review" of the status of Plaintiff's suspension: "I have been assigned to review the status of your interim suspension that was issued on March 1, 2019." **Defendant Fiacco wrote** that he would decide "whether, and under what circumstances, the interim suspension issued to you on March 1, 2019 should continue." He promised to communicate his decision to Plaintiff no later than the close of business on Monday, September 16, 2019.

137.    Notably, in the September 7th letter, Defendant Fiacco still did not offer Plaintiff a hearing. Instead, the letter merely offered a 1-hour telephone interview without any due process protections.

138.    On September 9, 2019, the day Plaintiff filed his initial Complaint in this action, Defendant Lavoie emailed Plaintiff to see if he would like to start the process of reviewing his report that Jane Roe 2 had sexually assaulted him.

139.    Plaintiff responded, "I want [Jane Roe 2] investigated.  I have been asking for help for a long time as well as making reports." Plaintiff and Lavoie attempted to set up a time to meet, but were unable to coordinate a meeting time.  Defendant Lavoie never followed up again to schedule with Plaintiff.

140.    On September 11, 2019, after the BDN published an article titled "A student cleared of rape sues Maine's university system for not protecting him more," Plaintiff became aware of a Facebook post about him by someone he did not know. The post read as follows:

> Oh this sh*t just gets better and better. Not only did the scumbag get let off by the former president after being found guilty, and has now been let off a second time by the new president, BUT THATS NOT ALL!! Now hes suing the Umaine system. So not only did he get away with multiple sexual assaults, now hes going to get a big payday out of it too. On an unrelated note, do I still know anyone around Farmington with a good brick-throwing arm?

141.    A few days later, the BDN published another article entitled "Student suing Maine's university system is under investigation." In the online comments section following the article, someone threatened to take Plaintiff out to sea and leave him there.

142.    After learning of the Facebook post and the comment on the BDN page, Plaintiff feared for his own safety.

143.    Defendant Fiacco interviewed Plaintiff on September 12, 2019—over six months after the start of the interim suspension—as part of the "review" of the suspension. Plaintiff never received a suspension hearing relating to Jane Roe 2's allegations.

144.    Also on or about September 12, 2019, Defendant Helmke wrote a two-sentence memorandum about the May 3rd meeting, falsely stating that Plaintiff had provided no substantive information and that Plaintiff had declined to give an account of any of the complaints against him, even though Helmke had told Plaintiff and his attorney at the meeting that UMS was not expecting Plaintiff to respond to the new complaints against him from Jane Roe 3 and Jane Roe 4 at that time.

145.    Mr. Helmke did not send this memorandum to Plaintiff until weeks later, on October 22, 2019.

146.    On or about September 13, 2019, Plaintiff received word that a new Title IX complaint had been filed against him by another individual (Jane Roe 5).

147.    On September 20, 2019, Defendant Fiacco sent Plaintiff a letter communicating his decision to continue the Interim Suspension. Defendant Fiacco "determined that [Plaintiff's] continued presence on any University of Maine System campus during the investigation and discipline proceedings is likely to pose a substantial threat to the UMS community and sufficient exigent circumstances exist to warrant the continuation of the interim suspension status." A true, redacted copy of Fiacco's September 20, 2019 letter is attached as **Exhibit D**.

148.    Defendant Fiacco's letter stated that he based his decision on the allegations of Jane Roe 1 (even though Plaintiff had been fully exonerated of sexual assault in that matter), as well as the new allegations by Jane Roes 3, 4, and 5, none of which had been adjudicated.

149.     Meanwhile, Plaintiff had learned that Jane Roe 1 had filed a complaint against UMS with the Maine Human Rights Commission (the "Commission"), based on the outcome of the Title IX investigation she had initiated against Plaintiff.

150.     In her complaint with the Commission, Jane Roe 1 lodged largely the same accusations against UMS as were published by the BDN. She claimed that her Committee-level "win" in the Title IX proceedings had been unfairly overturned and that UMS had made significant mistakes in resolving her accusations against Plaintiff.

151.     UMS's response to Roe 1's Commission complaint was quite unlike the retaliatory public comments made by Defendant Brown in the wake of the BDN articles. In its August 2018 Commission filing, UMS vigorously defended the fairness and thoroughness of its investigatory and adjudicative process.

152.     For example, UMS stated that it had "conducted a prompt, thorough, and fair investigation into [Roe 1's] allegations and adjudicated the charges against [Plaintiff] in three levels of impartial and equitable review, during which time [Roe 1] was permitted to present any and all evidence to support her allegations and dispute any testimony or evidence presented by [Plaintiff]."

153.     UMS further asserted that it "did not give preferential treatment to either party's evidence," that Roe 1's "allegation that she was denied the opportunity to see and respond to all of the evidence is false," and that her "allegation that she was discriminated against throughout the investigation and adjudication process is false."

154.     UMS also clearly stated to the Commission that it "ultimately found [Plaintiff] not responsible for sexual assault."

155.    Defendant Brown could have responded to the BDN articles with the identical statements UMS made to the Commission,[1] emphasizing the thoroughness and correctness of the Title IX investigation and adjudicatory process. He did not.

156.    On October 9, 2019, Defendants Helmke and Scheele interviewed Plaintiff regarding the allegations made by Jane Roe 2 and Jane Roe 4.

157.    At the October 9th interview, Defendant Scheele stated that she had spoken with one of Plaintiff's witnesses.

158.    Also at the October 9th interview, there was a lengthy discussion of the Facebook group "Look Us In The Eyes," but UMS ultimately omitted that discussion from the transcript of the interview.

159.    On October 18th and 22nd, Defemdant Helmke emailed Plaintiff stating that he was not allowed to share names or information about one Title IX complainant with the other complainants, and that he would redact names on all documents.

160.    On October 22nd, Defendant Helmke responded to Plaintiff's protests by promising to include the discussion of the Look Us In The Eyes group in the October 9th transcript. Helmke wrote: "While you may be correct about this being a retaliatory group, whether they are or not is not part of our investigations."

161.    Then, on October 25, 2019, Plaintiff received word of another new Title IX complaint against him by another individual (Jane Roe 6), based on events that she alleged occurred in 2015.

---

[1] Defendant Brown would not have needed to compromise the identities of any of the parties or witnesses to make these statements; he could have made substantively the same assertions using aliases, as has been done in this Complaint.

162.    Defendant Lavoie and Hope Shore had contacted Jane Roe 6 multiple times, over several months, in an attempt to induce her to file her complaint.

163.    On or about November 23, 2019, Plaintiff and his girlfriend were harassed in public regarding the allegations that had been made against him.

164.    On December 2, 2019, Attorney Carey emailed Defendant Scheele stating that, in 2015, Plaintiff and another student had reported Jane Roe 2 to their dorm's Community Assistant. This report had been necessitated by Jane Roe 2's suicidal threat and her threats against Plaintiff. Attorney Carey requested that Defendant Scheele locate and place the 2015 report in the Jane Roe 2 file.

165.    In his December 2nd email, Attorney Carey included numerous texts from Jane Roe 2, including the one in which she admitted to raping Plaintiff and apologized for doing so. Carey identified the sender and recipient of each text, and stated that if Scheele had any questions about the texts, she should contact him. She did not do so.

166.    Finally, in the December 2nd email, Attorney Carey expressed concern that Jane Roe 2's file referenced Jane Roes 3 and 4, and vice versa, without redactions.

167.    Defendant Helmke had stated twice in writing to Plaintiff and Carey that he was not allowed to commingle information in this way, Despite promising to redact all names, he had not done so.

168.    Defendant Scheele never responded to this concern.

169.    On December 10, 2019, UMS conducted a hearing relating to the allegations made against Plaintiff by Jane Roe 4.

170.   Defendant Helmke failed to record most of the Jane Roe 4 hearing, taping only Plaintiff's closing statement.

171.   After receiving written summaries of the Jane Roe 4 hearing from Defendant Helmke and Hope Shore, Plaintiff emailed them multiple corrections and additions, including the following:

-   Jane Roe 4 stated that BDN reporter Erin Rhoda had contacted her, given her Plaintiff's name, and told her that he was the person referred to in the BDN article of January 28, 2019;

-   Jane Roe 4 stated that she was mad at the university and mad that former UMF president Kate Foster had allowed Plaintiff to "get away with it";

-   Defendant Helmke answered for Jane Roe 4 when Plaintiff asked her whether she was part of "Look Us In the Eyes." Defendant Helmke interjected: "I believe it was stated that she was not." But Jane Roe 4 immediately interrupted, stating, "Yes I am"; and

-   Jane Roe 4 said, "They told me to report him." When asked to specify who had told her report Plaintiff, Jane Roe 4's first response was Defendant Lavoie.

172.   On December 20, 2019, Defendant Helmke issued a decision finding Plaintiff "Not Responsible" for all charges in Jane Roe 4's matter.

173.   Ultimately, Jane Roe 3 opted not to proceed with her Title IX matter against Plaintiff.

174.     Defendants UMS and Scheele finally conducted a hearing regarding the allegations made by Jane Roe 2 on January 9, 2020, ten months after Defendant Fiacco had suspended Plaintiff.

175.     In emails to Defendant Scheele before the hearing, Plaintiff stated that in the 2017 interview he had told Laura Rodas and Brian Ufford about Jane Roe 2 sexually assaulting him, and that Amie Parker had subsequently told Plaintiff that the school had no ability to investigate Jane Roe 2 because she already had graduated.

176.     During the hearing, Jane Roe 2 admitted to coercive and abusive behavior, including sexual assault. She conceded that "there were many times that [Plaintiff] wanted to stop but she kept going."

177.     In spite of Attorney Carey's email a month earlier, Ms. Scheele stated at the hearing that the texts were so confusing that it was impossible to tell who they were to or from.

178.     But during the hearing, Jane Roe 2 admitted to sending the text to Plaintiff acknowledging that she had raped him and apologizing for it.

179.     During the hearing, Defendants UMS and Scheele failed to admit into evidence a 2015 report from Plaintiff and another student that would have exonerated Plaintiff.

180.     During the hearing, Defendants UMS and Scheele ignored numerous texts written by Jane Roe 2, which exonerated Plaintiff.

181.     Defendants UMS and Scheele failed to contact Plaintiff's witnesses, whose testimony would have exonerated him in the Jane Roe 2 matter.

182.    Defendant Scheele's file for the hearing indicated that Jane Roe 2 had referenced another student who had accused Plaintiff of Title IX violations, and that student had referenced Jane Roe 2. This indicated that Defendants were commingling evidence from several cases against Plaintiff, despite Defendant Helmke's assurance to Plaintiff that such commingling of evidence would not be permitted.

183.    On January 29, 2020, Plaintiff discovered an old computer file, which contained text messages from 2015 between himself and Jane Roe 6. These texts verified his account of the events and proved that Jane Roe 6 was lying. He forwarded the text messages to Defendant Scheele.

184.    Defendant Lavoie sent Plaintiff a letter dated February 6, 2020, concerning the complaint he had filed against Jane Roe 2. Lavoie stated that UMS would not investigate his complaint. A true, redacted copy of Lavoie's February 6, 2020 letter is attached as **Exhibit E.**

185.    The Student Conduct Code specifically requires that "[i]n cases of alleged sexual assault, domestic violence, dating violence, or stalking the University will provide a prompt, fair, and impartial investigation and resolution."

186.    Defendant Lavoie also stated in her letter that because Jane Roe 2 is no longer a student at the University, "[t]he University does not have jurisdiction under its Student Conduct Code to adjudicate this matter and impose discipline."

187.    The Student Conduct Code specifically states that "[j]urisdiction is determined on the date of the alleged incident."

188.    Defendant Lavoie further stated that, in the course of the investigation of Jane Roe 2's complaint against Plaintiff, evidence provided by Plaintiff regarding his allegations against Jane Roe 2 had been investigated, including the "context surrounding [the] text message" that Plaintiff "contends demonstrates that [Jane Roe 2] admitted to raping you," but that there was no sufficient basis for the University to pursue a formal investigation and adjudication of his complaint against Jane Roe 2.

189.    Finally, Lavoie asserted that UMS would not undertake an investigation because Plaintiff's complaint against Jane Roe 2 had been "covered under the terms of the Settlement Agreement."

190.    On February 13, 2020, Attorney Carey responded by sending a letter from Plaintiff requesting review of UMS's decision not to investigate his complaint against Jane Roe 2. In his letter, Plaintiff detailed the number of attempts he had made to notify UMS officials of the assault, as well as the inconsistent information he had received from Lavoie about whether UMS had jurisdiction over Jane Roe 2 as a former student.  A true, redacted copy of Plaintiff's letter is attached as **Exhibit F.**

191.    On February 28, 2020, Jessica Chubbuck, chair of the Student Conduct Committee, wrote to Plaintiff and Jane Roe 2 communicating the Committee's decision to uphold Lavoie's decision not to investigate Plaintiff's complaint against Jane Roe 2.

192.    On March 17, 2020, Defendant Scheele issued findings of "Not Responsible" on all Title IX charges brought by Jane Roe 6 against Plaintiff.

193.    In her "Rationale for Findings," Defendant Scheele stated: "The Reporting Party has submitted information that contains significant material inaccuracies (examples:

date/time frame of the alleged incident, which impacted the Reporting Party's statement that her relationship with the Responding Party did not continue after the incident, and the nature of her involvement with a Facebook group). Therefore, I have reasons to question the credibility of the Reporting Party's account of what occurred, and I cannot conclude, based on the preponderance of the evidence (more likely than not), that the alleged incident occurred."

194.    On that same day, however, UMS found Plaintiff "Responsible" on several charges stemming from the allegations made by Jane Roe 2. It issued a sanction of dismissal.

195.    UMS issued this decision and sanction over a year after Plaintiff had been placed on an interim suspension without a hearing. During that entire year, Plaintiff was unable to attend class on campus, perform his job at the Fitness Center, or escape from the constant harassment and threats, all fueled by Defendant Brown's public commentary that consistently insinuated Plaintiff's guilt.

196.    On June 16, 2020, the Student Conduct Code Committee voted to uphold Plaintiff's dismissal in the Jane Roe 2 matter. Plaintiff timely appealed the decision and sanction.

197.    On July 9, 2020, Defendant Scheele emailed Plaintiff to state that Jane Roe 5 had ceased to participate in the Title IX process. As a result, UMS suspended its investigation due to a lack of information.

198.    Thus, as all other charges had either been adjudicated in Plaintiff's favor or abandoned, the only Title IX matter for which he was found responsible and sanctioned was the one involving Jane Roe 2.

199.    On July 20, 2020, Defendant Lavoie emailed Plaintiff with the names of the members of the Appeal Committee in the Jane Roe 2 matter. She told Plaintiff that she expected to receive the results of the appeal in a week or two.

200.    On September 5, 2020, Defendant Lavoie wrote to Plaintiff and his parents: "Unfortunately, the Presidential appeal committee has not released its outcome yet. I was in touch with the Chair this week however, due to many circumstances (not related to the case) the matter is not resolved. I will be in touch with an update no matter what next week."

201.    On September 18, 2020, the Appeals Committee at UMS finally issued a brief ruling, upholding the dismissal sanction imposed against Plaintiff in the Jane Roe 2 matter.

202.    Plaintiff has been deeply affected by UMS's actions. He has lost 25 pounds. He has nightmares and trouble sleeping. He worries about being harassed and assaulted. He has sought counseling, and has been on medication, both of which generate significant costs.

203.    Plaintiff has completed online all remaining classes required to graduate, but has been denied a UMS degree due to his dismissal.

204.    UMS has also unlawfully prevented Plaintiff from performing his job at the Fitness Center during the relevant time period, thereby causing him to lose wages.


## COUNT I
### (Violation of Title IX by Defendant UMS – Hostile Educational Environment)

205.    Plaintiff repeats the allegations contained in paragraphs 1 through 204.

206.    Based on the foregoing, in separate incidents, Plaintiff was subjected to harassment based on his sex by two other students at UMF.

207.   UMS created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* in that (i) Plaintiff was a member of a protected class; (ii) UMS had actual knowledge of the other students' sexually harassing behavior against Plaintiff; (iii) the sexually harassing behavior was in UMS's programs and activities; (iv) the sex-based harassment of Plaintiff was so severe, pervasive, and objectively offensive that it deprived him of access to educational opportunities and benefits provided by UMS; and (v) UMS was deliberately indifferent to the harassment, such that its lack of response was clearly unreasonable in light of the known circumstances.

208.   Plaintiff has suffered damages, including interference with his educational opportunities, as a direct and proximate result of UMS's violation of his Title IX rights.

209.   UMS's actions have caused Plaintiff harm, including but not limited to emotional distress.

## COUNT II
### (Violation of Title IX by Defendant UMS – Selective Enforcement)

210.   Plaintiff repeats the allegations contained in paragraphs 1 through 209.

211.   When Plaintiff, a man, reported that he had been sexually assaulted by Jane Roe 2, UMS took no action.

212.   However, when two women, Jane Roe 1 and Jane Roe 2, both falsely accused Plaintiff of sexual assault, UMS took action against Plaintiff under Title IX.

213.   Plaintiff, Jane Roe 1, and Jane Roe 2 were all similarly situated as Title IX complainants when they reported to UMS that they had been sexually assaulted.

214.    Both the severity of the penalties against Plaintiff and the decisions whether to launch Title IX investigations were due to Plaintiff's gender.

215.    UMS was motivated by Plaintiff's gender in its inconsistent decisions not to initiate any investigation in response to his reports of sexual assault, while initiating investigations against Plaintiff for similar allegations.

## COUNT III
### (Violation of Title IX by Defendant UMS – Procedural Due Process)

216.    Plaintiff repeats the allegations contained in paragraphs 1 through 215.

217.    Plaintiff meets the definition of a complainant under Title IX.

218.    UMS had actual knowledge of sexual harassment perpetrated against Plaintiff, as Plaintiff made repeated complaints of Jane Doe 2's abuse to multiple UMS employees, including UMS Title IX investigators.

219.    UMS failed to respond promptly, and its communication with Plaintiff regarding Jane Doe 2's abuse clearly demonstrated deliberate indifference to Plaintiff: multiple Title IX investigators discouraged Plaintiff from filing a report by falsely indicating that nothing could be done due to lack of jurisdiction over the respondent.  These statements were clearly unreasonable in light of contrary information in the Student Conduct Code.  UMS's response violated Title IX.

220.    In addition, UMS through its Interim President Brown made repeated public statements that amounted to a public campaign against Plaintiff. Brown also elevated the Look Us In The Eyes group to official status at UMF, despite its obvious retaliatory motive against Plaintiff.

221.    Brown's campaign as UMF's then-Interim President irreversibly tainted Plaintiff's reputation and infected the Title IX investigatory and adjudicative process in the Jane Roe 2 matter, such that Plaintiff was unable to obtain a fair resolution of the claims made against him, in violation of his rights as an accused under Title IX.

## COUNT IV
### (Title IX Retaliation by Defendant UMS)

222.    Plaintiff repeats the allegations contained in paragraphs 1 through 221.

223.    Plaintiff engaged in protected activity under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX").

224.    UMS was aware of Plaintiff's protected activity.

225.    UMS undertook action against Plaintiff in response to his protected activity by engaging in a series of adverse actions, including but not limited to (i) barring Plaintiff from his place of employment; (ii) suspending Plaintiff; (iii) making public statements suggesting that, although Plaintiff had been fully exonerated of sexual assault in both disciplinary proceedings, those findings had been made in error; (iv) improperly providing the Title IX case files against Plaintiff to the press and others; and (v) failing to disclose to the press that the disciplinary proceedings against Plaintiff for sexual assault and/or rape had been dismissed for exculpatory reasons.

226.    A retaliatory motive played a substantial part in prompting UMS's negative actions against Plaintiff.

227.    By virtue of the foregoing, UMS has violated Plaintiff's right to be free from retaliation, intimidation, coercion, and intimidation related to his protected activity.

228.    UMS's actions have caused Plaintiff harm, including damage to his reputation and emotional distress.

## COUNT V
**(42 U.S.C. § 1983: Violation of Procedural Due Process)**
**(Claim for Damages against Defendants Fiacco, Lavoie,**
**Scheele, Brown, and Helmke)**

229.    Plaintiff repeats the allegations contained in paragraphs 1 through 228.

230.    Plaintiff has a property interest to which the Fourteenth Amendment's due process protection applies, which is the benefit of being enrolled at and progressing toward a post-secondary degree from UMF.

231.    Defendants are state actors who have acted, individually and collectively, to deprive Plaintiff of that property interest without due process of law. This includes but is not limited to his suspension without notice or hearing in March 2019, the delays in his hearing on the merits for ten months, the failure to provide him with an impartial tribunal, the encouragement of the initiation of false claims against Plaintiff, and the dismissal sanction issued against Plaintiff despite the lack of credible evidence, as outlined above.

232.    Defendant Fiacco acted under color of state law in depriving Plaintiff of that property interest without due process of law, including but not limited to the March 2019 suspension without prior notice or hearing, by failing to provide him with a hearing for ten months, and by continuing the interim suspension for over a year prior to Plaintiff's dismissial.

233.    Defendant Lavoie acted under color of state law in depriving Plaintiff of that property interest without due process of law, including but not limited to by failing to

41

investigate Plaintiff's report of sexual assault by Jane Roe 2 based on her erroneous belief that the University lacked jurisdiction.

234.    Defendant Scheele acted under color of state law in depriving Plaintiff of that property interest without due process of law, including but not limited to by failing to adhere to the procedure required by the Student Conduct Code for Title IX investigations and hearings, by failing to act as an impartial tribunal, and by punishing him in spite of a lack of credible evidence.

235.    Defendant Brown acted under color of state law in depriving Plaintiff of that property interest without due process of law, including but not limited to making public statements insinuating Plaintiff's guilt, which encouraged false claims and prejudiced students, staff, faculty, and community members against Plaintiff, thereby irreparably damaging Plaintiff's right to fair and just proceedings.

236.    Defendant Helmke acted under color of state law in depriving Plaintiff of that property interest without due process of law, including but not limited to failing to timely investigate Jane Doe 2's complaint, which led to an unreasonable procedural delay, during which time Plaintiff's suspension continued.

237.    As a result of his unlawful suspension and dismissal, Plaintiff has suffered damages, including the inability to obtain his degree, damage to his reputation, and severe emotional distress.

## COUNT VI
### (Breach of Contract by Defendants UMS and the UMS Board of Trustees)

238.    Plaintiff repeats the allegations contained in paragraphs 1 through 237.

42

239.    Plaintiff entered into a contractual relationship with the University of Maine System by virtue of enrolling at the University for a post-secondary Academic Program, and the terms of that contract are set forth in the Student Conduct Code.

240.    The Student Conduct Code expressly states that it was "accepted by the Board of Trustees" and that amendments to it require action by the Board of Trustees.

241.    Defendant UMS and its Board of Trustees breached the contract by conducting the disciplinary proceeding at issue in this case in a manner that violated Plaintiff's federal and state constitutional rights and contravened the Student Conduct Code's promise of fundamental fairness.

242.    As a direct and proximate result of this breach, Plaintiff has suffered and will continue to suffer economic and emotional damages.

243.    Plaintiff has suffered damages, including interference with his educational opportunities, damage to his reputation, and emotional distress, as a direct result of the Defendants' breach of the Student Conduct Code.


## COUNT VII
### (42 U.S.C. § 1983: First Amendment Retaliation by Defendant Brown)

244.    Plaintiff repeats the allegations contained in paragraphs 1 through 243.

245.    Plaintiff engaged in speech and petitioning activity protected under the First Amendment to the Constitution when he defended himself in the Title IX matter filed by Jane Roe 1 and repeatedly reported Jane Doe 2's abuse to UMS employees.

246.   In response, Interim President Brown engaged in retaliatory conduct, including a campaign of public harassment and intimidation that chilled Plaintiff's speech and discouraged him from judicial redress.

247.   Defendant Brown, through his statements and actions, repeatedly made unprivileged false public statements to the press regarding Jane Roe 1's allegations against Plaintiff.

248.   This conduct, including but not limited to Defendant Brown's multiple statements to the press insinuating Plaintiff's guilt is sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.

249.   These actions of Interim President Brown damaged Plaintiff.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor against Defendants University of Maine System, the University of Maine System Board of Trustees, Eric Brown, David Fiacco, Scott Helmke, Elizabeth Lavoie, and Kenda Scheele and award him:

    a.   Injunctive relief sufficient to vacate his dismissal and permit him to receive his degree at UMF;

    b.   Compensatory damages in an amount that is reasonable in the premises;

    c.   Punitive damages in an amount that would punish Defendants for its reckless disregard of Plaintiff's rights so as to effectively deter similar conduct in the future;

    d.   Reimbursement of his reasonable costs and attorney's fees; and

    e.   Such other relief as the court may deem just and proper.

Dated:  October 19, 2020.

/s/ Richard L. O'Meara
Richard L. O'Meara
Francis D. Bigelow
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651
*E-mail:  romeara@mpmlaw.com*